WASHINGTON GAS LIGHT
CO., Petitioner,

v.

PUBLIC SERVICE COMMISSION OF
the DISTRICT OF COLUMBIA,
Respondent,

Apartment and Office Building Associa-
tion of Metropolitan Washington, Inc.,
Columbia Realty Venture, General Serv-
ices Administration, and People's Coun-
sel, Intervenors.

GENERAL SERVICES
ADMINISTRATION,
Petitioner,

v.

PUBLIC SERVICE COMMISSION OF
the DISTRICT OF COLUMBIA,
Respondent,

Washington Gas Light Co., and People's
Counsel, Intervenors.

APARTMENT AND OFFICE BUILDING
ASSOCIATION OF METROPOLITAN
WASHINGTON, INC., and Columbia Re-
alty Venture, Petitioners,

v.

PUBLIC SERVICE COMMISSION OF
the DISTRICT OF COLUMBIA,
Respondent,

Washington Gas Light Co., and People's
Counsel, Intervenors.

PEOPLE'S COUNSEL, Petitioner,

v.

PUBLIC SERVICE COMMISSION OF
the DISTRICT OF COLUMBIA,
Respondent,

Washington Gas Light Co., Intervenor.

No. 79-587, 79-740, 79-745 and 79-746.

District of Columbia Court of Appeals.

Argued Dec. 6, 1979.
Decided Sept. 10, 1982.

1188

Monte R. Edwards, Washington, D. C., with whom R. Stanley Harsh was on the briefs, for Washington Gas Light Co. Lewis Carroll, Washington, D. C., also entered an appearance for Washington Gas Light Co.

Melvin J. Washington, Asst. Corp. Counsel, Washington, D. C., with whom Judith W. Rogers, Corp. Counsel, and Richard W. Barton, Deputy Corp. Counsel, Washington, D. C., at the time the briefs were filed, were on the briefs, for respondent.

Frann G. Francis, Washington, D. C., for the Apartment and Office Building Association of Metropolitan Washington, Inc., and Columbia Realty Venture.

Sumner J. Katz, Gen. Services Administration, Washington, D. C., with whom Allie B. Latimer, Gen. Counsel, and Spence W. Perry, Asst. Gen. Counsel, General Services Administration, Washington, D. C., were on the briefs, for the General Services Administration.

Elizabeth A. Noel, Asst. People's Counsel, Washington, D. C., with whom Brian Lederer, People's Counsel, Washington, D. C., was on the briefs, for People's Counsel.

Before NEWMAN, Chief Judge, and HARRIS and PRYOR, Associate Judges.

PER CURIAM:

In these consolidated petitions of appeal, the various petitioners have raised numerous objections to a ratemaking decision of the Public Service Commission (the Commission or PSC) granting Washington Gas Company (WGL or the Company) an increase in operating revenues of $7.1 million (of which $3.9 million was included to cover added income taxes).

The proceeding commenced in July, 1977 when WGL filed with the Commission an application to increase its rates and charges for gas service within the District of Columbia. The Company originally sought to

increase its annual gross operating revenues by $8.6 million, so as to produce a 9.85% overall return on investment and a return of 14.5% on common equity. That request was based upon a calendar 1976 test year. On December 1, 1977, the Company filed an amended application based on a test year ending June 30, 1977. The amended application sought a $10.9 million revenue increase in order to produce the same overall rate of return (9.85%) and the same return on equity (14.5%) as were originally requested.

On October 19, 1977, the Commission granted intervention to the Apartment and Office Building Association of Metropolitan Washington, Inc. (AOBA), Columbia Realty Venture (CRV), the General Services Administration (GSA) (representing the consumer interests of the executive agencies of the United States Government), People's Counsel [1] (PC), the Staff of the PSC (Staff), and other parties not pertinent to these appeals. Following lengthy hearings, briefing, and considerable decisional delay, the Commission issued its Proposed Opinion and Order No. 6051 on February 13, 1979 (Order No. 6051). After the parties noted their exceptions to the proposed order, the Commission issued its Final Opinion and Order No. 6060 on March 16, 1979 (Order No. 6060) [2]. The final order, which adopted the proposed order with minor modifications, granted WGL a revenue increase of $7.1 million and authorized rates of return of 9.25% overall (on rate base) and 13.0% on common equity. The Commission also instituted a new rate design which had the effect of increasing the disparities in rates of return among WGL's various customer classes.

Timely Applications for Reconsideration of the Commission's final order were lodged with the PSC by all pertinent parties. See D.C.Code 1981, § 43–904. The Commission thereafter denied those applications in Order No. 6069, issued April 26, 1979, and Order No. 6082, issued May 11, 1979. These petitions of appeal followed.

On appeal, the Company raises eleven separate issues. It challenges as unlawful, unreasonable, or confiscatory the Commission's decisions regarding the rate design, rate of return, attrition, and the treatment of miscellaneous gains, losses, and operating expenses. It also contests the Commission's consideration of federal wage and price guidelines in setting the new rates. The GSA, AOBA, and CRV join the Company in challenging the rate design. People's Counsel supports the Commission on each of the issues raised by WGL, but, together with the GSA, urges that it was error for the Commission to compute WGL's revenue requirements using a tax allowance based on a 48% federal corporate tax rate, when that rate had been replaced by a 46% tax rate prior to the issuance of the Commission's decision.

We conclude that, with respect to all issues, as the decision of the Commission was not unreasonable, arbitrary, or capricious, and as the Commission adequately explained the reasons for its decision, the Commission's order must be affirmed.

## I. SCOPE OF REVIEW

 Our review of the Commission Order is governed in the first instance by D.C.Code 1973, § 43–706, which narrowly circumscribes the scope of our review "to questions of law, including constitutional questions; and the findings of fact by the Commission shall be conclusive unless it shall appear that such findings of the Commission are unreasonable, arbitrary, or capricious." See, e.g., Metropolitan Washington Board of Trade v. Public Service Commission, D.C.App., 432 A.2d 343, 350 (1981); Potomac Electric Power Co. v. Public Service Commission, D.C.App., 402 A.2d 14, 17 (en banc), cert. denied, 444 U.S. 926, 100 S.Ct. 265, 62 L.Ed.2d 182 (1979); People's Counsel v. Public Service Commission,

---

1. The Office of People's Counsel was established by Congress in 1975 to represent the interests of utility consumers in the District of Columbia. See D.C.Code 1981, § 43–406.

2. The new rates went into effect on that date.

D.C.App., 399 A.2d 43, 45 (1979); *Washington Public Interest Organization v. Public Service Commission,* D.C.App., 393 A.2d 71, 75 (1978), *cert. denied,* 444 U.S. 926, 100 S.Ct. 265, 62 L.Ed.2d 182 (1979). To facilitate our review, the Commission must indicate "fully and carefully the methods by which, and the purposes for which, it has chosen to act, as well as its assessment of the consequences of its orders for the character and future development of the industry." *In re Permian Basin Area Rate Cases,* 390 U.S. 747, 792, 88 S.Ct. 1344, 1373, 20 L.Ed.2d 312 (1968); *see Metropolitan Washington Board of Trade v. Public Service Commission, supra* at 351–52. We are obliged to examine the record to determine whether the Commission has acted arbitrarily, and whether each component of the Commission order is supported by substantial evidence. *In re Permian Basin Area Rate Cases, supra,* 390 U.S. at 792, 88 S.Ct. at 1373; *People's Counsel v. Public Service Commission, supra* at 45. We must further ascertain that, in striking a balance between the competing consumer and investor interests, "the Commission has given reasoned consideration to each of the pertinent factors." *Id.* at 45–46 (quoting *In re Permian Basin Area Rate Cases, supra,* 390 U.S. at 792, 88 S.Ct. at 1373).

■ At the same time, in recognition of the authority delegated to the Commission by Congress, and of the expertise of the commissioners in the complex and esoteric area of utility regulation, we accord great respect to the decisions of the commissioners. *See Goodman v. Public Service Commission,* 162 U.S.App.D.C. 74, 78–79, 497 F.2d 661, 665–66 (1974). We have stated that, "Our review of a utility commission order is the narrowest judicial review in the field of administrative law." *Potomac Electric Power Co. v. Public Service Commission, supra* at 17; *accord, Metropolitan Washington Board of Trade v. Public Service Commission, supra* at 351.

■ Theories of ratemaking in particular fall within the special province of the Commission. Although "[a] theory of ratemaking must be reasonable, explained, and

supported, [it] is not subject to the same substantiation principle as the substantial evidence test applicable to fact-finding." *Continental Air Lines, Inc. v. Civil Aeronautics Board,* 179 U.S.App.D.C. 334, 342, 551 F.2d 1293, 1301 (1977). A reviewing court may not supplant valid theories employed by the Commission with those "more nearly to its liking." *Metropolitan Washington Board of Trade v. Public Service Commission, supra* at 352. *Accord, In re Permian Basin Area Rate Cases, supra* 390 U.S. at 792, 88 S.Ct. at 1373; *Potomac Electric Power Co. v. Public Service Commission, supra* at 18. Nor may we "reassess the weights given by a rate-making agency to different factors, absent a legislative direction as to precisely what gravity each factor bears. All that the [reviewing] court may properly do is to consider whether the agency did take into account all the relevant factors and no others." *Association of American Publishers, Inc. v. Governors of the United States Postal Service,* 157 U.S. App.D.C. 397, 403–04, 485 F.2d 768, 774–75 (1973).

Indeed, the Supreme Court has established that it is the "total effect" of a rate order, rather than the theory employed, that determines its validity.

> Under the statutory standard of "just and reasonable" it is the result reached not the method employed which is controlling.... It is not theory but the impact of the rate order which counts. If the total effect of the rate order cannot be said to be unjust and unreasonable, judicial inquiry ... is at an end. The fact that the method employed to reach that result may contain infirmities is not then important. [*Federal Power Commission v. Hope Natural Gas Co.,* 320 U.S. 591, 602 [, 64 S.Ct. 281, 287, 88 L.Ed. 333] (1944) (citations omitted).]

This standard was held applicable to the District of Columbia Public Service Commission in *Washington Public Interest Organization v. Public Service Commission, supra* at 75:

> These statutory criteria [D.C.Code 1981, §§ 43–501, –601, –611, –905, –906]

are akin to those governing the Federal Power Commission and its oversight by the federal courts. In that context, the Supreme Court has held that unless the overall effect of a rate is "unjust and unreasonable," the Commission's order should be approved, irrespective of "infirmities" in the methodology used to calculate it.

*Accord, Metropolitan Washington Board of Trade v. Public Service Commission, supra* at 351.[3]

In *Washington Public Interest Organization v. Public Service Commission, supra,* we clarified our role as a reviewing court in light of the broad authority allotted the Commission under *Federal Power Commission v. Hope Natural Gas Co.* and its progeny:

> While it is true that a regulatory commission cannot be faulted for its methodology if the "total effect of the rate order cannot be said to be unjust and unreasonable," *Federal Power Comm'n v. Hope Natural Gas Co.,* [*supra,* 320 U.S. at 602, 64 S.Ct. at 287], it is also true that the methodology must be disclosed for the bearing it may have on that overall judgment. Absent precise explanation of methodology as applied to the facts of the case, there is no way for a court to tell whether the Commission, however expert, has been arbitrary or unreasonable. [*Washington Public Interest Organization v. Public Service Commission, supra* at 76–77.]

This requirement is intended to assist the reviewing court:

> [B]ecause ratemaking is complicated and understandably prone to technical, often shorthand terminology, there is a substantial risk that agency action will be too conclusional—not elaborate enough—for a non-expert court confidently to review. A court, without insisting on more precise explanation, could simply be fooled into accepting arbitrary agency action by the mesmerizing influence of the confidently expressed language of experts.

\* \* \* \* \* \*

> While our own authority is ... limited, our authority—and responsibility—to find out why an agency acts as it does is considerable. [*Id.* at 78–79.]

We therefore imposed an independent burden on the Commission to explain its actions fully and clearly, by (1) announcing the criteria governing its determination, and (2) explaining how the particular order reflects application of these criteria to the facts of the case. *Id.* at 75.

■■■ Ratemaking orders, as the product of expert judgment, are presumptively valid; the petitioner challenging an order carries the heavy burden of demonstrating clearly and convincingly a fatal flaw in the action taken. *Federal Power Commission v. Hope Natural Gas Co., supra* 320 U.S. at 602, 64 S.Ct. at 287; *Metropolitan Washington Board of Trade v. Public Service Commission, supra* at 351–52; *Potomac Electric Power Co. v. Public Service Commission,* at 18; *Goodman v. Public Service Commission,* D.C.App., 309 A.2d 97, 101 (1973). The additional requirements imposed on the Commission by *Washington Public Interest Organization v. Public Service Commission* do not detract from the presumptive validity of Commission rate orders. Even if the court disagrees with the Commission, if the Commission has fully and clearly explained what it does and why it does it, and the agency decision is supported by substantial evidence, the court, upon a finding that the Commission order is reasonable in its overall effect, should sustain the order.

With these considerations in mind, we turn to the individual assertions of error raised by the parties.

## II. RATE STRUCTURE

AOBA, CRV, GSA, and the Company contend that the rate design prescribed by the

---

**3.** Having discussed the principles governing our substantive review, and the case law establishing them, one is at a loss to comprehend the dissent's accusation that our conclusion amounts to an "unsupported assertion." *Post* at 1263. We are content to leave it to the reader to assess whose assertion is unsupported.

Commission unjustifiably discriminates in favor of certain residential utility customers at the expense of other commercial and industrial customers. We find that the rate design established by the Commission was based upon sound ratemaking principles and ample consideration of the evidence, and that class-based differences in the approved rates are adequately supported in the record by both cost and non-cost factors.

### A. *Background*

Rate design, or rate structure, is the mechanism whereby a utility realizes its revenue requirements. *See* Order 6051, at 80. Costs that are thus recovered include "customer costs," "demand costs," and "commodity costs." Customer costs are the fixed costs incurred in the maintenance of facilities and in providing service to customers.[4] These costs are unrelated to the quantity of gas consumption, and are virtually identical for all utility customers. Demand costs include equipment and storage costs that are incurred in serving customers collectively.[5] Equipment must be capable of meeting peak load requirements; in nonpeak periods storage costs are incurred in maintaining a state of preparedness for peak period demands. Certain WGL customers, especially those who use gas for heating and cooling, are largely responsible for the occurrence of peak periods, and thus bear greater responsibility than others for demand costs. Commodity costs cover the cost of the gas itself, and, in the immediate sense, vary directly with the volume of gas consumed.[6] *See generally* Order 6051, at 81 & n.1; WGL Exh. J, at 12, 17 (testimony of Edmund W. Smallwood).

Prior to 1976 WGL employed a Commission-sanctioned "declining block" rate structure. Under this system initial units of gas purchased were most expensive, in order for the Company to recoup fixed demand and customer costs. Successive purchases were incrementally less expensive, so that average commodity costs varied inversely with consumption. In times when commodity costs were relatively low, the declining block structure, which was inherently promotional, and which reflected economies of scale realized on fixed costs in sales to large scale commodity consumers, was justified on economic grounds, as closely mirroring cost causation. *See In re Washington Gas Light Co.*, 16 P.U.R.4th 261, 278 (D.C.P.S.C. 1976).

In 1976 the Commission, in consideration of escalating gas replacement costs and declining gas availability, reevaluated and rejected the traditional promotional rate structure:

Complicating the cost picture are several factors. One is that existing and new supplies of gas are becoming more and more costly. To the extent that the company must replace gas sold on a promotional basis with higher priced gas, its average costs will escalate. Another factor is that the company's service is limited by gas supply, as well as by pipeline capacity. In these circumstances, traditional allocation techniques must be reevaluated; customers' responsibility for fixed costs must be related more closely to their gas usage. [*Id.* at 278–79.]

Equally important, the Commission recognized the need to "stress conservation of a wasting resource, natural gas," and concluded that "[p]romotional rate structures tend to foster a misallocation of scarce resources." *Id.* at 279.

In lieu of the traditional rate structure the Commission in 1976 approved a two-

---

4. Customer costs include the costs of, for example, maintenance of the regulator, service line, and meter, as well as the service costs of reading meters and billing customer accounts.

5. Demand costs include the costs of the transmission and distribution systems, the storage facilities, and peak-shaving plants.

6. Although in the immediate sense commodity costs do vary directly with the quantity of gas consumed, due to continuing increases in commodity replacement costs, those who currently consume larger quantities of gas cause higher future commodity costs for all gas consumers. Thus perceived, higher commodity costs can rationally be attributed to customers who consume larger quantities of gas.

part rate, comprised of a uniform commodity charge of twenty-one cents per therm, and a "system" or "customer" charge.[7] A uniform commodity charge, it was reasoned, would encourage conservation and eliminate the misallocation problem inherent in the declining block structure. The system charge was designed both to insure that the Company would recoup fixed costs, and also to ease the transition from the declining block structure to a two-part rate structure. The Commission stated, "Our decision rests upon pragmatic as well as theoretical considerations. When a commission ushers in a drastically new rate structure, it has the responsibility—or at least the discretion—to temper radical changes in the historical rate patterns." *Id.* at 280.

Even upon issuance of the 1976 decision the Commission anticipated periodic review and modification of the system charge levels.

> Moreover, in a future general rate case, the commission will consider rate structure again. This case is only the first step in a periodic review of system charge levels. Once customers have had a fair opportunity to adjust to the new rate structure, the company can consider system charges which include more cost ingredients. [*Id.*][8]

### B. The Commission's Action in the Case Before Us

The Commission maintained the two-part rate structure in the instant case, keeping intact the commodity charge, and merely renaming the "system charge," which is now the "customer charge." Order 6051, at 81. Rate schedules, however, were reevaluated and revised. The commodity charge was increased from 21 cents per therm to 32.55 cents per therm. Order 6060, at 5. Customer charges for different classes of customers were modified as follows:

| CUSTOMER CLASS | FORMAL CASE 647 | FORMAL CASE 686 |
|---|---|---|
| | (1976) | (1979) |
| Residential heating | $72/year ($8/month; 9 months/year) | $45/year ($5/month; 9 months/year) |
| Residential non-heating | $45/year ($3.75/month; 12 months/year) | $30/year ($2.50/month; 12 months/year) |
| Small commercial & industrial heating (under 3,000 Ccf) (Ccf = 100 cubic feet) | $148.50/year ($16.50/month; 9 months/year) | $58.50/year ($6.50/month; 9 months/year) |
| Large commercial & industrial heating (3,000 Ccf and up) | $148.50/year ($16.50/month; 9 months/year) | $148.50/year ($16.50/month; 9 months/year) |
| Non-heating commercial & industrial | $84/year ($7/month; 12 months/year) | $84/year ($7/month; 12 months/year) |
| Watergate & Interruptible | $.19/therm | $.30/therm |

*See* Order 6060, Charts A and B; *In re Washington Gas Light Co., supra* at 287; Order 6051, at 90–100.

### 1. Residential Customers[9]

#### a. Heating and Cooling Customers

The Commission explicitly adopted the recommendation of WGL that the monthly

---

**7.** The two-part rate structure further departed from traditional rate schedules in that separate rates were established for different varieties of customers, whereas previously rate schedules had varied by type of use. *See In re Washington Gas Light Co., supra* at 279.

**8.** In the present case, the Commission was perfectly entitled to rely on those findings and principles made in Case 647 which were not peculiar to that individual case, and it specifically found that the basic facts had not changed. Accordingly, we must take those principles into account on judicial review of Orders 6051 and 6060. This conclusion embodies the same policy as provides a major underpinning of the familiar doctrines of res judicata, collateral estoppel, and adherence to precedent.

It would be pointless and wasteful to require the PSC to reinvent the wheel in this and every subsequent proceeding. To do so would turn an already protracted and complex process into an intractable morass, without any corresponding benefit. Therefore, the PSC may rely on principles established in one case, adapting them in light of subsequent experience, until it decides to abandon them.

**9.** The residential customer class includes individually-metered apartment customers, but no group-metered apartment buildings. *See* note 10 *infra*.

The Cooperative Housing Association (CHA) argued to the Commission that because WGL's fixed costs for mains, services, and regulators

charge to residential heating and cooling customers be reduced from $8 to $5, to "soften the adverse impact that a fixed charge each month has on small volume customers." Order 6051, at 95 (quoting WGL Exh. J, at 19–20 (testimony of Edmund W. Smallwood)). Whereas the WGL proposal sought a reduction only for customers who consumed below 100 Ccf per year, however, the Commission remarked that "WGL concedes that there is no real difference in the customer costs based on annual consumption [between customers who consume above and below 100 Ccf per year]," Order 6051, at 96, and therefore applied the $5 charge uniformly to all residential heating and cooling customers.

### b. Non-Heating and Non-Cooling Customers

Residential non-heating and non-cooling customers use gas solely for cooking and/or heating water. The Commission remarked upon the low revenues WGL receives from this class, but also noted that under the two-part rate this class of customers pays the highest unit price for service of any class. Id. WGL, the Commission found, had in the past promoted gas usage among these low-volume gas users "who are in no

are lower for individually-metered apartment customers than for customers living in houses, customers living in individually-metered apartments should pay lower customer charges than customers in houses. Specifically, CHA sought a customer charge of $2.50 monthly for individually-metered apartments, in contrast to the previous rate of $3.75 per month.

The Commission agreed with the merits of the CHA argument but considered CHA's request temporarily moot since charges for all residential customers were lowered. WGL was directed to study whether it would be appropriate to establish a separate sub-class for individually-metered apartment customers in the future. Order 6051, at 90–91.

10. Group-metered apartments are included in the category of commercial and industrial customers. In Formal Case 647 the Commission rejected a Company proposal under which apartment houses would have been charged by unit. Under the Company proposal apartment units would have paid a $3.50 monthly charge each, whereas industrial buildings would have paid a unitary $25 per meter monthly charge. Thus the Company would reap $350 monthly from a 100-unit apartment building, and poten-

position to respond to more cost-based rates." Id. at 97. The Commission, in the face of this conflict between cost causation and "historic rate patterns and social considerations," id., reduced the customer charge for the residential non-heating, non-cooling customer class by approximately the same proportion as it reduced the residential heating and cooling class, from $3.75 per month to $2.50 per month.

### 2. Commercial and Industrial Customers [10]

### a. The WGL Proposal

When two-part rates were first employed, all commercial and industrial heating and cooling customers were treated alike. In this case WGL proposed segregating these customers into three categories according to their levels of usage, and varying customer charges accordingly. Customers consuming less than 1,000 Ccf per year (the "store front commercial customer") would pay a $5 monthly customer charge; those consuming 1,000 to 3,000 Ccf per year would pay an $8 monthly charge; and those using in excess of 3,000 Ccf yearly would, under the WGL plan, pay a $25 monthly customer charge. WGL Exh. J, at 22.

tially as little as $25 from a 100-unit office building. The Commission found that no cost justification had been provided for treating office and apartment buildings so differently, and therefore rejected the Company proposal. In re Washington Gas Light Co., supra at 280–81.

In the instant case the Commission found that the Company had merely resurrected its earlier proposal, again without providing cost justifications for it. The Commission agreed with the Company that "certain components of customer costs would appear to increase with the size of the customer." Order 6051, at 93. The Commission added, however, first, that the Company had ignored "the self-evident economies of scale which cause customer costs for any apartment building to increase less rapidly than the increase in the number of apartment dwelling units," id., and second, that since customer charges for commercial and industrial customers like apartment houses would be computed on a per meter basis, and that since a large apartment house typically has more meters than a small one, customer charges would in fact be higher for large apartment houses than for small ones. Id. at 95.

### b. *The Commission's Order*

The Commission accepted WGL's dichotomy between those commercial and industrial heating and cooling customers who consume more than 3,000 Ccf per year and those who consume less than this amount, but the Commission found no basis for distinguishing between small usage customers (less than 1,000 Ccf yearly) and medium usage customers (1,000 to 3,000 Ccf yearly). A $6.50 monthly customer charge was imposed on all customers who use less than 3,000 Ccf per year.

The Commission also rejected WGL's proposal that large commercial heating and cooling customers pay a $25 monthly customer charge. First, the Commission found the previous customer charge of $16.50 for this group effectively comprehended the greater costs accompanying these customers' comparatively greater sizes. Second, the Commission stated that "[c]ustomer costs for all customer classes exceed the respective customer charges, but we can find no reason for increasing the charge for only one sub-class, large volume commercial." *Id.* at 98–99.

Rates for non-heating, non-cooling industrial and commercial customers were left unchanged at $7 per month.

### 3. *Interruptible Customers* [11]

In Formal Case 647 the rate for interruptible customers was set at nineteen cents per therm, two cents below the flat firm commodity charge. The Commission concluded that that rate covered fixed and commodity costs, was fair to consumers,

and was competitive with other sources of supply. *In re Washington Gas Light Co., supra* at 282.

In the instant case the Commission adopted the WGL proposal that the interruptible rate be increased to thirty cents per therm, to reflect increases in commodity, fixed, and capital costs; the Commission found too that the thirty cents per therm rate was still competitive with other fuel sources. Order 6051, at 99–100.

### C. *Analysis*

### 1. *Two-Part Rate Structure*

Only People's Counsel argued to the Commission in favor of a single volumetric rate rather than a two-part rate structure.[12] A single volumetric rate would embrace both the fixed costs of serving customers (described as "customer" and "demand" costs, see pp. 1194–1195 and notes 4–5 *supra*), and commodity costs. Dr. Wilson, the witness for People's Counsel, testified that gas supply, rather than delivery capacity, is the limiting factor in the Company's natural gas service area. PC Exh. D, at 13–14. The optimally efficient economic pricing solution, he concluded, would therefore be to attribute a zero weight to the sunk costs of the overbuilt transmission capacity, "and to recoup total revenue requirements largely on a volumetric basis." *Id.* at 13. The effect of the proposed volumetric prices would be to maximize conservation of the scarce resource, gas. *Id.* at 14.

The Commission agreed with People's Counsel that conservation was a major objective, Order 6051, at 85, but noted that

---

**11.** Whereas "firm" customers purchase gas on a requirements basis, "interruptible" customers purchase gas in bulk. Interruptible customers characteristically have the capacity to use alternate fuels, and are thus in a position to take advantage of competitive market conditions. *See Pa. Pub. Util. Comm'n v. Philadelphia Elec. Co.,* 33 P.U.R.4th 319, 360 (Pa.P.U.C.1980).

The Company's primary obligation is to its firm customers; interruptible customers purchase only "excess" gas supplies. So the Company can use interruptible service as a gas supply management tool: by selling excess gas, the Company avoids the necessity of investing in additional excess storage capacity. *See id.*

**12.** The appropriateness of a two-part rather than a single volumetric rate structure is not contested on appeal. Discussion of the rationale for imposition of a volumetric rate structure is nevertheless material to consideration of the overall reasonableness of the rate order. The Commission, although it refused in this case to adopt so unusual and extreme a solution as a single volumetric rate structure, agreed in principle with a number of the considerations that would support such a structure, and incorporated these to some extent in the rate design it finally ordered.

gas supply prospects were improving, at least for the near-term future. *Id.* at 84–85. The Commission questioned Dr. Wilson's assertion that the Company had excess storage capacity, *id.* at 84, and his testimony concerning marginal cost pricing principles. *Id.* at 87.

Further, the Commission found that the imposition of a volumetric rate structure would aggravate the risk to the Company of under-collection of fixed costs. Fixed costs are incurred independently of the level of gas sales. *Id.* at 82–83. The fixed cost component of a volumetric rate would be determined on the basis of projected temperatures and fuel usage. The danger of under-collection of fixed costs as a result of unexpectedly warm temperatures and low fuel usage would be aggravated where all fixed costs were recouped through the commodity charge, as they would be under a single volumetric rate structure.[13] The Commission found rather that maintenance of a two-part rate structure, and utilization of a warmer "normal weather standard,"[14] were desirable to reduce the risk to WGL of under-collection of fixed costs. *Id.* at 83–84.

The Commission also remarked upon the inconsistency of People's Counsel's proposal with modern utility practice. Whereas under the proposal offered by People's Counsel fixed costs would have been recovered entirely through the commodity charge, the Commission noted that the Federal Power Commission "has never designed pipeline rates which recover more than 75 percent of fixed costs through the commodity charge." *Id.* at 84. The Commission agreed, though, that, consistent with modern public utility practice, the majority of WGL's fixed costs would continue to be recovered through the commodity charge. *Id.*

### 2. Differentiation Among Customer Classes

The petitioners ground their opposition to the rate design established by the Commission, first, on the Commission's substantial reliance on factors other than cost causation in formulation of the rate design, and second, on the closely related problem of the alleged disparity among the rates of return the Company will receive from different classes of customers under the order. The disparity, it is asserted, renders the rate design unconstitutionally confiscatory in that, as a concomitant of that disparity, certain groups are compelled to subsidize others' gas usage, instead of merely paying for their own purchases.

#### a. Legitimacy of Cost-Related and Non-cost factors

▇ By now, the permissibility of relying on non-cost factors in rate design is beyond serious dispute. Inasmuch as the differences in customer charges among the various consumer classes, and the alleged differences in "class rates of return" derive

---

13. Under the two-part rate structure fixed costs are recovered in large part through the commodity charge, though a portion of the Company's fixed costs is recovered through the flat customer charge. The amount of fixed costs collected through the commodity charge necessarily varies directly with the level of fuel sales. To assure that the company will realize its revenue requirements, the Commission establishes the fixed cost component of the commodity charge in accordance with a projected level of fuel sales.

14. Fuel sales are substantially weather sensitive. In order realistically to project fuel sales, the Commission does not predicate its estimate upon actual sales in a given test year, but rather adjusts test year revenues to reflect sales under assumed "normal weather conditions". These "normal weather conditions" are determined by using average temperatures and temperature trends over a thirty-year period and making future projections therefrom.

Yearly temperatures are then calculated and stated in terms of "degree day deficiencies": the extent to which daily mean temperatures fall below 65 degrees Fahrenheit. Order 6051, at 38 n.1. Prior to the instant case WGL fuel sales were calculated on the basis of 4,211 degree day deficiencies. In this case the Commission noted a warming trend in the area, and adopted the "normal weather year" proposed by WGL of 3,987 degree day deficiencies. *Id.* at 39–41. This modification inured to the benefit of the Company, since the Commission, having projected higher temperatures and lower fuel usage, considered the lower anticipated consumption in calculating the fixed cost component of the commodity charge. *See id.* at 83.

from reasonable consideration of such factors, they do not render the rates invalid.[15]

Preliminarily, we note that the use of non-cost factors *in addition* to cost causation does not amount to a rejection of the latter. Contrary to petitioners' contention, the Commission did not repudiate the significance of the principles of cost causation for utility ratemaking. The Commission's specific denial that it was rejecting cost-causation principles, Order 6060, at 16; Order 6051, at 90, attains credence from its discussion of the lack of cost justification for discriminating between residential heating and cooling customers who consume above and below 100 Ccf of gas per year, as was proposed by WGL, *id.* at 96, and from its discussion of the conflict between the principles of cost causation and countervening considerations of the value of service, historic rate patterns, and equity, in setting rates for residential non-heating and non-cooling customers, *id.* at 97.

Furthermore, relevant cost considerations are not limited to historic costs (the cost already paid for existing fuel stocks), but include replacement costs (the cost of purchasing new fuel stocks to replace those currently being consumed). The Commission has expressed concern with escalating gas replacement costs. In Formal Case 647, the basic facts and rationales of which were reaffirmed in the instant case, Order 6051, at 89–90,[16] a two-part rate structure was first substituted for the traditional declining block rate structure. The Commission, commenting upon the increasing complexity of the economic equation for utility rate designs, which impelled this transition, stated:

Complicating the cost picture are several factors. One is that existing and new supplies of gas are becoming more and more costly. To the extent that the company must replace gas sold on a promotional basis with higher priced gas, its average costs will escalate. Another factor is that the company's service is limited by gas supply, as well as by pipeline capacity. In these circumstances, traditional allocation techniques must be reevaluated; customers' responsibility for fixed costs must be related more closely to their gas usage. [*In re Washington Gas Light Co., supra* at 278–79 (citing *Consolidated Gas Supply Corp. v. Federal Power Commission,* 172 U.S.App.D.C. 162, 520 F.2d 1176 (1975)).]

*Accord, Midwest Gas Users Association v. State Corporation Commission,* 3 Kan. App.2d 376, 382–83, 393, 595 P.2d 735, 740, 747 (1979); *United States Steel Corp. v. Pennsylvania,* 37 Pa.Commw.Ct. 195, 207–10, 390 A.2d 849, 856–57 (1978); *In re Laclede Gas Co.,* 25 P.U.R.4th 51, 58 (Mo.P.U.C. 1978). Although the Commission projected increasing gas supplies in the near-term future, Order 6051, at 84–85, it noted too the rising cost of the commodity. *Id.* at 99. It is anticipated that as local supplies of gas are depleted, the Company will eventually have to replenish its commodity supplies from more exotic and expensive sources. *See* Order 6051, at 88. Because gas is a limited and wasting resource, *see In re Washington Gas Light Co., supra* at 279, it is foreseeable too that rising recovery costs will contribute to increased commodity replacement costs, regardless of the economic climate—for we note also the effect of inflation on replacement costs.

**15.** The dissent is able to reach its conclusions only by ignoring or severely discounting several of these factors, on the theory that they either were not invoked by the Commission or were not considered important by it. However, the considerations discussed in our opinion were in fact invoked by the Commission in the orders under review. Those which apply with particular force to particular classes, or whose relevance had not already been adequately elaborated in earlier decisions were discussed in some detail. Those factors whose significance in justifying unequal class rates of return was already established in Case 647 (which included energy conservation, rising gas costs, and other factors) were explicitly invoked by reference to that case. Order 6051 at 89–90. *See In re Washington Gas Light Co., supra* at 278–84. The Commission is not required to rehash its reasons for adopting basic policies in every rate case, at the risk of having relied-upon factors of recurring importance disregarded or discounted by courts on review. *See* note 8 *supra.*

**16.** *See* note 15 *supra.*

[T]he cost of recovering natural gas can no longer be treated as just another cost of doing business. Although there is considerable controversy over the amount of natural gas which can be ultimately recovered domestically, there is little difference of opinion that the amount of natural gas ultimately recovered will cost considerably more per Mcf than gas recovered in the past. This is a reasonable assumption because not only are the factors of production (land, labor, and capital) involved in gas exploration and development increasing in cost, but the process itself is becoming more costly. Where gas could once be recovered onshore in porous wells at shallow depths and in great quantities, the depletion of these resources has forced the natural gas industry to drill deeper in tighter formations, drill offshore, or look to supplies beyond the continental limits of this country. Hence, even if the traditional costs of production level off or decrease, the cost of recovering natural gas will continue to increase or, in other words, putting an end to inflation will not put an end to increases in the price of gas. [*In re Laclede Gas Co., supra* at 88.]

[11] Under this analysis, the inclusion of substantial fixed costs in the commodity charge is cost-justified.[17] The high usage customers contribute disproportionately to the exhaustion of relatively inexpensive commodity sources, and thus accelerate future increases in commodity prices for all utility customers. *See id.* A higher commodity price would tend to decrease consumption, thereby reducing the upward pressure on gas prices. Petitioners allege that due to the inclusion of fixed costs in the commodity charge, customers who consume greater quantities of gas are compelled to subsidize lesser consumers. The high usage customer, however, if charged solely on the basis of current commodity prices at any given time, never covers the gas replacement costs for which he is responsible. The price system is thus distorted, with the smaller consumer absorbing higher costs caused by the greater consumer, or, in effect, subsidizing the greater gas consumer. The Commission's inclusion of substantial fixed costs in the commodity charge tends to mitigate the distortions in cost allocations caused by rising replacement costs.

By attributing to each customer the expenses for which he is responsible, the consumer has before him the correct price indicators upon which to base his purchase and resource consumption decision. The Commission expressed concern in Formal Case 647 that "[p]romotional rate structures tend to foster a misallocation of scarce resources." *In re Washington Gas Light Company, supra* at 279. *See In re Laclede Gas Co., supra* at 88–89.

> If every customer on [the] company's system must pay at least the cost of replacing any gas he consumes, then those customers have the proper price information to decide whether the benefits of conserving that gas are equal to the price. If any customer on [the] company's system does not have to pay at least the cost of replacing the gas that customer consumes, then that customer is permanently insulated from the cost impact his consumption has upon [the] company's entire system.

By recovering more than historic cost in the commodity charge, the Commission's order moves toward *long-term* cost-reflective pricing, which contributes to a more efficient allocation of resources.[18]

---

17. As will become apparent in subsection c, *infra,* these considerations strongly undercut petitioners' assertions that current inequality among alleged rates of return realized from various customer classes constitutes irrational discrimination or unconstitutionally confiscatory cross-subsidization.

18. The dissent insists that this court must blind itself to the fact that rising replacement cost militates against a commodity charge limited to historic commodity cost, relying on the authority of *Securities and Exchange Commission v. Chenery Corp.,* 318 U.S. 80, 87–88, 94, 63 S.Ct. 454, 459, 462, 87 L.Ed. 626 (1943). The very treatise cited in dissent observes that the "ideal" stated in *Chenery* does not constitute an enforceable rule, a fact that the dissent conveniently omits.

We would be compelled to reject the petitioners' contention that a utility rate order depends for its validity upon a predominantly cost-based foundation, even if that concept is expanded to encompass replacement cost. On the contrary, historic and replacement costs are not the only criteria in the establishment of a rate structure, *see Apartment House Council of Metropolitan Washington, Inc. v. Public Service Commission, supra* at 57, and it is a function of the *Commission* to determine the relative weight to accord the various factors that it considers in the ratemaking process, *see Association of American Publishers, Inc. v. Governors of the United States Postal Service, supra,* 157 U.S.App.D.C. at 403–04, 485 F.2d at 774–75.

■ The value of service to the consumer is one of the valid non-cost factors. The

One might wish that not only agencies but also courts could and would live up to the Supreme Court's statement of the ideal. No one will quarrel with the ideal. But as a practical rule for practical enforcement, the statement goes beyond what may be expected either from agencies or from courts. [2 K. Davis, Administrative Law Treatise § 16.12 (1958).]

The dissent ignores the fact that our discussion of replacement cost arises by way of exposing a fallacy in *petitioner's* assumption that all the relevant cost-causation factors are subsumed in its analysis, which is based on historic cost. *Chenery* does not require a court to ignore a fallacy in a petitioner's argument as to a proposition that he bears the burden of establishing, simply on the ground that it was not among those explicitly cited by the agency. In *Chenery,* the Supreme Court placed upon the *agency* the burden of showing that the fiduciary rule used to single out certain shareholders for lesser rights upon reorganization was authorized by the agency statute. It had to show that the rule was derived from the SEC's mandate to separate "fair and equitable" terms from those "detrimental to ... the interest of investors," and not "merely" by nonbinding common law principles.

In contrast, the rate design does not fall if the Commission fails to establish that replacement costs must be recovered in the commodity charge. Rate design orders are presumptively valid, and it is the petitioners' burden to establish discrimination. *See* part I *supra.* The Company's failure to account for replacement cost in its estimates undermines its case, whether or not the Commission explicitly refers to that fact.

Even if *Chenery* required us to consider only those objections to petitioners' proof raised by the Commission, that criterion is satisfied here. The replacement cost consideration relates to the legality of recovering part of fixed costs in the commodity charge. That issue was addressed by the PSC in Case 647, *see In re Washington Gas Light Co.,* 16 P.U.R.4th at 279–80, whose continuing validity on this issue was reaffirmed on Order 6051, *see* note 15 *supra.* In that case, the Commission explicitly cited the fact that the cost of replacement (new) gas is greater than the cost of old fuel as a reason for increasing the proportion of total costs recovered through the commodity charge, including part of fixed costs. The Commission legitimately invoked the authority of that decision and its supporting reasoning by reference in the present case. *Id.* Accordingly, we are not required to ignore replacement costs on appellate review.

The dissent further attempts to disqualify replacement cost as a legitimate factor by suggesting that it was not the Commission's "real" reason for its action. *Post* at 1244. It does this by quoting from another part of Order 6051, which has nothing to do with the principle at hand. When quoted in context, the intended meaning is abundantly clear.

In designing rates for the residential non-heating/non-cooling sub-class, the commission faces a direct conflict between the principle of cost causation, on the one hand, and historic rate patterns and social considerations on the other hand.... *We shall accordingly reduce the customer charge for this sub-class* from $3.75 to $2.50 per month....

We take *this action* essentially for equitable reasons.... At least at this time, we feel compelled to provide some degree of relief for existing customers who are in no position to respond to more cost-based rates. Equally important is the Commission's desire to lessen the extent to which the low-volume gas user pays a higher per unit price for service. [Order No. 6051, at 97 (emphasis added).]

The first two quoted sentences are omitted from the dissent. The "action [taken] essentially for equitable reasons" was the decision to reduce the *customer* charge for non-heating residential customers, without making a comparable reduction for some other classes. This decision has only a minor effect on the disparities in class rates of return estimated by the Company. It has no significant relevance to the replacement cost issue, which concerns the size of the *commodity* charge, not the relative sizes of the various *customer* charges. Thus, contrary to the impression given by the dissent, the language it quotes does not refer to the issue as to which replacement cost *is* relevant and as to which it is therefore involved by the PSC and this court. That issue is the decision to recover fixed costs through the commodity charge, which is applied equally to all classes.

Commission's reliance upon value of service as a relevant factor[19] in the determination of whether there has been unlawful discrimination is supported by precedent, *see, e.g., In re Washington Gas Light Co.,* 99 P.U.R.3d 139, 144 (D.C.P.S.C.1973); and this court has previously endorsed consideration by the Commission of "whether customers have paid different amounts for the same service under the same circumstances.... So long as the classifications are reasonable, a difference in rates may exist between different classes of customers." *Atlantic Telephone Co. v. Public Service Commission,* D.C.App., 390 A.2d 439, 444 (1978). *See also Florida Retail Federation, Inc. v. Mayo,* 331 So.2d 308, 312 (Fla.1976); *Midwest Gas Users Association v. State Corporation Commission, supra,* 3 Kan.App.2d at 381–91, 595 P.2d at 739–46; *New England Telephone and Telegraph Co. v. Public Utilities Commission,* 390 A.2d 8, 59 (Me.1978); *In re Arkansas Louisiana Gas Co.,* 558 P.2d 376 (Okl.1976); *United States Steel Corp. v. Pennsylvania, supra* 37 Pa.Cmwlth. at 207–09, 390 A.2d at 856. "[E]ach unit of natural gas has the same energy value and the same economic value no matter how many units of gas a customer may purchase." *In re Arkansas Louisiana Gas Co., supra* at 378. The intrinsic value of service to the customer may conflict with the cost of service to the utility, but is, we conclude, a valid equitable consideration, which the Commission not unreasonably included in the utility rate equation.

The Commission's consideration of historical rate patterns in fashioning the order was likewise not inappropriate. *See*

*Apartment House Council of Metropolitan Washington, Inc. v. Public Service Commission, supra* at 58. While structuring utility rates solely on the basis of the ability of different groups of customers to pay would comprise a manner of social legislation and subsidy best left to the legislative branch of government, *see United States Steel Corp. v. Pennsylvania, supra* 37 Pa.Cmwlth. at 173, 390 A.2d at 871; *In re Rate Design for Electric Corporations,* 26 P.U.R.4th 280 (N.Y.P.S.C.1978), in the instant case we find no abuse of discretion in the Commission's refusal to impose high gas rates on residential customers where the Company, through past advertising and favorable rate structures, promoted dependence by these customers on gas usage. Moreover, consideration of an equitable factor such as this is not invalidated simply because the same rationale might apply to certain members of other customer classes. *See Metropolitan Washington Board of Trade v. Public Service Commission, supra* at 358–59. Such imperfections are inherent in any system employing broad classifications, and the Commission may exercise its discretion to provide relief to those classes which, as a whole, have the greatest claim to it.[20]

The Commission also permissibly relied upon the need for resource conservation. Order 6051, at 89. We have previously affirmed the Commission's obligation to aid in the energy crisis. *Apartment House Council of Metropolitan Washington, Inc. v. Public Service Commission, supra* at 57; *see Metropolitan Washington Board of Trade v. Public Service Commission, supra* at 358. Although the Commission anticipates a ready supply of gas in the near future,

---

**19.** The PSC explicitly stated that this factor, along with the others dealt with in Case 647, justified disparate rates of return among all customer classes. Order 6051 at 89–90. *See In re Washington Gas Light Co.,* 16 P.U.R.4th at 283 (value of service cited as supporting refusal to equalize class rates of return). The policy of preventing unit energy prices from departing too radically from the value of service to the customer was also explicitly raised in the present case with respect to the customer charge for the residential non-heating/non-cooling sub-class. Order 6051 at 97.

**20.** The dissent would apparently impose on the Commission a burden of conducting costly comparative studies of the income of utility consumers, or of the effect of past promotional rates and advertising on them, before taking note of such equitable factors. *See post* at 1252. That is not its burden. The Commission is entitled to make reasonable inferences as to the effect of its orders on the various consumer classes. It is then for petitioners to make a convincing showing of unfairness or discrimination. They are free to present whatever empirical studies they like in order to meet that burden.

Order 6051, at 84–85, recognizing that gas is a scarce, finite, and wasting resource, and that conservation is in the public interest, *see, e.g., In re Washington Gas Light Co.,* 16 P.U.R.4th at 279, we find reasonable and within the scope of its allowed discretion the Commission's incorporation of a conservation goal into the ratemaking equation. *See Central Hudson Gas and Electric Corp. v. Public Service Commission,* 447 U.S. 557, 571, 100 S.Ct. 2343, 2354, 65 L.Ed.2d 341 (1980) ("We accept without reservation the argument that conservation . . . is an imperative national goal. Administrative bodies empowered to regulate electric utilities have the authority—and indeed the duty— to take appropriate action to further this goal."); *California Manufacturers Association v. Public Utilities Commission,* 24 Cal.3d 251 at 260, 155 Cal.Rptr. 664 at 669, 595 P.2d 98 at 103 (Public Utility Commission "may properly consider prospective shortages of natural gas and the need to conserve that commodity"); *Boston Edison Co. v. Department of Public Utilities,* 375 Mass. 1, 47, 375 N.E.2d 305, 333, *appeal dismissed,* 439 U.S. 921, 99 S.Ct. 301, 58 L.Ed.2d 314 (1978) (it was reasonable to conclude that the exemption of the first 384 kilowatt hours of electricity use "would encourage energy conservation in the public interest").

b. *Differences in Customer Charge Among the Various Customer Classes*

It is unnecessary to reiterate in detail the Commission's rationale for its setting of customer charges, which are outlined in section B, *supra.* Inasmuch as these differences are reasonably based on legitimate cost and non-cost factors already discussed, they do not render the rates invalid. Two areas of contention merit a brief further mention, however: the charges applied to residential non-heating and non-cooling cus-

tomers, and those applied to interruptible customers.

One factor influencing the Commission was the tension inherent between the cost to the Company of providing service, and the value of service to WGL customers. Discussing residential non-heating and non-cooling customers, the Commission commented:

Because of the very low volume of gas which this sub-class takes relative to its customer costs, a two-part rate yields an anomaly; this sub-class pays the highest *unit* price for service at the same time as WGL earns the least return from this service.

In designating rates for the residential non-heating/non-cooling sub-class, the Commission faces a direct conflict between the principle of cost causation, on one hand, and historic rate patterns and social considerations on the other hand. [Order 6051, at 96–97 (emphasis in original).]

We cannot say that the charge arrived at was based on illegitimate factors or embodies a capricious application of them. On the contrary, the record reflects a reasoned consideration and resolution of an issue as to which reasonable people can differ. It is not for us to substitute our preferences for the judgment confided by law to the Commission.

While in the case of residential non-heating and non-cooling customers these cost considerations led the Commission to reduce the customer charge, *id.,* it was drawn by other factors to approve WGL's proposed increase to a thirty cents per therm rate for interruptible customers. *Id.* at 99–100. These included rising fuel costs, the amount of investment fairly allocable to interruptible service customers,[21] the value of the

21. In Formal Case 647, the Commission commented upon the deceptiveness of the rate of return from interruptible customers:

Rate of return is a function of investment. In fact, under any formula, proportionately less rate base is allocated to interruptible customers than to any major category of firm customers. Thus, although interruptible cus-

tomers consumed 5 per cent of the company's test-year gas supply, they were allocated only 1.5 per cent of its fixed costs. As a result, the interruptible customers' rate of return will always appear to be on the high side, and considered alone, will be meaningless. All this, of course illustrates the truth of our observation that "[a]n attempt to de-

service provided to these customers, and the closely related factor of the competitiveness of the rate charged interruptible customers for gas with the price of other forms of fuel. Order 6051, at 99–100. "Utility companies operating under public franchises and having monopolistic characteristics are subject to special regulation." *Public Utilities Commission v. Capital Transit Co.*, 94 U.S.App.D.C. 140, 145, 214 F.2d 242, 247 (1954). Although such regulation protects utility companies to a degree from ordinary market pressures, realities of the marketplace, including the company's competitive position and, in this context, the price of alternative fuels, may be considered in establishing or assessing the reasonableness of a rate structure. *See United States Steel Corp. v. Pennsylvania, supra*, 37 Pa. Cmwlth. at 207–09, 390 A.2d at 856. We find that the Commission acted reasonably in predicting the interruptible rate upon the above enumerated facts, and that the rate works no unfair discrimination. As it is neither unreasonable, arbitrary, nor capricious, and is supported by substantial evidence, the rate must be sustained.

c. *Alleged Differences in Class Rates of Return*

■■■■ The objections raised by petitioners and in dissent relating to class rates of return are based entirely on a data analysis prepared by Washington Gas Light itself that is seriously flawed, was never adopted by the Commission, and which the Commission was under no obligation to adopt. Even if the PSC had adopted it as

an aid in rate design, it does not follow that those rate of return estimates would become the legal benchmark for judicial assessment of whether the rates are impermissibly discriminatory under the D.C. Code or the Constitution. While the choice of a rate design—within wide bounds—is for the Commission to make, the standards for judging where the bounds lie, *i.e.*, what is "discriminatory", are for the court to establish. Finally, even if one hypothesizes the impossible—a single, objective, agreed upon method for allocating costs—differences in the resulting class rate of return estimates would not satisfy petitioners' burden of proving illegally discriminatory rates. If, as here, the asserted differences flow from a reasonable application of legitimate cost and non-cost policies, they are permissible. Indeed, if the non-cost factors are given weight at all, differences in class rates of return are virtually inevitable.

The record contains no decisive projection of the several rates of return reasonably to be expected under the instant rate order. During the hearings, Mr. Smallwood, vice-president of WGL, presented evidence indicating a range of rates of return from firm service customers varying from a negative 8.42% from residential non-heating customers to 26.11% from commercial and interruptible fuel users. On cross-examination, however, Mr. Smallwood renounced the figures he had earlier espoused, due to the erroneous methodology—the misallocation of mains to individually metered apartments [22]—that he had relied upon in calculating those figures.[23] WGL Exh. N, at 26.

termine rate of return for a single class of service, rather than for the company's entire utility service, is a fruitless undertaking." [*In re Washington Gas Light Co.*, 16 P.U. R.4th at 282 (quoting *In re Washington Gas Light Co.*, 99 P.U.R.3d at 146).] The Commission readopted this reasoning in the instant case. Order 6051, at 99–100.

22. The Company allocated the cost of mains on a per-meter basis, failing to eliminate the unfairness that results from alloting the same share of costs to a single apartment as to an entire building containing numerous group-metered units.

The Company employs a "cost of capital" method to determine the rate of return. As

discussed in notes 17–18 *supra*, the rate of return for a particular class of customers is calculated first by determining the cost of capital assets the use of which on a pro rata basis is fairly attributable to that class. The allocation of capital assets such as mains to customer classes is thus highly material to the determination of the rate of return realized or realized from the several classes, and a misallocation of capital assets is likely to distort the results.

23. Commissioner Stratton in his dissent to the instant order relied upon the same methodology as had Mr. Smallwood. Commissioner Stratton anticipated that under the customer

He testified further that he had not, since learning of the error, recomputed the rates of return, and could not state with certainty whether the resulting rate would be negative. The Commission, acting within the scope of its allowed discretion, accordingly disregarded WGL's erroneous projection of class rates of return in fashioning the rate order.[24]

Since the Company's cost causation analysis failed to pass muster, and despite the extensive consideration the Commission gave to cost allocations and cost causation during the rate hearings, no specific cost data clearly underlie the rate order. This lack of specificity does not alone imperil the validity of the order. We have previously held that

[i]t is not necessary that differences in rate of return be specifically and quantitatively supported by customer class-cost considerations. The Supreme Court has stated that "[a]llocation of costs is not a matter for the slide-rule. It involves judgment on a myriad of facts. It has no claim to an exact science." [*Apartment House Council of Metropolitan Washington, Inc. v. Public Service Commission, supra* at 57 (1975) (quoting *Colorado Interstate Gas Co. v. Federal Power Commission,* 324 U.S. 581, 589, 65 S.Ct. 829, 833, 89 L.Ed. 1206 (1945)).]

charges established in Orders 6051 and 6060 the rates of return would be as follows:

| CLASS | RATE OF RETURN |
|---|---|
| *Firm Sales* | |
| Residential heating | 4.91% |
| Residential non-heating | (8.42%) |
| Commercial heating | 15.13% |
| Commercial non-heating | 26.11% |
| Watergate & Interruptible | 58.05% |

*See* Order 6060, Chart D.

24. Recognizing that the WGL's expert analysis in the record is inadequate, the dissenter goes on to perform his own. *Post* at 1248. However, this is a task confided, for very good reasons, to the Commission, as aided by the parties before it. Unlike courts, the PSC has an expert technical staff. Its analysis will be of help to the appellate court as well as the Commission itself. Perhaps more importantly, by introducing new calculations for the first time in an appellate opinion, the dissent effectively cuts off the right of the parties to respond to them and analyze the shortcomings they may

*Accord, Midwest Gas Users Association v. State Corporation Commission, supra,* 3 Kan.App.2d at 391, 393, 595 P.2d at 746, 747.

Apart from the problems of accounting for individually-metered vs. group-metered apartments, the Washington Gas Light analysis is based on more fundamental assumptions that the Commission is not compelled to accept as a guide to rate design. Neither is this court compelled to accept those assumptions as the foundation for determining what is impermissibly discriminatory under the Constitution or D.C. Code.[25] In particular, petitioner's approach assumes that fixed costs must be allocated on a per-consumer basis, without regard to how much each consumer used the system. Even if one corrects the error of failing to account for the fact that individually-metered homes should not pay the same share as an entire building of group-metered apartments, *see* note 10 *supra,* it is not obvious that a per-unit allocation would be the only permissible one. For example, one might rationally allocate fixed costs, other than those directly attributable to *particular* customers or groups of customers,[26] in proportion to consumption. Indeed, this is the cost recovery method that overwhelmingly predominates in the sale of consumer goods and services generally. In the typical

have. Accordingly, we decline to engage in such an endeavor and confine our review to the rate analyses presented to the Commission below.

25. *If* the PSC had accepted the utility analysis, that analysis would, however, be relevant to the narrower question of whether the Commission had applied it in an arbitrary or capricious manner.

26. There are a few cost items that can be directly associated with a particular customer in the sense that, if the customer were not served by the system, the costs would not be incurred. These include, for example, the cost of the customer's meter and of sending his monthly bill. Together they represent the marginal cost to the system of extending service to an additional customer in the service area. This is to be contrasted with the bulk of fixed costs, such as gas mains, for which there is no single "correct" or "objective" means of allocation.

business, there is no "customer charge" and therefore one hundred percent of fixed costs are covered by the "commodity charge"—the price of the good or service in question. Most observers would not consider it unfairly discriminatory that a customer who buys one dollar's worth of goods contributes less to the overhead costs of the store than the customer who buys $100's worth of goods. Indeed, it might be considered unfairly discriminatory if the two were required to pay a separate and equal fee for overhead.

If the Commission or this court adopted the principle of cost allocation in proportion to consumption, then the current set of rates would result in higher estimated rates of return for the classes of smaller consumers than for the other categories. Under the utilities' terminology, this would reflect a suspiciously unjust "cross-subsidy" of the large by the small user. It would be eliminated by recovery of *all* fixed costs through the commodity charge. We do not raise this possibility for the purpose of suggesting that it be adopted by the Commission as a guide to rate design. Nor do we adopt it as the standard for finding unconstitutional discrimination. If we did, we would have to reject the proposed rates and require the *elimination* of the customer charge, thus moving further from the result sought by the utility. Rather, we raise it to refute the suggestion that the "imprecision" in cost allocation is only a matter of technical differences in methodology. It is also a question of fundamental choices among alternate basic assumptions, no one of which can "objectively" be identified as the "correct" one. Under these circumstances, the dissent's unexamined presumption that we are compelled to rely on the petitioner's preferred choice, after correction of certain acknowledged errors, is specious.

 Even if one hypothesizes an objective, agreed-upon standard for estimating class rates of return, substantial disparities among the resulting estimates would not satisfy petitioners' burden of making a convincing showing of unlawful discrimination. "Discriminatory rates" cannot simply be equated with differences in estimated rates of return from subparts of the utility's business.[27] We have never imposed a requirement of uniformity among the rates of return from different customer classes; differences have indeed traditionally been tolerated. Our scrutiny of the legality of allegedly discriminatory differences in charges imposed upon utility customers focuses rather upon the reasonableness of the customer classifications. *Metropolitan Washington Board of Trade v. Public Service Commission, supra* at 360–61; *Atlantic Telephone Co. v. Public Service Commission, supra* at 444; *Apartment House Council of Metropolitan Washington, Inc. v. Public Service Commission, supra* at 57.[28] Indeed, insofar as the Commission may per-

**27.** The dissent in its preoccupation with the concept of class rates of return as a basis for invalidating a rate design that it finds too favorable to residential consumers and not favorable enough to commercial and industrial customers, virtually equates disparate class rates of return (as defined by the utility itself) with "discriminatory rates." *See, e.g., post* at 1242 & n.1. Of course the "discriminatory charges" rendered illegal by D.C.Code 1981, § 43–501 are the rates charged *customers,* not the rate of return on shareholders' equity. Although shareholders have a due process right to an opportunity to earn a certain level of return on their investment, *see* part III *infra,* their earnings are unaffected by the manner in which the overall rate is attributed to particular classes of customers; there are no "residential non-heating shares", only shares in the utility as a whole.

It appears that the dissent would rule that an adequate showing of discrimination is made out simply by a showing of disparate class rates of return, as defined by the utility itself. The burden would then shift to the Commission to rebut the claim by showing that the "discrimination" is justified. This has never been the law in this jurisdiction and we decline to adopt it now. The burden rests where it always has—on the party alleging illegal rate discrimination. *See* part I *supra.*

**28.** We find the dissent's attempt to distinguish such cases as *Apartment House Council* and *Metropolitan Washington Board of Trade* to be unpersuasive. Those and other cases indicate most clearly that non-cost factors are permissible and that it is the function of the *Commission,* not this court, to weigh them and exercise discretion to arrive at a reasonable accommodation.

missibly consider factors other than cost causation in structuring the rate design, it is inevitable that differences among rates of return will exist.

Because the utility's revenue requirement is based on cost (expenses plus capital return) and because customer rates are designed to provide the revenue requirement, it is apparent that consideration by the commission of any factor other than cost will result in some customers paying less while others necessarily pay more than cost. Having discretion to consider factors other than cost, the commission must necessarily create some disparity among users. . . . [*California Manufacturers Association v. Public Utilities Commission*, 24 Cal.3d 251, 261, 595 P.2d 98, 103, 155 Cal.Rptr. 664, 669 (1979) (en banc).]

Only a minor part of the differences in class rates of return, as calculated by petitioners, is due to the differences in the customer charges applied to various classes. The differences are predominately due to the fact that a substantial part of fixed costs is recovered through the commodity charge. As a result, a larger *absolute* amount of fixed costs is borne by large users. However, they bear a smaller *proportion* of such costs in relation to their consumption, since part of fixed costs are borne through flat customer charges. Thus, if there are permissible grounds for recovering a portion of fixed costs in the commodity charge, notwithstanding a cost causation theory that allocates fixed costs on a flat per-customer basis, the rates must be upheld.

The discussion in subsection a, *supra*, shows that there are indeed adequate bases for the Commission decision to recover a substantial portion of fixed costs through the commodity charge. It will suffice simply to summarize them here. One reason is conservation of energy resources. The higher the marginal cost of gas to the consumer (the commodity charge), the greater the incentive to reduce energy waste or to shift to lower cost energy sources. Concern that commodity prices cover replacement costs is another permissible consideration. As existing sources of gas are exhausted, finding and exploiting new ones becomes increasingly expensive. If the commodity charge is not higher than the historic cost, it will fail to cover the higher replacement cost, leading to an undesirable allocation of resources. Moreover, high demand is a contributing factor to higher resource prices. It is therefore not unjust that those who consume more and therefore are more responsible for overall consumer demand bear a proportionately higher burden of replacement costs. Value to the consumer, ability to pay, and historical rate patterns are additional reasons for not recovering fixed costs exclusively through the customer charge.[29]

▮▮▮ Finally, at each juncture the Commission has balanced countervailing criteria, and in so doing has satisfied the independent burden imposed on it by *Washington Public Interest Organization v. Public Service Commission, supra* at 75–77, to announce the criteria governing the rate determination and to explain how the order reflects application of these criteria to the facts before it. The Commission acted within the scope of its discretion in balancing the various criteria upon which it relied. Mathematical formulae are not required. "Allocation of costs is not a matter for the slide-rule. It involves judgment on a myriad of facts. It has no claim to an exact science." *Colorado Interstate Gas Co. v. Federal Power Commission*, 324 U.S. 581, 589, 65 S.Ct. 829, 833, 89 L.Ed. 1206 (1945).

**29.** In view of the multiple reasons supporting the result reached by the Commission, the dissent's preoccupation with a single factor (the concerns over replacement costs evidenced in Case 647, which was reaffirmed in this case) is puzzling. Even if replacement costs are ignored, there are more than adequate reasons specifically invoked in Orders 6051 & 6060 for permitting a therm charge in excess of historic gas cost. The fact that these factors, already the subject of discussion in other cases, could have been discussed at greater length is not an excuse to exclude them as bases for reviewing the present orders, as the dissent does. Neither is it significant that these factors are cited in the text of the Commission opinions, and are not the subject of separate formal findings.

As petitioners have failed to demonstrate that the order is unjust and unreasonable in its total effect, the rate design must be sustained.

## III. RATE OF RETURN

By determining and weighting the cost of each portion of WGL's capital structure, the Commission found that the Company is entitled to the opportunity to earn a maximum overall return of 9.25% on its rate base.[30] Only the Company disputes this finding, contending that this allowance is unreasonable and confiscatory. It traces the alleged error to two facets of the "cost of capital" analysis used by the Commission to establish the authorized overall return: (1) the Commission's determination that WGL should be allowed a 13% return on common equity; and (2) the Commission's reduction of the test-year cost of debt by means of amortizing gains which had been realized in past years upon WGL's redemption of certain long-term debentures.[31]

██ The statutory authority of the Commission to design "reasonable, just, and nondiscriminatory" rates, D.C.Code 1981, § 43–501, is, we have stated, "deliberately

30. The Company's authorized overall rate of return is determined by the "cost of capital" method. That method seeks to determine what return the Company must offer its investors in order to attract the capital investment in its stocks and bonds necessary to finance its construction and operations. Order 6051, at 16; see In re Potomac Elec. Power Co., 29 P.U. R.4th 517, 521 (D.C.P.S.C.1979). See also Sun City Water Co. v. Arizona Corp. Comm'n, 26 Ariz.App. 304, 309 -10, 547 P.2d 1104, 1109–10, vacated on other grounds, 113 Ariz. 464, 556 P.2d 1126 (1976) (en banc); City of Evansville v. Southern Ind. Gas & Elec. Co., 167 Ind.App. 472, 479 81, 339 N.E.2d 562, 569- 70 (1975); In re Southwestern Bell Tel. Co., 10 P.U.R.4th 323, 328 29 (Ark.P.S.C.1975); In re Southern Conn. Gas Co., 24 P.U.R.4th 162, 194 (Conn.Pub.Util. Control Auth. 1978).

> The rate of return is an expression, in terms of percentage of rate base, of: " ... the amount of money a utility earns, over and above operating expenses, depreciation expense, and taxes, expressed as a percentage of the legally established net valuation of utility property, the rate base. Included in the 'return' are interest on ... debt, dividends on preferred stock, and earnings on common stock equity. In other words, the return is that money earned from operations which is available for distribution among the various classes of contributors of money capital...." [In re Potomac Elec. Power Co., 29 P.U.R.4th at 521–22 (quoting P. GARFIELD & W. LOVEJOY, PUBLIC UTILITY ECONOMICS 116 (1964)).]

It is assumed that the cost of capital, when competently computed, is essentially and practically the equivalent of a fair rate of return. See New England Tel. & Tel. Co. v. Public Utils. Comm'n, supra at 32.

The overall cost of a utility's capital is calculated by determining the cost of each component in the company's capital structure. A weighted cost for each component is derived by multiplying its cost by its ratio to total capital. The sum of these weighted costs then becomes the utility's overall rate of return, which is multiplied by the company's rate base to determine the company's revenue requirement. See id.

In this case, the Commission found WGL's capital structure (as of December 31, 1977) and capital costs to be as follows:

| Type of Capital | Proportion of Capital | Cost Rate | Weighted Cost |
|---|---|---|---|
| Debt | 48.3% | 7.04% | 3.40% |
| Preferred | 12.5 | 6.59 | .82 |
| Customer Deposits | 0.9 | 6.0 | .05 |
| Equity | 38.3 | 13.0 | 4.98 |
| Overall | 100.0 | | 9.25 |

Order 6051, at 25.

31. Under the Commission's "cost of capital" method of establishing an overall rate of return, each component of the Company's capital structure is independently significant, and the overall return is a direct function of the weighted costs of each type of utility capital. See note 30 supra. Furthermore, some types of capital are riskier than others: for example, equity is generally considered a more risky investment than debt capital. Thus the overall rate of return cannot, theoretically, be assessed in isolation. Nor, for the same reasons, is WGL's authorized overall return subject to meaningful comparison with the returns earned by other gas distributors in the absence of an in-depth analysis of those utilities' capital structures.

The record in this case does not contain sufficient data for us to perform this type of complex inquiry, nor do we think such an endeavor would be as meaningful as a review of the Commission's treatment of each of the two primary components of WGL's capital structure: common equity and long-term debt. We note that all interested parties—WGL, People's Counsel, and the Commission—focus their rate of return arguments on these two individual components rather than on the overall 9.25% allowance.

broad." *Metropolitan Washington Board of Trade v. Public Service Commission, supra* at 350.

> [T]he Commission [is given] authority to formulate its own standards and to exercise its ratemaking function free from judicial interference, provided the rates fall within a zone of reasonableness which assures that the Commission is safeguarding the public interest—that is, the interests of both investors and consumers. . . . From the investor standpoint, courts have defined the lower boundary of this zone of reasonableness as "one which is not confiscatory in the constitutional sense." *Federal Power Commission v. Natural Gas Pipeline Co.,* 315 U.S. 575, 585 [62 S.Ct. 736, 742, 86 L.Ed. 1037] (1942); *Washington Public Interest Organization v. Public Service Commission,* [*supra* at 76]. From the consumer standpoint, the upper boundary cannot be so high that the rate would be classified as *"exorbitant." [Metropolitan Washington Board of Trade v. Public Service Commission, supra* at 350 (emphasis in original).]

If the overall effect of a rate order is found to be reasonable, judicial inquiry must stop; any infirmities in the method employed to determine those rates becomes immaterial. *Federal Power Commission v. Hope Natural Gas Co., supra* 320 U.S. at 602, 64 S.Ct. at 287; *People's Counsel v. Public Service Commission, supra* at 46. As the return on equity authorized in this case lies within the "zone of reasonableness," we find no error with respect to either aspect of the rate of return determination.

### A. *Return on Common Equity*

Three witnesses presented evidence on the cost of WGL's common equity. Each relied primarily upon a "discounted cash flow" (DCF) analysis to arrive at a proposed return on common equity.

The DCF method takes into account current and anticipated income to the investor from dividends and the eventual sale price of the stock. The method of determining the cost of equity under the DCF approach can be stated by a rather simple formula, *i.e.,* market capitalization rate (cost of equity) equals the *current dividend yield plus anticipated growth.* This constitutes the marginal cost of equity and is commonly referred to as the "barebones" cost of capital. Rate analysts usually adjust this figure to allow for market pressure upon the issuance of additional shares of common stock and for the costs of issuing the stock. [Order 6051, at 17 (emphasis added).]

*See also In re Washington Gas Light Co.,* 16 P.U.R.4th at 274 n.8; Staff Exh. 14, Sch. 5.

The Company's witness, Patrick J. Maher, first determined the "yield" component in his DCF analysis. He assumed that utility common stocks are interest-rate sensitive: *i.e.,* that their dividend/price ratios tend to follow the general level of interest rates for long-term bonds. WGL Exh. C, at 13. Using data on newly-issued Aa-rated long-term utility bonds and stock yields for selected companies in Moody's and Standard & Poor's indices of gas distributors and electric utilities, *id.* at 13–15, Maher concluded that investors in gas distribution companies over the preceding two years had been requiring stock yields (dividends) at a level of approximately 90% of the corresponding bond yields. He further stated that long-term utility bonds had recently been selling with yields of 8 to 9%. *Id.* at 22. Assuming average future bond yields of 8.5%, he projected that the stock dividend/price ratio of his comparison companies would be about 7.5% to 7.75%. *Id.* at 23.

To derive the "growth" component of his DCF analysis,[32] Maher calculated the

---

**32.** Although the "growth" component of the DCF analysis is intended to represent the "expected future growth in the value of the equity investor's investment," *New England Tel. & Tel. Co. v. Public Utils. Comm'n, supra* at 36, there is a lack of unanimity as to the best

indicator of expected growth. Factors which are widely considered relevant in predicting growth (and which were relied upon in various combinations by the three witnesses on rate of return in this case) include the historical growth patterns of dividends, book value, and

growth in retained earnings for the Standard & Poor's and Moody's groups of natural gas distributors during the period 1974–76. Those companies showed an average growth of 4.72% in 1974, 5.02% in 1975, and 5.97% in 1976. WGL Exh. 3. Sch. 19. Based on these figures, Maher estimated that investors reasonably could expect growth in the neighborhood of 5.5% to 6.0% when investing in the gas distribution industry. WGL Exh. C. at 21. Adding that projection to the dividend yield component, he concluded that the "investors' capitalization rate" or "marginal cost of equity" in the industry was approximately 13% to 13.75%. *Id.* at 23.

Maher further stated his belief that the return on equity should be higher than the marginal cost of equity. If the Company realized only the marginal cost of equity capital on sales of common stock, he claimed, its stock would sell at book value. Due to the cost of floating additional common shares, however, he argued that the utility would actually receive less than the book value of its present stock from new investors. Thus he concluded that sales at book value would dilute existing equity and reduce the value of outstanding shares. *Id.* at 23. Maher recommended a return on common equity of 14.0% to 14.5%, which he believed would promote the sale of WGL's stock at a market-to-book premium of approximately 11.5%. *Id.* at 24–25.[33]

The Staff's witness, Gerald J. Glassman, like Maher based his DCF analysis on historical yield and growth data for a representative group of gas distributors. Glassman selected from Standard & Poor's data file on 155 utility companies, twelve comparison companies with characteristics approximating those of WGL; these characteristics included 1976 sales between $65 million and $500 million, with gas sales providing at least 90% of total revenues, and equity ratios between 25% and 45%. (WGL during 1976 had operating revenues of $270 million, entirely from gas sales; its equity ratio was approximately 35%.) Staff Exh. 14, at 28–29 & Sch. 6. Using data on WGL and the comparison companies for the years from 1967 to 1976, *see id.,* Sch. 6, he estimated that WGL's dividend yield should be approximately 8.25%. *Id.* at 36. He further concluded that a reasonable expectation of growth in common stock value would be "no more than 4%." *Id.* at 34. Adding these two components together, he determined that the market capitalization rate or marginal cost of WGL's common equity was approximately 12.25%. *Id.* at 36. To this figure Glassman recommended adding a 7.5% allowance to compensate for the effect of flotation costs and market pressure.[34] His resultant proposed return on equity was 13.24%. *Id.* at 39–40.

People's Counsel's witness, Dr. Caroline M. Smith, used a DCF methodology similar to the one employed by Glassman. She selected as comparison companies fifteen gas distribution companies that were listed in the Value Line Investment Survey and

retained earnings of representative utilities. *See, e.g.,* WGL Exh. C, at 20–21; Staff Exh. 14, at 27; PC Exh. B, at 11–12.

**33.** From 1974 to 1976, WGL's common stock sold on the open market at an average discount of more than 40% below book value. This figure was well below the average market-to-book ratio for comparable gas distributors during the same period. *See* Staff Exh. 14, Sch. 11; WGL Exh. 3, Sch. 16.

**34.** Glassman's estimate of 7.5% was based upon studies of selling costs and market price movements in recent years. Selling costs for new issues by gas companies ranged from 3% to 7% in 1976 and 1977. During the same two years, there were both positive and negative market pressures in the gas industry. Staff Exh. 14, at 40–41 & Sch. 12. "Market pressure" is the impact of a new stock issuance on the price of the stock. It is measured by projecting the difference between the offering price of the new issue, and the price that would have prevailed in the absence of the new offering, after allowing for upward or downward movements of the market as a whole during the period between announcement of the new issue and the pricing date. *See* PC Exh. B. at 30, 33; Staff Exh. 14, at 40. For example, an increase in the supply of a particular class of stock may have the effect of depressing the market price per share. Glassman testified that in the gas industry in 1976–1977, positive market pressures averaged 2.7%, while negative market pressures averaged 3.7%. *Id.* at 41 & Sch. 12.

that derived 85% or more of their gross revenues in 1976 from residential, commercial, and industrial gas sales. PC Exh. B, at 10 & Sch. 3. Smith calculated the "current dividend yield" for each company, (the dividend/price ratio based on average prices for June through November, 1977), and then used the average of those yields—8.22%—as the dividend yield component of her DCF analysis. Id. at 11. To derive the growth component, she studied trends in her comparison companies' earnings per share, dividends per share, and book value per share. Results for several time periods were used. From those data she concluded that investors' expectations for growth in the value of gas utility common stocks were approximately 3.5% to 4%. Id. at 12 & Sch. 4. Combining the yield and growth factors, she estimated that the market capitalization rate for the comparison companies' common equity was approximately 11.75% to 12.25%. Id. at 15 & Sch. 6. Smith then conducted a regression analysis, which indicated that the ratio of common equity in a utility's capital structure is the single most important factor influencing investor assessments of relative risk among gas distributors. The lower the common equity ratio, she found, the higher the risk. She further found that WGL's common equity ratio was significantly lower than the average for her fifteen comparison companies, thus increasing the cost of WGL's common equity by more than a quarter of a percentage point above the fifteen companies' average. She concluded that the "bare-bones" cost of common equity for WGL is in the range of 12.05% to 12.55%. Id. at 17–22 & Schs. 7–8.

Unlike Maher and Glassman, Smith disputed the need for any adjustment to cover flotation costs or market pressure. Based upon studies of the effect on securities markets of new stock and bond issuances by utilities, she concluded that market pressure has been an insignificant or nonexistent phenomenon in recent years. Id. at 30–33. She recommended that a market pressure adjustment, if made, should not exceed 3% of the price of the stock to be issued. Id. at 34. Smith also testified that WGL was not likely to issue any additional common stock within the next five years, as, she surmised, its capital needs during that period would be financed largely by debt, retained earnings, depreciation, deferred taxes, and investment tax credits. Id. at 29. This testimony was uncontradicted. See Order 6060, at 46 (Stratton, C., dissenting). Smith therefore concluded that no flotation cost adjustment was warranted, but added that if the Commission did allow such an adjustment, it should not exceed .06%. PC Exh. B, at 34–36.

■■■■■ The Commission, acting within the scope of its discretion, decided that the cost-of-equity evidence submitted by the Staff and People's Counsel was more reliable than that supplied by WGL. It explained:

The Company repeats one of the same errors which caused us to place little reliance on its return-on-equity evidence in the last case. The companies which Mr. Maher used in his analysis simply are not comparable to Washington Gas Light Company. For his long-term study, 1960–1976, he used Standard & Poor's natural gas distributors indices. When focusing on more recent industry experience, 1974–1976, Mr. Maher expanded his analysis to include the Moody's group. Unfortunately, these indices include companies which are not only in the gas distribution business, but which also have transmission facilities and produce significant quantities of gas. One company is even engaged in oil production, the sale of chemicals and chemical products, and engineering and construction services. Each of these companies had returns on equity and retained earnings growth which were greater than the average from 1974–1976. And their common stock has consistently sold at a market-to-book premium, whereas the group as a whole sold at an average discount from 1974–1976. In light of this lack of comparability, we again cannot place principal reliance on the Company's evidence.

The return-on-equity evidence of the Staff and People's Counsel avoids this deficiency. Mr. Glassman studied the

growth and dividend yield of Washington Gas Light Company and a group of 12 gas distribution companies which were selected as being representative of the gas distribution industry and similar to Washington Gas Light Company from the standpoint of investment uncertainty. Similarly, Dr. Smith studied 15 gas distribution utilities, each of which received 85 percent or more of gross revenues from gas sales in 1976. [Order 6051, at 18–19.] In accordance with the Glassman and Smith studies, the Commission determined that WGL's marginal (or "bare-bones") cost of common equity was 12.25%. Order 6051, at 18–19. This ruling cannot be said to be arbitrary, unreasonable, or unsupported by reliable and probative evidence. The Commission properly may give more credence to certain evidence than it does to other evidence which it deems less reliable. *See Goodman v. Public Service Commission,* 162 U.S.App.D.C. at 78, 497 F.2d at 665; *Washington, Marlboro & Annapolis Motor Lines, Inc. v. Public Utilities Commission,* 114 F.Supp. 328, 333 (D.D.C.1952), *aff'd,* 93 U.S. App.D.C. 63, 206 F.2d 490 (1953). The Commission had a reasoned basis for rejecting the Company's studies.

The Commission also adopted the recommendation of People's Counsel that no allowance be made for market pressure and flotation costs because "it does not appear that the Company is planning to issue new equity in the foreseeable future." *Id.* at 20. The Commission did, however, add seventy-five "basis points" to WGL's bare cost of equity, thereby raising the Company's authorized return on equity to 13%, because the Commission did not believe that a 12.25% return on equity would provide an adequate spread between the bare cost of equity and current high yields on government and utility bonds. *Id.* at 21–22. The Commission was influenced too: (1) by the

substantial market-to-book discounts on the sale of WGL stock from 1974 to 1977, *id.* at 23; *see* note 33 *supra;* (2) by the fact that the average rate of return on equity for the comparison companies selected by the Staff had been consistently higher than WGL's, Order 6051, at 23; and (3) by "the continuing uncertainty surrounding the gas supply picture." *Id.* at 24.

The Company contends that the authorized return and the resultant level of rates are unreasonable and confiscatory. In the Company's view, it was illogical for the Commission to lower WGL's authorized return on equity from 13.4%, (as established in WGL's last rate proceeding, in 1976, *In re Washington Gas Light Co.,* 16 P.U.R. 4th at 277), to 13%, in the face of · "spiralling" interest rates, particularly after the Commission had acknowledged WGL's recent poor performance with regard to market-to-book ratios, growth rates, and actual return on equity. People's Counsel and the Commission, on the other hand, urge that the rate levels established in this case are ample. They take issue with the Company's assertion that costs of capital "spiral" in the long run; on the contrary, they argue, capital costs fluctuate over time. Therefore, a reduction in the allowed rate of return on common equity is not *per se* unreasonable merely because interest rates have risen since the last rate order. Moreover, they argue, the 13% return compares favorably with the common equity earnings of those gas distributors that Staff witness Glassman found comparable to WGL.[35]

In assessing the rate of return authorized by the Commission, we are guided by two landmark decisions of the Supreme Court. In *Bluefield Water Works & Improvement Co. v. Public Service Commission,* 262 U.S. 679, 692–93, 43 S.Ct. 675, 678–79, 67 L.Ed. 1176 (1923), the Court stated:

---

**35.** *Rate Earned on Average Book Equity of Comparable Gas Distributors*

| | |
|---|---|
| 1967 | 12.99% |
| 1968 | 12.96 |
| 1969 | 12.56 |
| 1970 | 12.27 |
| 1971 | 13.08 |
| 1972 | 12.38 |
| 1973 | 13.03 |
| 1974 | 11.52 |
| 1975 | 12.77 |
| 1976 | 11.45 |

[Staff Exh. 14, Schs. 8 & 11.]

A public utility is entitled to such rates as will permit it to earn a return on the value of the property which it employs for the convenience of the public equal to that generally being made at the same time and in the same general part of the country on investments in other business undertakings which are attended by corresponding risks and uncertainties; but it has no constitutional right to profits such as are realized or anticipated in highly profitable enterprises or speculative ventures. The return should be reasonably sufficient to assure confidence in the financial soundness of the utility and should be adequate, under efficient and economical management, to maintain and support its credit and enable it to raise the money necessary for the proper discharge of its public duties. A rate of return may be reasonable at one time and become too high or too low by changes affecting opportunities for investment, the money market and business conditions generally.

In *Federal Power Commission v. Hope Natural Gas Co.,* supra 320 U.S. at 603, 64 S.Ct. at 288, the Court elaborated upon the *Bluefield* criteria:

> The rate-making process under the Act, i.e., the fixing of "just and reasonable" rates, involves a balancing of the investor and the consumer interests.... From the investor or company point of view it is important that there be enough revenue not only for operating expenses but also for the capital costs of the business. These include service on the debt and dividends on the stock.... By that standard the return to the equity owner should be commensurate with returns on investments in other enterprises having

corresponding risks. That return, moreover, should be sufficient to assure confidence in the financial integrity of the enterprise, so as to maintain its credit and to attract capital. [Citation omitted.]

The *Bluefield* and *Hope* cases continue to provide the basic framework for analyzing the fairness or reasonableness of allowed rates of return.

On the record before us, it is apparent that the 13% authorized return on common equity compares favorably with the actual returns on equity realized by those gas distributors that were found similar to WGL. *See* note 35 *supra.* Only once during the ten-year period from 1967–76 was the comparison companies' average return on equity over 13%. In the most recent year for which data was available, 1976, those companies averaged only an 11.45% return on equity.

This comparison may be somewhat misleading, because it compares WGL's *authorized* return on equity with other companies' *actual* returns. In his dissenting opinion, Commissioner Stratton matched WGL's authorized return in this case against the common equity returns authorized by respective state commissions in each of the comparison companies' most recent rate proceedings.[36] All but two of the eleven gas distributors in the Staff's comparison group had been authorized nominal equity returns in excess of the 13% allowed in this case. Nevertheless, we are unable to conclude that WGL's authorized rate of return falls outside the "zone of reasonableness." *See In re Permian Basin Area Rate Cases, supra* 390 U.S. at 767, 88 S.Ct. at 1360 (quoting *Federal Power Commission v. Natural Gas Pipeline Co.,* 315 U.S. 575, 585, 62

**36.** Commissioner Stratton set forth data showing the following *authorized* rates:

| Company | Date of Order | Equity Return |
|---|---|---|
| Alabama Gas | 12/28/76 | 12.8 % |
| Atlanta Gas Light | 12/9/76 | 13.25% |
| Brooklyn Union Gas | 11/28/78 | 13.75% |
| Indiana Gas | 11/23/77 | 15.9 % * |
| Laclede Gas | 7/1/77 | 13.4 % |
| Michigan Gas | 1/4/78 | 13.5 % |
| Minnesota Gas | 10/2/78 | 12.47% |
| N.J. Natural Gas | 12/8/77 | 13.5 % |

| Company | Date of Order | Equity Return |
|---|---|---|
| Northwest National | 1/5/79 | 13.4 % |
| Piedmont | 8/7/78 | 13.06% |
| Southwest Gas | 8/8/77 | 14.2 % |

Order 6060, at 48–49 & n.39 (Stratton, C., dissenting).

* The equity return figure for Indiana Gas is an estimate based on a fair value rate base, while the other equity return figures were calculated according to an original cost rate base.

S.Ct. 736, 742, 86 L.Ed. 1037 (1942)); *Metropolitan Washington Board of Trade v. Public Service Commission, supra* at 350. WGL's authorized rate of return is in the same general range as that of comparable utilities. The Commission's cost-of-equity determination is supported by the evidence, and its upward adjustment of that figure by seventy-five basis points, although not supported by specifically quantifiable evidence in the record, appears to be a rational attempt to bring the Company's equity return up to a competitive level.

■ Moreover, an inadequate authorized rate of return has not been primarily responsible for WGL's financial plight in recent years: The Company has been unable to earn its allowed return. This appears to be a common experience. *Compare* the table of authorized earnings for comparable companies, note 23 *supra,* with the table of actual earnings for comparable companies, note 22 *supra.* A utility's inability to realize its authorized return is usually caused by inflationary forces (in the form of attrition in the rate base and increased operating expenses), inefficient management, or both. There is no evidence (nor has any party alleged) that WGL has been improvidently managed; there is, however, no doubt that inflation has affected, and continues significantly to affect, regulated utilities. We later discuss separately the question of whether the Commission has

taken legally adequate steps to account for attrition and inflation. At this juncture, we conclude that the Commission's determination of a 13% rate of return on equity is supported by the record and is not confiscatory or unreasonable as a matter of law.[37]

### B. *Treatment of Gains Realized on Reacquisition of Long-Term Debt*

As part of a predetermined sinking fund obligation, WGL periodically repurchases some of its outstanding long-term debt. The Company is able to reacquire these obligations at less than their par value when their coupon rate is lower than the coupon rate in the current bond market. When a bond is repurchased at less than par, the company realizes a gain. From 1955 through 1977, WGL realized from such purchases gains totaling $3,747,000.

Prior to the ratemaking proceeding in issue here, it was WGL's practice to account for these gains as "below-the-line" profits— that is, net earnings accruing to the benefit of the company's stockholders, rather than its ratepayers—in the year the applicable debt was retired. Thus, whenever WGL repurchased one of its debentures at less than face value, the resultant gain was treated as part of the Company's retained earnings and, presumably, was taken into account when the Company declared shareholder dividends.[38]

---

**37.** Since we find the 13% allowed return on equity to be lawful on its face, we need not discuss whether the Commission was justified in declining to factor into its determination an adjustment for market pressure and flotation costs. Any infirmities in the method employed by the Commission are immaterial as long as the net result or overall effect of the Commission's order is reasonable. *Federal Power Comm'n v. Hope Natural Gas Co., supra* 320 U.S. at 602, 64 S.Ct. at 287; *People's Counsel v. Public Serv. Comm'n, supra* at 46. We note at any rate that the Commission took alternative steps to adjust upward the bare cost of equity, and WGL does not specifically contest the Commission's findings in this respect.

**38.** In *Washington Pub. Interest Org. v. Public Serv. Comm'n, supra* at 82, we outlined the basic principles of public utility accounting:

A regulated company's balance sheet segregates the "utility plant" assets (including

land), which are "used and useful" in serving the public, from the company's other assets—called "nonutility property"—which are carried on the books, most commonly, as investments. [J. SUELFLOW, PUBLIC UTILITY ACCOUNTING: THEORY AND APPLICATION 25–31 (1973).] Similarly, the company's income statement carefully separates "utility operating income" and related expenses from its "other income" arising out of activities beyond the Commission's jurisdiction. *Id.* at 20–25. Gains and losses on "utility" operations generally are allocated "above the line" to the ratepayers, whereas "nonutility" gains and losses are allocated "below the line" to the investors. *Id.* at 23–24. In a sense, therefore, each public utility is at least two companies: one serving and accountable to the public (through the good offices of the Commission) and the other accountable solely to its investors.

Until the ratemaking proceeding presently before us, this accounting practice apparently was not challenged by the Commission. In the instant proceeding, however, the Commission ruled that this treatment of gains is unrealistic and inequitable, at least for ratemaking purposes. The Commission instead determined that the gain realized from each repurchase should be amortized over the remaining life of the particular debt retired, and that each year during that remaining life, the amounts so amortized should be used to offset the Company's overall cost of debt. The effect of this policy is to shift the benefits of these gains from the Company's shareholders to its ratepayers, since a utility's cost of debt is a factor considered by the Commission in setting the authorized overall rate of return.[39] The rationale behind this policy shift was described by the Commission as follows:

> Any reduction in or savings associated with the cost of debt should be passed on to the customers. This is the corollary of the principle that all legitimate costs incurred in financing or refinancing debt are part of the cost of debt and should be passed on to the consumer. [Order 6051, at 12.]

The policy thus prescribed by the Commission is not a novel one. Rather, the Commission followed the decision of the Federal Power Commission (FPC) in *Manu-facturers Light and Heat Co.,* 44 F.P.C. 314, 319–26, 84 P.U.R.3d 511, 516–22 (1970), in which the FPC announced a policy virtually identical to that adopted in this proceeding. The FPC has reaffirmed its *Manufacturers Light & Heat Co.* ruling on several occasions. *See, e.g., Columbia Gulf Transmission Co.,* 53 F.P.C. 2016, 2024–25, 10 P.U.R.4th 116, 122–23 (1975); *Kansas-Nebraska Natural Gas Co.,* 53 F.P.C. 1691, 1708, 9 P.U.R.4th 481, 496–97 (1975), *aff'd sub nom. Kansas-Nebraska Natural Gas Co. v. Federal Power Commission,* 534 F.2d 227 (10th Cir. 1976); *Consolidated Gas Supply Corp.,* 52 F.P.C. 454, 465, 5 P.U.R.4th 418, 427–28 (1974). *See also Accounting for Premium, Discount and Expense of Issue, Gains and Losses on Refunding and Reacquisition of Long-Term Debt, and Interperiod Allocation of Income Taxes,* Order No. 505, 51 F.P.C. 714, 39 Fed.Reg. 6,093 (1974), *rehearing denied,* 51 F.P.C. 1746 (1974), *clarified & aff'd,* 59 F.P.C. 591 (1977), *aff'd mem. sub nom. Texas Eastern Transmission Corp. v. Federal Energy Regulatory Commission,* 187 U.S.App.D.C. 426, 574 F.2d 637, *cert. denied,* 439 U.S. 836, 99 S.Ct. 119, 58 L.Ed.2d 132 (1978). In addition, a nearly unanimous consensus of state regulatory bodies agree that gains as well as losses resulting from the repurchase of debentures should be passed on to ratepayers.[40]

---

These allocations either to ratepayers or to investors are implemented on the company's books through use of accounts established under the Uniform System [of Accounts] to reflect transactions with specified consequences above or below the line. Fundamentally, therefore, a utility's accounting system is designed to channel entries into accounting categories intended to have a prescribed impact on periodic ratemaking. *Id.* at 24. [Footnote omitted.]

**39.** In numerical terms, the effect of the PSC's decision is to reduce the cost of long-term debt in the test year by $275,000, to a cost rate of 7.04%. Long-term debt represents 48.3% of WGL's total test-year capital. Order 6051, at 25 & n.1. For a description of how the various components of capital structure figure in the determination of the authorized rate of return, see notes 30 & 31 *supra.*

**40.** Some state commissions amortize the gains realized from these acquisitions over the remaining lives of the retired bonds, as did the FPC in *Manufacturers Light & Heat Co., supra,* and the PSC in the case before us. *See, e.g., In re Southern Cal. Gas Co.,* 27 P.U.R.4th 63, 73 (Cal.P.U.C.1978); *In re Montana-Dakota Util's Co.,* 21 P.U.R.4th 1, 24 (S.D.P.U.C.1977); *In re Sierra Pac. Power Co.,* 15 P.U.R.4th 560 (Nev.P.S.C.1976) (abstract). Other states, however, utilize different methods for computing the amount by which the cost of debt will be offset by these gains. Rather than amortizing the gains over the remaining lives of the debentures, some state agencies, for example, reduce the cost of debt in the test year by the average gain over the preceding five-year period. *See In re Consumers Power Co.,* 3 P.U.R.4th 321, 331–32 (Mich.P.S.C.1974). Others simply use actual or estimated test year gains to reduce the cost of debt in that test year. *See, e.g., In re Elizabethtown Gas Co.,* 3 P.U.R.4th 182, 190–91 (N.J.Bd.Pub.Util.Comm'rs 1973); *In re National Fuel Gas Distrib. Corp.,* 17 P.U.R.4th 138, 154 (N.Y.P.S.C.1976). While all of these methods are designed to pass on to consumers

WGL does not contest the Commission's decision to implement such a policy. The Company contends, however, that the Commission properly could consider only those gains realized on purchases in the test year and thereafter. Instead, the Commission adopted the approach followed by the Federal Power Commission in *Manufacturers Light and Heat Co., supra:*

> [T]he amount of gains to be used as an offset to interest costs should be the pro forma amount that would have been amortized during the test year had such gains been amortized over the remaining life of the debt from the date of realization to the date of maturity of the issues involved. [Order 6051, at 14–15 (citing *Manufacturers Light and Heat Co., supra* at 324–26, 84 P.U.R.3d at 520–21).]

Put in simpler terms, the Commission announced that for ratemaking purposes it would look to all gains realized since the repurchasing scheme began in 1955; that it would treat those gains as if they had been amortized from the time of repurchase over the remaining lives of the bonds involved; and that it would offset the cost of long-term debt in the test year (1977) by the sum of the portions of these gains which would have been amortized in that year under such a system of accounting. WGL argues that by dipping back into gains realized prior to the test year, which were recorded by the Company as "below-the-line" earnings under the then-acceptable method of accounting, the Commission has engaged in a type of retroactive ratemaking proscribed in *Board of Public Utility Commissioners v. New York Telephone Co.,* 271 U.S. 23, 46 S.Ct. 363, 70 L.Ed. 808 (1926). In that case, the Supreme Court struck down an order that the telephone company make up future earnings deficiencies out of excessive depreciation reserves accumulated in the past. The Court stated:

> The revenue paid by the customers for service belongs to the company. The amount, if any, remaining after paying taxes and operating expenses, including the expense of depreciation, is the company's compensation for the use of its property. If there is no return, or if the amount is less than a reasonable return, the company must bear the loss. Past losses cannot be used to enhance the value of the property or to support a claim that rates for the future are confiscatory. . . . And the law does not require the company to give up for the benefit of future subscribers any part of its accumulations from past operations. Profits of the past cannot be used to sustain confiscatory rates for the future. [*Id.* at 31–32, 46 S.Ct. at 366 (citations omitted).]

In the proceedings below, the Commission acknowledged that "past excessive earnings belong to the regulated utility just as past losses must be borne by it. A course of action which would violate this doctrine is commonly referred to as retroactive ratemaking." Order 6060, at 7. The Commission, however, went on to rule:

> We were very careful not to indulge in retroactive ratemaking. The Commission's decision does not deprive stockholders of any past gains to which they were entitled prior to our decision in this case. They are permitted to keep all those gains which would have been amortized prior to the test year had the Commission instituted a policy of passing on the gains to the customers at the time the gains were realized. The customers get only the remaining pro forma unamortized gains which fall within the test period and in successive years. Under these circumstances, we do not think that it can be fairly said that we have engaged in retroactive ratemaking. [*Id.*]

WGL contends on appeal that the Commission did not go far enough to avoid retroactivity. The Company argues, in effect, that because the Commission until now has tolerated the utility's practice of accounting for these gains as below-the-line

---

the benefits of the gains on reacquired debt, the latter approach has been criticized because it "would permit the timing of reacquisitions to occur prior to the test year thereby benefiting the shareholders while burdening the ratepayer with the refinancing cost." *In re Kansas-Neb. Natural Gas Co., supra* at 1708, 9 P.U.R.4th at 497.

earnings, its stockholders acquired a vested entitlement to the entire amounts of all gains realized prior to the 1977 test year. The Commission and People's Counsel urge, on the other hand, that since it is the ratepayers who ultimately bear the cost of the utility's debt, any gains arising from reacquisitions of long-term debt should inure to the ratepayers' benefit in the form of a reduction in current debt cost. People's Counsel contends that it is no more an act of retroactivity to use these past gains as offsets to present debt cost than it is to permit WGL to charge present ratepayers for the current cost of debt securities issued in years past.

We agree with the Commission and People's Counsel that the Company's argument denies the realities—as well as the equities—of long-term debt financing. When a utility repurchases a debenture in the open market at a discount, the effect of such a transaction is to reduce the company's embedded cost of debt. This is true regardless of whether the discount is treated for accounting purposes as a reduction in debt expense or, as has been WGL's practice, as retained earnings. In other words, gains on reacquired debt reduce the company's embedded cost of debt, irrespective of the utility's accounting practices. As the Federal Power Commission noted in *Manufacturers Light and Heat Co., supra* at 323–24, 84 P.U.R.3d at 519–20:

> [T]he discounts on repurchased debt under consideration here represent a savings which is virtually automatic. [The utility] is required to repurchase its debentures for sinking fund purposes. So long as interest rates continue above the levels of the early 1950's, such repurchases will continue to be made at discounts each year. Unless amortization of these amounts is required, the cumulative effect will be to add large sums to retained earnings, with no benefit to consumers. Yet consumers will continue to pay the cost of debt, including new debt issued at higher rates to replace that retired.

> \* \* \* \* \* \*

Patently, all legitimate costs incurred in financing or refinancing debt are part of the cost of debt, and should be passed on to the consumer. Conversely, any reduction in or savings associated with cost of debt also should be passed on to the consumer.

\* \* \* \* \* \*

Since management is required . . . to incur both premiums and discounts associated with prudent retirement of debt, it is neither accurate nor equitable to describe such charges and credits as fortuitous. Instead, sound principle requires that they be treated as a normal and recurring part of utility financing and given appropriate recognition in determining the true cost of debt.

The question of retroactive ratemaking was not discussed as such in *Manufacturers Light and Heat Co.* In that case, however, the FPC amortized gains over the remaining lives of debentures retired from 1956 through the test year, 1969, even though it apparently had never before announced such a ratemaking policy. Later, in *Columbia Gulf Transmission Co.,* 53 F.P.C. 2016, 2024–25, 10 P.U.R.4th 116, 122–23 (1975), the FPC rejected a utility's argument that the agency properly could amortize only those gains realized since the date the utility began amortizing such gains for accounting purposes. *Cf. Washington Public Interest Organization v. Public Service Commission, supra* at 82–85 (PSC is not bound to conform ratemaking policies with accounting method used by utility even where system of accounting was prescribed by the Commission).

■ We think that the ratemaking policy announced in the federal precedents and adopted by the Commission here is soundly supported by the realities of long-term debt financing. As the FPC noted in *Manufacturers Light and Heat Co.,* the savings in debt cost associated with the repurchase of debentures at a discount are "virtually automatic." 44 F.P.C. at 323, 84 P.U.R.4th at 519. Furthermore, it is the ratepayers, rather than the stockholders, who are burdened with payment of income taxes on the

gains realized, as well as with the cost of financing new debt issued by the Company to replace the retired debt.[41] Accordingly, we find that the Commission's amortization of all gains realized since 1955 did not constitute illegal retroactive ratemaking. The fact that the Commission until now has acquiesced in the Company's use of a method of accounting that did not reflect the actualities or the equities of debt financing provides an insufficient basis to hold that WGL's stockholders acquired an immediate "vested" interest in all gains realized prior to the 1977 test year. We therefore affirm the Commission's treatment of gains realized on the reacquisition of long-term debt.

## IV. PROPOSED ADJUSTMENTS TO ACCOUNT FOR POST-TEST-PERIOD CHANGES IN OPERATING EXPENSES AND RATE BASE

### A. Attrition

The Company challenges the Commission's denial of its request for an additional 0.5% authorized return on rate base above and beyond the return indicated by the cost-of-capital computation in order to offset the effects of attrition.[42] The Company's request for an incremental attrition allowance was in addition to its plea for more conventional attrition remedies such as a year-end rate base and pro forma adjustments to its test-period operating expenses. The 0.5% figure represented approximately one-half of the projected effect upon the Company's earnings of two specific factors that WGL anticipated would cause attrition: expanding rate base and increased direct labor costs. See WGL Exh. C, at 29–31. The Company's witness, Maher, estimated that WGL's year-end rate base for the District would be $87 million for 1977 and $92.4 million for 1978, representing an annual growth rate of 6.21%.

He further projected that when the Company's then-current labor agreement expired on May 31, 1978, a new settlement would be reached at a five or six percent increase. Id. at 29–30.

The Commission Staff also recommended that a specific attrition allowance be granted. Its witness, Glassman, estimated WGL's 1978 rate base growth at about three percent, to $89.6 million by year-end. He suggested that the attrition allowance should be based solely on expected rate base expansion, and not on anticipated increases in operating costs (such as wages and pensions). Accordingly, he proposed an incremental allowance of 0.27% on the year-end 1977 rate base. Staff Exh. 14, at 46–58; see id., Schs. 14–15.

People's Counsel opposed any lump-sum attrition allowance. Its witness, Daniel Sack, testified that attrition would be mitigated adequately by the use of a year-end rate base and by allowing the Company to make pro forma adjustments to reflect known increases during 1977 and 1978 in the costs of labor, pensions, insurance, taxes, peak-shaving gas, and other expense items. PC Exh. C. at 30–31. See also WGL Exh. D, at 6–9; WGL Exh. 4, at 4–21, 23, 25–26 (testimony and exhibits prepared by Lewis G. Unkle). People's Counsel suggested also that the effects of attrition would be offset further by increased operational efficiencies, which a WGL witness had predicted would be forthcoming. See WGL Exh. A, at 5–7 (testimony of Paul E. Reichardt). Finally, People's Counsel referred to testimony by Staff witness Glassman to the effect that customer contributions to capital in the form of deferred income tax accumulations would continue to rise each year and would not be reflected in the Company's cost of service until the next rate proceeding is instituted.

---

**41.** It should be noted that the same rising interest market which allows the Company to repurchase debt at a discount also makes the new financing more costly.

**42.** "Attrition" is the tendency of a utility's rate of return to diminish over time as a result of high construction costs, an expanding rate base, and increasing operating costs. Factors

exacerbating attrition are inflation and regulatory lag: construction and operating expenses rise while the utility's tariffs remain fixed. See Potomac Elec. Power Co. v. Public Serv. Comm'n, supra at 23; Telephone Users Ass'n v. Public Serv. Comm'n, D.C.App., 304 A.2d 293, 298 (1973), cert. denied, 415 U.S. 933–34, 94 S.Ct. 1448, 1449, 39 L.Ed.2d 492 (1974).

The Commission essentially adopted the position urged by People's Counsel. It stated in part:

The Commission is sympathetic to the attrition problem which the Company has been experiencing throughout the 1970's. It is a matter of great financial importance to the Company as well as to District customers. Nevertheless, on the basis of this record we are hesitant to adopt the proposed solution of a lump-sum adjustment; we are not convinced that a lump-sum adjustment to the revenue requirement is a reasonable approach to the attrition problem in this case.

For purposes of this case, we will continue to rely on the corrective measures adopted in past cases. The year-end rate base which this Commission uses has long been recognized as a device to compensate for attrition resulting from a growth in investment which outstrips growth in revenues. Although this device does not alleviate attrition stemming from expenses growing faster than sales, the Commission does adjust test-year expenses for "known changes" which occur during, or within a reasonable period subsequent to, the test year.

In an effort to formulate policy for future cases, the Commission has decided to undertake a thorough reevaluation of the problem. We recognize that year-end rate base and pro forma adjustments may not be adequate in the years to come. Much depends on the future trends in the underlying factors which affect the Company's attrition rate. [Order 6051, at 27–28.]

The Commission suggested that alternative remedies, such as a projected test year, might be preferable to a lump-sum attrition allowance, and stated its intention to institute a separate proceeding "in the near future" to reevaluate the problem.[43] Id. at 28–29.

In its Application for Reconsideration of the Commission's final order (submitted April 16, 1979), the Company renewed its request for attrition relief. It proffered new data tending to demonstrate that the newly-approved rates were already insufficient to allow WGL its authorized return.[44] It asked that the Commission recompute WGL's revenue requirement using a pro forma test year ending December 31, 1978.

On April 26, 1979, the Commission issued its First Order on Reconsideration (Order No. 6069), in which it denied the Company's plea that updated figures be substituted for the "stale" test-year data. The Commission found that WGL's request to supplement the record came much too late. It noted that if it decided to incorporate the Company's post-1977 test-year evidence into the case at that time, it would be compelled to reopen the record in order to allow other parties to confront WGL's witnesses and test their 1978 and 1979 calculations. Such an endeavor, it found, would be tantamount to initiating a new rate proceeding. Order 6069, at 2–3.

We agree with the Commission that it was under no obligation to consider extra-record evidence that was offered for

43. We note that the Commission has since begun rulemaking proceedings to address the problem of attrition. See 27 D.C.Reg. 2,794 (June 27, 1980); Zinder Companies, Inc., Policy Options for the Ratemaking Treatment of Attrition (report and recommendations prepared for the Public Service Commission). Though the Commission has issued its final Rules of Practice and Procedure, (which were first proposed together with the Zinder report), see 28 D.C. Reg. 2,984 (July 3, 1981), as amended id. at 3,343 (July 24, 1981), the Commission has not yet taken any final action on the attrition issue.

44. In prepared testimony, Mr. Maher testified that if the new rates had been in effect during 1978, WGL's District of Columbia operations

would have produced a return on average rate base of 8.61% and a return on equity of 11.38%. (This is compared with the authorized returns of 9.25% and 13%, respectively; the comparability of the returns on rate base is dubious, however, since the Company used an average, rather than year-end, rate base to arrive at the 8.61% figure.) He also testified that at the "going level" of expenses as of March 16, 1979, the Company's returns under the new rates would be 6.73% on rate base and 6.42% on equity. Finally, Maher projected the Company's pro forma returns for calendar year 1978 at 5.86% on rate base and 4.15% on equity.

the first time after the Commission's final order had been issued. While it may be an abuse of discretion for an agency to ignore the most recent data on the record of a proceeding, *see West Ohio Gas Co. v. Public Utilities Commission* (No. 2), 294 U.S. 79, 81–82, 55 S.Ct. 324, 325, 79 L.Ed. 773 (1935); *Potomac Electric Power Co. v. Public Service Commission, supra* at 18–19; *Telephone Users Association v. Public Service Commission,* D.C.App., 304 A.2d 293, 298 (1973), cert. denied, 415 U.S. 933–34, 94 S.Ct. 1448, 1449, 39 L.Ed.2d 492 (1974), the same cannot be said as easily for evidence submitted after the record has been closed and a final opinion issued. *See Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.,* 419 U.S. 281, 294–96, 95 S.Ct. 438, 446–47, 42 L.Ed.2d 447 (1974) ("we have always been loath to require that factfinding begin anew merely because of delay in proceedings of such magnitude and complexity"); *Illinois Commerce Commission v. United States,* 292 U.S. 474, 480–81, 54 S.Ct. 783, 785, 78 L.Ed. 1371 (1934); *cf. Potomac Electric Power Co. v. Public Service Commission, supra* at 19 ("[A] request to use more recent data submitted in a last minute filing . . . is not necessarily a fair or reasonable request. It is to be resolved in the reasonable exercise of the Commission's discretion.") (footnote omitted). Only in exceptional circumstances is it appropriate for a reviewing court to remand a final ratemaking decision in order to update a "stale" record. *See Atchison, Topeka & Santa Fe Railway Co. v. United States,* 284 U.S. 248, 52 S.Ct. 146, 76 L.Ed. 273 (1932) (Commission's refusal to reopen record in light of the economic metamorphosis brought on by the Great Depression was an abuse of discretion). Although the PSC consumed a considerable amount of time before rendering a decision after the record in this case was closed—perhaps due to the number of novel and complex issues raised—we do not find any "exceptional" circumstances justifying a reopening of the record. On appeal, WGL contends that the Commission failed to state adequate findings of fact in support of its decision, and argues, in effect, that, in light of the con-

tinuing erosion to its rate of return caused by inflation, the failure to provide an attrition allowance was *per se* unreasonable.

No party disputes the fact that WGL's earnings have suffered from attrition in recent years, or that inflation is likely to remain an economic reality in the near future. The Commission recognized the Company's earnings erosion and took several steps that it considered sufficient to combat attrition in this case. Besides routinely allowing WGL to amend its original application (based on a calendar 1976 test year) to incorporate a test year ending June 30, 1977, the Commission also (1) adjusted the mid-1977 test period to reflect known changes in operating costs occurring shortly thereafter, and (2) used a year-end rate base (as of December 31, 1977) in establishing WGL's revenue requirements. WGL's argument, that the Commission was required to grant further relief in the form of an attrition allowance to compensate for expected growth in the rate base and anticipated increases in labor costs, is, we find, without merit.

Although other jurisdictions have accepted separate attrition allowances as a valid means of hedging against inflation, *see, e.g., Legislative Utility Consumers' Council v. Granite State Electric Co.,* 119 N.H. 359, 362–63, 402 A.2d 644, 646–47 (1979) (attrition allowance of 0.5% of rate base upheld); *In re Georgia Power Co.,* 30 P.U.R. 4th 409, 420–21 (Ga.P.S.C.1979) (authorized return on equity increased by 0.7% to account for attrition), a majority of state regulatory commissions adhere to the view that, absent extraordinary conditions, using a year-end rate base and making adjustments for known and measurable changes occurring within a reasonable time after the test period are sufficient steps to offset attrition. *See, e.g., In re General Telephone Co.,* 19 P.U.R. 4th 227, 232–35 (Fla.P.S.C.1977); *In re Kansas Power and Light Co.,* 13 P.U.R.4th 213, 223 (Kan.St.Corp.Comm'n 1975); *In re East Ohio Gas Co.,* 16 P.U.R.4th 137, 153–54 (Ohio P.U.C. 1976); *In re Chesapeake and Potomac Telephone Co.,* 19 P.U.R.4th 349, 363–64 (Va.St.Corp.Comm'n

1977). General allegations of as-yet-un-quantified future cost increases and rate base expansion do not provide an automatic entitlement to incremental attrition relief.

Effective ratemaking requires "an honest and intelligent forecast as to probable price and wage levels" in the near future. *McCardle v. Indianapolis Water Co.*, 272 U.S. 400, 408, 47 S.Ct. 144, 147, 71 L.Ed. 316 (1926). *See also Telephone Users Association v. Public Service Commission, supra* at 300–03. To be sure, WGL made a bona fide attempt to quantify the expected growth in its rate base during the year 1978 and the estimated increase in labor costs that would be engendered by the new labor agreement (to be negotiated following the expiration of the then-existing contract on May 31, 1978). However, there were a number of countervailing factors in the record that support the Commission's refusal to grant a supplemental allowance based on those estimated increases. First, there was a significant lack of unanimity as to the expected growth in WGL's rate base. The Company's prediction was more than 100% greater than that of the Staff, and People's Counsel challenged the methodology used by both. Second, the Company's projection with respect to future wage levels not only was speculative, but also related to a labor settlement that was yet to be negotiated and, in any event, would not take effect until June 1, 1978. The Commission did not act unreasonably in refusing to grant rate relief on the basis of conjectural costs so far removed from the test period. Third, there was evidence that the size of WGL's labor force had declined steadily in recent years, due in part to productivity efficiencies. There also was evidence that the Company expected to cut costs in some areas through improved technologies in the near future.

In addition, a Company witness pointed out that customer contributions in the form of deferred income taxes should continue to rise each year. Evidence was adduced that the gas supply picture for the near future had improved since WGL's last rate proceeding. The Company recently had been authorized to expand its service obligation by up to 5,000,000 therms per year to a maximum of 3,000 new customers. *See* note 49 *infra.* And finally, we observe that the Commission computed WGL's operating expenses using a 48% federal corporate income tax rate, whereas Congress had recently lowered the actual rate to 46%, effective January 1, 1979. Since we today affirm the Commission's use of the 48% tax rate (*see* Part IV (B) *infra*), the savings that the Company realizes on the difference between the two rates will serve also to mitigate attrition.[45]

In sum, although it is generally desirable for the Commission to account for changes in costs or in the rate base occurring within a reasonable period after the test year—even when this entails making educated forecasts—there were sufficient offsetting factors in this case to justify the Commission's refusal to grant the Company separate relief based on projected post-test-year rate base expansion and labor expense increases. On the basis of the record before us, we cannot conclude that the Commission committed reversible error in finding that the Company had failed to justify its request for a separate attrition allowance.

### B. *Federal Income Tax Rate*

The Commission computed WGL's revenue requirements using the 48% federal corporate income tax rate, which was in effect until December 31, 1978.[46] Order 6060, at

**45.** Another possible factor weighing against a separate attrition allowance was suggested by the Virginia State Corporation Commission, which postulated that when attrition is found to exist, capital markets will reflect the expectation of the erosion of earnings in the cost of equity capital, (which in turn will be reflected in the utility's authorized rate of return). It stated:

A threshold question in evaluating the concept of attrition, as proposed, is whether the

so-called attrition phenomenon is already taken into account in determining the cost of capital.... If the cost of capital already includes an implicit attrition allowance by way of a risk premium, no further allowance or adjustment is needed. [*In re Chesapeake & Potomac Tel. Co., supra* at 364.]

**46.** [W]hen setting new gas rates, the Commission accounts for income taxes in two ways. The test year cost of service includes an

9–10. People's Counsel and the GSA contend here, as they did before the Commission, that since the rates in issue here went into effect on March 16, 1979, upon the issuance of Order 6060, the Commission should have used instead the newly-enacted 46% tax rate, which became effective on January 1, 1979. The Commission and the Company respond that the 46% rate was properly rejected because of its remoteness from the test year.[47] If it were to be utilized, they argue, equity then would require that a number of post-test-period cost increases (which were not reflected in WGL's pro forma test-period expenses) also be incorporated. WGL additionally contends that People's Counsel's espousal of the 46% tax rate is inconsistent with its position opposing an attrition allowance. The Commission stated:

Were we to consider the new 46 percent corporate income tax rate, fairness and consistency would dictate that we likewise consider other offsetting changes in the tax laws, together with changes in other expenses, such as higher wage rates for labor. And in fact, the reduction in the income tax rate effective in 1979 is not the only change in the tax laws. Both the taxable wage base and the percentage rate for the social security tax (FICA) have been increased for 1979. There could well be other changes which, in the aggregate, might more than offset any rate reduction occasioned by using the 46 percent tax rate. But People's Counsel has failed to address this question of offsetting post-test year increases in expenses. For the reasons stated, we cannot grant People's Counsel's exception on this point. [Order 6060, at 10 (footnote omitted).]

The Commission's interest in using income and expense data from a discrete time period, the test year, and its reluctance continually to extend that period until the issuance of its Final Order, are, we conclude, not unreasonable limitations on the ratemaking process. *See Potomac Electric Power Co. v. Public Service Commission,* supra at 18–19. The Commission's use of the 48% tax rate must therefore be affirmed.

V. TREATMENT OF EXPENSES INCURRED FOR ADVERTISING, TRADE ASSOCIATION MEMBERSHIP, COMMUNITY AFFAIRS PROGRAMS, AND BUSINESS AND CIVIC ORGANIZATION SUPPORT

The Commission, over the dissent of Commissioner Stratton, found that certain expenses, including $95,000 for general advertising, $56,000 for trade association dues, $130,000 incurred in providing information to schools and community groups, and $35,000 for membership dues and support payments to civic and business organizations, did not inure to the benefit of WGL's customers. The Commission therefore concluded that these expenses should be borne by the Company's shareholders, rather than its ratepayers. Order 6051, at 68–74. The Commission concurrently announced its intention to initiate rulemaking hearings on the treatment of advertising expenses in the near future. *Id.* at 69.

On appeal the Company argues that the Commission's change of policy was arbitrary and unreasonable. The Commission and People's Counsel respond that the Commission acted within the scope of its al-

---

allowance for income taxes paid on test year taxable income. From this cost of service, the Commission determines any deficiency in the revenues generated from the existing rates, when compared to the revenues needed to permit the Company to earn the allowed rate of return. The second tax component relates to this revenue deficiency. When the Commission increases rates to eliminate the revenue deficiency, the increase granted includes an additional allowance so that the Company can pay the taxes on the

increased revenues and still net the amount needed to remove the revenue deficiency. This is the so-called "tax multiplier." [Order 6060, at 9.]

**47.** The test year ended on June 30, 1977. Thus, People's Counsel and GSA would have the Commission utilize a tax rate which did not become effective until 18 months after the end of the test period.

lowed discretion and that, as the Company failed to prove that these expenditures directly benefited the ratepayers, the Commission's action must be sustained. Finding no error, we affirm the Commission's treatment of these expenses.

### A. Advertising expenses

In the proceedings before the Commission, People's Counsel proposed that WGL's general and administrative expenses be reduced by $95,000, the amount expended by WGL on general advertising during the test year. First, People's Counsel contended that WGL had for accounting purposes treated the advertising expenses as being "of a good will or institutional nature which is ... designed to improve the image of the utility or the industry," rather than as "informational." [48] Second, Daniel Sack, the witness for People's Counsel, stated in prepared testimony that, in light of restrictions on the Company's authorization to expand service to new customers,[49] he considered it inappropriate to charge advertising expenses to the ratepayers.[50]

WGL's witness, Unkle, responded that, despite the "technical wording" of the Uniform System of Accounts, over half the expenses in the account represented the Company's contribution to the American Gas Association's media advertising program, which informs customers about gas safety, gas supply, fuel characteristics, and the rising cost of gas. Unkle acknowledged that the Company had in the test year kept another, separate account, which covered informational advertising to customers.

The Commission accepted People's Counsel's proposed adjustment to the Company accounts, stating:

*Whenever WGL wants to charge its advertising to the ratepayers, it must carry the burden of proof.* In this instance, People's Counsel alleged that WGL's advertising program was strictly for "image" building. *Faced with this challenge, WGL should have come forward with a detailed presentation.* Instead, although WGL presented a rebuttal witness, he contented himself with a three-sentence response. The witness' statement that the advertising was "informational" is phrased in generalized and conclusory language. It defies analysis or verification. In these circumstances, the Commission will not require the ratepayers to underwrite these advertising costs. [Order 6051, at 69 (emphasis added).]

On appeal, the Company contends that the Commission erred in its allocation of the burden of proof. The Commission charged the Company with the burden of responding to the challenge by People's Counsel to WGL's accounting practice. The Company argues instead that "the Commission bears the burden of explaining the reasonableness of any departure from a long-standing practice, and any facts underlying its explanation must be supported by substantial evidence." *Columbia Gas Transmission Corp. v. Federal Energy Regulatory Commission,* 202 U.S.App.D.C. 219, 299 n.31, 628 F.2d 578, 586 n.31 (1979). *See also Atchison, Topeka & Santa Fe Railway Co. v. Wichita Board of Trade,* 412 U.S. 800, 808, 93 S.Ct. 2367, 2375, 37 L.Ed.2d 350 (1973).

The case before us differs materially from *Columbia Gas Transmission Corp. v. Federal Energy Regulatory Commission, supra,* upon which petitioner relies. In *Columbia Gas, the Commission itself,* and its predecessor, the Federal Power Commission, for nearly twenty-five years had used

---

**48.** The Company's witness, Unkle, acknowledged that the disputed advertising expenses had been recorded in Account 930.1 of the Uniform System of Accounts, and that Note A to Account 930.1 limits expenses in that account to image-building advertising costs. *See* 18 C.F.R. Pt. 201, Account 930.1 (1980).

**49.** There was no evidence of record to this effect. Sack's statement, however, was un-

challenged. We note that in *In re Washington Gas Light Co.,* Formal Case No. 687, Order No. 5998 (May 16, 1978), the Commission authorized WGL to expand its annual firm service to a maximum of 3,000 new customers. *Id.* at 17.

**50.** For a general discussion of public utility accounting practices, see note 38 *supra.*

one method of accounting (the *Seaboard* formula) for purposes of both cost allocation and rate design. 202 U.S.App.D.C. at 295 & n.12, 628 F.2d at 582 & n.12. In rate proceedings one party had suggested substitution of another accounting method (the *United* formula) for purposes of rate design. Several parties presented substantial evidence in opposition to such a substitution, while its proponent simply contended without evidentiary support that the substitution would distribute certain costs more equitably. The Commission staff also supported the *United* proposal. An administrative law judge found the *United* proposal inapplicable, but was overruled by the Commission which in conclusory fashion adopted the *United* proposal. *Id.* 202 U.S.App.D.C. at 296–98, 628 F.2d at 583–85. The court reviewed the record and found no evidence that adoption of the *United* proposal would serve any purpose. Under these circumstances, the court stated that, although the Commission was empowered to reconsider its policy and change its approach, in case of such a change the Commission was at least required fully to articulate the basis for its decision. *Id.* 202 U.S.App.D.C. at 305–06, 628 F.2d at 592–93. *See also West Ohio Gas Co. v. Public Utilities Commission* (No. 1), 294 U.S. 63, 72, 55 S.Ct. 316, 321, 79 L.Ed. 761 (1935) (commission's disallowance of certain advertising expenses as business expenses chargeable to ratepayers was wrong where the commission's action had *no basis* in evidence, *either direct or circumstantial*).

■ In this case, unlike *Columbia Gas,* the Commission had never before ruled on the accounting treatment of advertising expenses.[51] We are thus not confronted with a departure from a long-standing Commission practice. Under these circumstances, the Commission did not bear the burden of explaining the reasonableness of its ruling.

The Commission's ruling on the burden of proof issue, that it was incumbent upon the Company to demonstrate that the advertising benefited its ratepayers in order to charge its ratepayers for these expenses, was consistent with modern utility practice. *See, e.g., In re General Telephone Co.,* 37 P.U.R.4th 127, 155 (Cal.P.U.C.1980); *In re Mountain States Telephone and Telegraph Co.,* 22 P.U.R.4th 516, 541 (Colo.P.U.C.1977); *In re Hawaiian Telephone Co.,* 23 P.U.R.4th 385, 404 (Hawaii P.U.C.1978); *In re Central Illinois Public Service Co.,* 34 P.U.R.4th 267, 280–81 (Ill. Commerce Comm'n 1979); *In re South Carolina Electric and Gas Co.,* 37 P.U.R.4th 441, 480 (S.C.P.S.C.1980). Courts too have ruled that institutional advertising expenses should not be charged to ratepayers "unless the utility establishes [that] such expenditures benefit all ratepayers." *State v. Oklahoma Gas and Electric Co.,* 536 P.2d 887, 894 (Okl.1975); *accord, e.g., State ex rel. Laclede Gas Co. v. Public Service Commission,* 600 S.W.2d 222, 228–29 (Mo.App. 1980), *appeal dismissed,* 449 U.S. 1072, 101 S.Ct. 848, 66 L.Ed.2d 795 (1981); *City of Cleveland v. Public Utilities Commission,* 63 Ohio St.2d 62, 70–73, 406 N.E.2d 1370, 1377–79 (1980); *cf. Washington Public Interest Organization v. Public Service Commission, supra* at 85 (the question before us in determining the propriety of a Commission ruling on an accounting issue was whether the Company had made a "convincing showing" that the Commission's ruling was unreasonable, unjust, or discriminatory.) *But see* note 55 *infra.*

■ The Commission fairly described the Company's evidence as a "generalized and conclusory" refutation of People's Counsel's proposal. Order 6051, at 69.[52] The evidence presented by People's Counsel, although weak, was at least as substantial

---

51. Although there was no evidence of record respecting the Company's past practice, the Company's allegation that it had previously charged advertising costs above the line to the ratepayers was undisputed.

52. We note too that the Company denied only in part the allegations of People's Counsel that

the advertising was image-building in nature. The Company's witness, Unkle, asserted that "over half" of the expenses in question had been applied to informational advertising, and failed even to address the allocation of the remainder of the expenses.

as the Company's. Circumstantial evidence was presented—the recording of the disputed expenses in Account 930.1, and the existence of a second separate account for informational advertising, as testified to by the Company's witness Unkle on cross-examination—indicative that the Company had made an internal judgment that the expenses were image-building in nature.[53] Also, Sacks's argument, that since WGL would in the near future be permitted to expand only minimally promotional advertising was unnecessary, buttressed the position of People's Counsel.[54] Under these circumstances, we cannot conclude that the Company has made a convincing showing that the Commission's determination, that the Company failed to prove that the advertising was other than image-building in nature, was factually unreasonable.

 Nor did the Commission err as a matter of law in concluding that such expenses must be charged to the Company's shareholders rather than its ratepayers. The principle underlying public utility accounting systems is that gains and losses on assets which are "used and useful" in serving the public are allocated to the ratepayers, while expenses for and profits from nonutility assets are allocated to the company's shareholders. *Washington Public Interest Organization v. Public Service Commission, supra* at 82. "A regulated utility may not impose unnecessary costs upon its consumers." *Cities Service Gas Co. v. Federal Power Commission,* 424 F.2d 411, 417 (10th Cir. 1969), *cert. dismissed,* 400 U.S. 801, 91 S.Ct. 9, 27 L.Ed.2d 33 (1970). A large number of public utility commissions have in recent years concluded that "institutional" advertising, which is "designed to enhance or preserve the corporate image of the utility, and to present it in a favorable light," *City of Cleveland v. Public Utilities Commission, supra* 63 Ohio St.2d at 70, 406 N.E.2d at 1377 (quoting *In re Promotional Practices of Public Utilities and Cooperative Utility Associations,* 97 P.U.R.3d 1, 4 (Okla.Corp.Comm'n 1972)), benefits company shareholders, rather than ratepayers, and should be disallowed as an operating expense upon which to base utility rates. *See, e.g., In re Southwestern Bell Telephone Co.,* 27 P.U.R.4th 493, 509–11 (Ark.P.S.C. 1979); *In re Mountain States Telephone and Telegraph Co., supra* at 541 (Colo.); *In re Southern Bell Telephone and Telegraph Co.,* 21 P.U.R.4th 451, 471–72 (Fla.P.S.C. 1977); *In re Hawaiian Telephone Co., supra* at 403–04; *In re Idaho Power Co.,* 29 P.U.R.4th 183, 204 (Idaho P.U.C.1979); *In re Interstate Power Co.,* 32 P.U.R.4th 494, 509 (Minn.P.S.C.1979); *In re Empire District Electric Co.,* 30 P.U.R.4th 1, 3–4 (Mo.P.S.C. 1979); *In re Gas Co.,* 35 P.U.R.4th 106, 127–28 (N.M.P.S.C.1980); *In re South Carolina Electric and Gas Co.,* 34 P.U.R.4th 458, 489 (S.C.P.S.C.1979); *In re Otter Tail Power Co.,* 30 P.U.R.4th 26, 34–36 (S.D.P.U.C. 1979); *In re Monongahela Power Co.,* 25

**53.** Petitioner's treatment of the disputed expenses under the Uniform System of Accounts was not dispositive of the purpose of these expenditures. "[T]he existence of any particular accounting system does not automatically dictate the treatment of expense items for ratemaking purposes." *Providence Gas Co. v. Burman,* 376 A.2d 687, 699 (R.I.1977). *See also Washington Pub. Interest Org. v. Public Serv. Comm'n, supra* at 85; *New Eng. Tel. & Tel. Co. v. Public Utils. Comm'n, supra* at 23. However, "a utility's accounting system is designed to channel entries into accounting categories intended to have a prescribed impact on periodic ratemaking." *Washington Pub. Interest Org. v. Public Serv. Comm'n, supra* at 82. "[The Uniform System of Accounting,] which is designed to assist in ratemaking, reflects years of fine tuning premised on expert views about balancing investor and consumer interests." *Id.* at 85. Although petitioner's accounting treatment of the disputed expenses did not automatically dictate their treatment for ratemaking purposes, it was circumstantial evidence upon which the Commission might reasonably rely unless the Company effectively refuted it.

**54.** In *West Ohio Gas Co. v. Public Utils. Comm'n* (No. 1), *supra* 294 U.S. at 72, 55 S.Ct. at 321, the Supreme Court stated,

We take judicial notice of the fact that gas is in competition with other forms of fuel . . . . A business never stands still. It either grows or decays. Within the limits of reason, advertising or development expenses to foster normal growth are legitimate charges upon income for rate purposes as for others.

The impact of competition, and thus the relevance of *West Ohio Gas* to this case, was much diminished by the limitation on WGL's authorization to expand. *See* note 49 *supra.*

P.U.R.4th 449, 455 (W.Va.P.S.C.1978); *In re Madison Gas and Electric Co.,* 34 P.U.R.4th 569, 575 (Wis.P.S.C.1980). Courts have sustained such determinations as being reasonable and within the scope of the commissions' authority. *E.g., State ex rel. Laclede Gas Co., supra* at 226–29; *City of Cleveland v. Public Utilities Commission, supra* 63 Ohio St.2d at 72–73, 406 N.E.2d at 1378–79; *State v. Oklahoma Gas and Electric Co., supra* at 894; *Pacific Northwest Bell Telephone Co. v. Davis,* 43 Or.App. 999, 1015, 608 P.2d 547, 556 (1979); *cf. Consolidated Edison Company of New York, Inc. v. Public Service Commission,* 47 N.Y.2d 94, 417 N.Y.S.2d 30, 34, 103, 390 N.E.2d 749, 752–53 (1979), *rev'd on other grounds,* 447 U.S. 530, 544, 100 S.Ct. 2326, 2337, 65 L.Ed.2d 319 (1980) (sustaining the Commission's ruling disallowing the company's accounting method under which promotional advertising expenses were considered above-the-line expenses chargeable to ratepayers).[55]

We conclude that the Commission's ruling, that the Company bears the burden of demonstrating why ratepayers should cover the cost of institutional advertising expenses, and that the Company had failed to meet this burden, was not unjust, unreasonable, or discriminatory. The ruling of the Commission must therefore be sustained.[56]

## B. Trade Association Dues

People's Counsel's witness Sack proposed that $56,000 expended by WGL for trade

---

55. Some courts, like the dissent in this case, have concluded that *West Ohio Gas Co. v. Public Utils. Comm'n* (No. 1), *supra,* makes a utility's judgment that an advertising or public relations expenditure is chargeable to the ratepayers conclusive, or at least shifts the burden of proof to the regulatory body. *Alabama Power Co. v. Alabama Pub. Serv. Comm'n,* 359 So.2d 776, 780 (Ala.1978); *New Eng. Tel. & Tel. Co. v. Department of Pub. Utils.,* 360 Mass. 443, 482·84, 275 N.E.2d 493, 517–18 (1971); *Central Me. Power Co. v. Public Utils. Comm'n,* 153 Me. 228, 243–46, 136 A.2d 726, 736–37 (1957). We think that such a reading is far too broad. In that case, the advertising was for what was in 1935 a concededly appropriate purpose—increasing the consumption of gas. Furthermore, due to declining marginal costs, this purpose was deemed to be of particular benefit to ratepayers. *Id.* The only objection to the advertising item was that it was excessive in amount or wastefully spent. The Commission had made an arbitrary reduction of the allowance, without supporting evidence for its allegations of waste. Perhaps the presumption of validity accorded in that case is adequately supported on the ground that utility managers have no incentive to make ineffective or otherwise wasteful expenditures. However, that reasoning is simply inapplicable where, as here, a utility is charged with making advertising expenditures for illegitimate purposes, or for valid purposes that accrue to the benefit of shareholders rather than ratepayers. Apart from the oversight imposed through the PSC, utility management is accountable to shareholders, not ratepayers. If allowed to do so, management may succumb to the temptation of undertaking public relations projects for the benefit of the former, while charging their cost to the latter. Thus there is no justification for extending *West Ohio Gas* to cover the situation where an advertising expenditure is alleged to be in a non-allowable category and not merely excessive, as the dissent would have us do. Accordingly, the burden of proof remains in its customary place—on the utility.

The modern trend is in accord with this view. See Note, *Public Utilities: The Allowance of Advertising Expenses for Rate-Making Purposes—Is This Trip Really Necessary?,* 29 OKLA. L.REV. 202, 213 (1976), and decisions cited therein. Courts have balanced against the *West Ohio Gas* presumption of utility managers' good faith the need for protection of the consuming public by regulation against public utilities' functioning as natural monopolies. *E.g., State ex rel. Laclede Gas Co. v. Public Serv. Comm'n, supra* at 226. That court stated:

> By adoption of ... a rule [permitting the Public Service Commission to disallow institutional advertising expenditures from operating expenses for ratemaking purposes unless the utility demonstrates that such expenditures benefit ratepayers], the managerial prerogatives of Laclede are maintained, and the right of Laclede to continue to exercise its right of free speech is preserved, while at the same time the P.S.C. can perform its regulatory role of balancing the integrity of regulated utilities against the protection of the ratepayer. [*Id.* at 228–29.]

*Accord, State v. Oklahoma Gas and Electric Co., supra* at 894. This, we think, is clearly the better rule.

56. We note that there is nothing in the Commission Order on the issue, which was based on the Company's failure to meet its burden of proof, that would prevent the Company from attempting to show that these expenses should be borne by the ratepayers in a future rate proceeding.

association dues be excluded from the company's operating expenses. Sack suggested that "[t]he ratepayer gets no benefit" from these dues, and that such expenses are "not a necessary part of providing gas service to the consumer." PC Exh. C, at 23–24. On cross-examination, Sack conceded that he had made no attempt to discover what the Company's trade association membership entailed.

In his rebuttal testimony, WGL's witness Unkle stated:

Of the $56,000 of association dues included in the rate case, ... $55,400 represents annual dues paid by the Company for its membership in the American Gas Association [AGA].

As a member of the American Gas Association, the Company has available to it resources for prompt, competent analysis of significant issues affecting the short and long term viability of the gas industry. The American Gas Association also acts as an industry clearinghouse for information on new techniques in coping with industry problems related to gas operations. [WGL Exh. L, at 6.]

The Commission adopted People's Counsel's proposal and eliminated $56,000 from WGL's operating expenses. In so doing, the Commission remarked:

[Trade associations] represent their members in matters affecting them, such as proposed legislation, activities of relevant regulatory agencies, litigation, information dissemination, and image-building advertising.

\* \* \* \* \* \*

Although AGA's general activities are undoubtedly valuable to investors, *the record does not demonstrate that they improve customer service. Accordingly, it is more appropriate for WGL's stockholders to fund the gas industry's legislation and public relations programs.*

To illustrate our rationale for excluding AGA dues from cost of service, we contrast these dues to WGL's payments to AGA regarding a coal gasification project. In Case No. 647 [16 P.U.R.4th at 267], we allowed WGL to recover those

payments to AGA through rates. We viewed the coal gasification project as related to future customer service, in the sense that it enhanced gas supplies. On the other hand, the general activities of the AGA, as funded by the dues in question, are far less tied to improving service to the customer. [Order 6051, at 69–71 (emphasis added).]

Review of the accounting treatment of expenditures such as trade association dues is typically and appropriately entrusted to the Public Service Commission. The purpose of Commission oversight is to protect the consuming public against monopolistic exploitation, *see State ex rel. Laclede Gas Co. v. Public Service Commission, supra* at 226, in part by assuring that utility customers are compelled to pay only for expenses that accrue to their benefit. The Commission's allocation of the burden to the Company to demonstrate that the payment of trade association dues benefits customers comports with modern utility commission regulatory practice. *See Colorado Ute Electric Association, Inc. v. Public Utilities Commission,* 198 Colo. 534, 541, 602 P.2d 861, 865–66 (1979) (en banc); *In re Florida Gas Co.,* 13 P.U.R.4th 255, 259 (Fla.P.S.C. 1975); *In re Idaho Power Co.,* 23 P.U.R. 299, 319–20 (Idaho P.U.C.1977); *In re Rules and Regulations Covering Rate Case Treatment of Certain Expenses,* 30 P.U.R.4th 338, 343 (N.M.P.S.C.1979). Likewise, the Commission's disallowance of trade association dues as operating expenses for ratemaking purposes, in the absence of evidence that the expenses directly benefit the ratepayer, parallels the practice of many other utility commissions. *See, e.g., In re Idaho Power Co., supra* at 319–20; *In re Kansas City Power and Light Co.,* 28 P.U.R.4th 398, 437–38 (Mo.P.S.C.1979); *In re Rules and Regulations Covering Rate Case Treatment of Certain Expenses,* 30 P.U.R.4th at 343; *In re Minnesota Gas Co.,* 32 P.U.R.4th 1, 27–28 (S.D.P.U.C.1979); *Washington Utilities and Transportation Commission v. Washington Natural Gas Co.,* 32 P.U.R.4th 530, 542–43 (Wash.Utils. & Transp.Comm'n 1979); *In re Pennzoil Co.,* 6 P.U.R.4th 189,

194 (W.Va.P.S.C.1974). *Contra, In re Southwestern Bell Telephone Co.,* 28 P.U. R.4th 519, 537 (Kan.St.Corp.Comm'n 1979); *In re Columbus and Southern Ohio Electric Co.,* 24 P.U.R.4th 261, 287 (Ohio P.U.C. 1978).

■ We conclude that here, in the absence of evidence that AGA activities benefited customers, the Commission acted reasonably and within the scope of its allowed discretion in concluding that ratepayers should not be compelled, by inclusion of those expenditures in the Company's operating expenses, to pay the AGA dues.[57]

### C. Community Affairs Expenses

The Company's witness, Unkle, testified that, at the invitation of schools and community groups, WGL sends out speakers to talk about matters relating to gas service, including fuel conservation, safety considerations, the two-part billing system, estimated billing, the gas supply situation, and the rising cost of gas. WGL Exh. L, at 6. During the test year, WGL incurred expenses of $130,000 on this speakers program. People's Counsel's witness, Sack, recommended that the entire amount be disallowed as an operating expense. He testified:

> The amount of $130,000 described as community activities is clearly to enhance the public image of the Company and, as such, should be borne by the stockholder. The Company is free to make these expenditures and may even consider that it is under a certain amount of community pressure to do so. These activities are probably not equally available to all ratepayers and may, in fact, not even be desired by many of the ratepayers. I believe that this expense, being one of enhancing the public image of the Com-

pany, should be borne by the stockholders. [PC Exh. C, at 24.]

On cross-examination, Sack admitted that his characterization of the Company's speakers program as "one enhancing the public image of the Company" was based on speculation concerning the implications of the descriptive title of the program.

In rebuttal, Unkle denied that WGL's community activities were undertaken to enhance the Company image. Rather, he stated,

> Talking about such subjects to community groups is one important way our Company can provide information about subjects of vital concern both to us and our customers.
>
> ... The purpose is to communicate with customers on those subjects about which they want more information. In fact, the Company is under a certain amount of community pressure to engage in such activities. Such expenses are not only proper, but they are vital. [WGL Exh. L. at 6–7.]

The Commission adopted People's Counsel's proposal, explaining its reasoning as follows:

> [T]he Commission believes that WGL's shareholders should pay these community affairs expenses. We take this action for two reasons. In the first place, notwithstanding WGL's protestations to the contrary, many of these community affairs activities are image-building in effect. These presentations enhance WGL's appearance in the community without any direct link to providing utility service. Secondly, we analogize these community affairs expenses to the charitable discounts for telephone service which we discontinued in a prior C&P rate proceeding, Case No. 631. There, we viewed

---

**57.** The dissent's theory that a utility should be allowed to charge trade association fees to ratepayers because unregulated businesses pass on those costs to consumers, *post* at 1260, is based on a faulty premise. Since trade association dues are not a cost of providing the service (*i.e.,* a company could provide the service without being a member of the association) one would not expect them to be passed

on to consumers in a competitive market. Rather, the dues would be in the nature of reinvested profits. A company choosing to join and pay dues would thus forego a small part of present profits in the hope of reaping future benefits, such as favorable legislation which an association promotes by lobbying and public relations. Thus the dissent's invocation of a market analysis cuts against its conclusion.

those telephone discounts as a "forced contribution by telephone users to 'individuals and organizations to which [the ratepayers] might not otherwise contribute.'" (Order No. 5790, p. 78). In the same way, if ratepayers must underwrite WGL's community affairs expenses, they will be forced to make a contribution to the beneficiaries of WGL's program. That would be unfair, particularly since only a limited number of community organizations are receiving speakers from WGL.

In taking this action, we do not find that WGL has acted imprudently. Nevertheless, the nature of the community affairs program is more akin to the interest of WGL's stockholders than to [that of] the ratepayers. We shall, however, reserve the right to reevaluate in the future this issue and the question of support to civic organizations. [Order 6051, at 73–74.]

On appeal, the Company likens the expenditures in issue to informational advertising. Utility commissions generally find informational advertising, relating, for example, to safety and conservation, to be chargeable as an above-the-line expense to ratepayers. *See, e.g., In re Peoples Gas Light and Coke Co.,* 34 P.U.R.4th 292, 317–18 (Ill. Commerce Comm'n 1979) (75% of informational advertising expenses allowed above-the-line); *In re Gas Co., supra* at 128 (N.M.); *In re South Carolina Electric and Gas Co.,* 37 P.U.R.4th 441, 480 (S.C.P.S.C. 1980); *In re Madison Gas and Electric Co.,* 34 P.U.R.4th 569, 575 (Wis.P.S.C.1980). The Company contends that the Commission's ruling, that these expenditures must be charged below the line to WGL's shareholders, rather than above the line to the ratepayers, was arbitrary and unreasonable. The Commission responds that, as in the case of the challenged advertising expenses and trade association dues discussed above, the Company failed to meet its burden of demonstrating that the expenses in question directly benefited the utility's ratepayers.

■ As in the case of the other challenged expenses, we also accept the Commission's allocation of the burden of proof with respect to community affairs expenses. As the Company has primary control of its own records, there is no injustice in allotting to the Company the initial responsibility for demonstrating the reasonableness of above-the-line charges to its ratepayers.

■ The sparse record with respect to the challenged community affairs expenses consists merely of cross-allegations as to the nature and purpose of the speakers programs, unsubstantiated by documentary evidence on either side. The Commission did not act arbitrarily in refusing to accept WGL's conclusory assertions here; the burden of proof imposed in this case is consistent with the Commission's usual practice. *See, e.g., In re Potomac Electric Power Co.,* 36 P.U.R.4th 139, 186–87 (D.C.P.S.C.1980):

> While we readily appreciate that an applicant for a rate increase cannot be expected in its initial filing to offer detailed support for each and every aspect of its cost of service, we do expect substantially more than this conclusory and bare bones effort to deal with a concrete, specified issue such as this one. Without more, Pepco's skeletal affirmative case falls far short of showing, even at a prima facie level, the appropriateness of its advertising expenditures .... [*Id.* at 186.]

Nor is the Commission's disallowance of these community affairs expenses inconsistent with the treatment accorded such items by utility commissions in other jurisdictions. *See, e.g., In re Northwestern Bell Telephone Co.,* 37 P.U.R.4th 1, 23 (Minn.P.S.C. 1980) (expenditures for open house community events, multisubject films, town talkers, displays and exhibits on multisubjects excluded from above-the-line operating expenses). On this record the Commission could reasonably conclude, as it did, that the Company failed to demonstrate a direct link between the speakers program and the provision of utility service, and thus that the Company did not justify above-the-line

treatment for the community affairs expenses.[58]

### D. *Business and Civic Support Payments*

The Commission further disallowed as operating expenses for ratemaking purposes WGL's contributions to various business and civic organizations.[59] Although it recognized that all of these organizations appeared to be meritorious and deserving of the business community's support, the Commission concluded:

> WGL's management decision to contribute to these organizations is not the ratepayers' concern. However worthwhile these organizations may be, the ratepayers may not be required to make forced contributions to them. Since the ratepayers do not directly benefit from WGL's payments in terms of gas service, they should not bear this cost. [Order 6051, at 72.]

■ We cannot conclude that the Commission's decision on this point was arbitrary or unreasonable. The Company's contributions to these organizations are tantamount to charitable donations. Reviewing courts have generally held that it is a proper exercise of agency discretion for a regulatory commission to exclude such donations from a utility's cost of service. *See, e.g., Alabama Power Co. v. Alabama Public Service Commission, supra* at 779–80; *New England Telephone and Telegraph Co. v. Public Utilities Commission, supra* at 55–56 (Me.); *State ex rel. Utilities Commission v.*

*Southern Bell Telephone and Telegraph Co.,* 24 N.C.App. 327, 335, 210 S.E.2d 543, 549 (1975), *vacated on other grounds,* 289 N.C. 286, 221 S.E.2d 322 (1976). Indeed, a growing number of courts have held that charitable contributions *may not* be recovered from the ratepayers, and have reversed utility commission orders that allowed such contributions as operating expenses. *See, e.g., Alabama Power Co. v. Alabama Public Service Commission,* 390 So.2d 1017, 1027 (Ala.1980); *City of Cleveland v. Public Utilities Commission, supra* 63 Ohio St.2d at 73–74, 406 N.E.2d at 1379–80 (and cases cited therein). *Contra, New England Telephone and Telegraph Co. v. Department of Public Utilities,* 360 Mass. 443, 480–84, 275 N.E.2d 493, 518–21 (1971). We note too that the Uniform System of Accounts treats charitable contributions as a below-the-line deduction from income, chargeable to the shareholders rather than the ratepayers. 18 C.F.R. Pt. 201, Account 426.1 (1980). *But see* note 53 *supra.*

We accordingly find no error in the Commission's conclusion that "the ratepayers may not be required to make forced contributions" to business and civic organizations, Order 6051, at 72, and we therefore affirm the Commission's below-the-line treatment of these expenses.

### VI. TAX NORMALIZATION OF CONSTRUCTION OVERHEADS

In an attempt to create a source of interest-free capital, WGL requested that the

---

**58.** *See* note 56, *supra.* The Commission Order made explicit reference to reevaluating this issue at a later time. [Order 6051, at 73–74.]

The Company also challenges the analogy drawn by the Commission between charitable discounts and the speakers program, arguing that, whereas a charitable discount helps the recipient organization achieve its goals, which may or may not be shared by utility ratepayers, the Company speakers program, by providing consumer information, fosters Company goals and the overall goals of the community. Under the speakers program, the Company sends out speakers to schools and community organizations at the request of those groups. Were above-the-line treatment allowed for the speakers program, individual ratepayers would, as in the case of charitable discounts charged above the line, be compelled without choice to subsi-

dize a program the benefits of which they would not necessarily experience. Utility commissions commonly consider such expenditures more properly charged to company shareholders than to their ratepayers. *See* Part V(D) *infra.*

**59.** WGL's witness, Unkle, explained the nature of these payments:

> Business support payments represent amounts paid to various civic and business groups which are concerned with preserving and improving the Washington community. Of the $35,000 of such payments included in the test year, $12,600 was paid to the Washington Board of Trade, $6,480 to the National Capital Downtown Committee and $5,000 to the District of Columbia Municipal Research Bureau, Inc. [WGL Exh. L, at 6.]

Commission "normalize" (*i.e.*, defer) the tax effect of certain construction overhead expenses for ratemaking purposes. The Internal Revenue Code allows utilities to deduct the full amount of certain indirect expenses related to construction work in the year in which they were incurred. I.R.C. § 167(*l*). In the test year, WGL took full tax deductions for the amounts expended on these eligible overheads, which included pensions, group insurance premiums, and social security and unemployment compensation taxes for construction workers, as well as interest on debt in the Allowance for Funds Used During Construction (AFUDC). On a separate set of books, however, the Company capitalized these expenses over the useful life of the plant for rate purposes. By capitalizing the overheads for rate purposes, while deducting these expenses in full during the test year for tax purposes, the Company hoped to improve its cash flow situation since it would be obtaining, in effect, an interest-free loan of capital from the ratepayers.[60]

 Normalization is a recognized method of providing capital for companies that otherwise are having difficulty securing working or construction funds. "The proper test for determining whether or not normalization of book-tax timing differences should be authorized is whether or not the utility company has experienced, or will experience in the following year, severe cash-flow problems and internally generated fund reductions of significance." *In re Laclede Gas Co.*, 27 P.U.R.4th 241, 261 (Mo. P.S.C.1978).

In this case, the Commission denied the Company's request for normalization, find-

ing that "WGL does not appear to have cash flow difficulties sufficient to warrant the ratepayers paying for income taxes WGL is not in fact paying." Order 6051, at 61. The Commission also was skeptical of WGL's suggestion that tax normalization would result only in a tax deferral, rather than a permanent tax savings. It stated:

> From the narrow perspective of each individual item of plant, one might argue that there will only be a tax deferral because each plant component will eventually go into service and start to generate tax benefits for the ratepayers. But looking at the broader perspective of income taxes paid, the Commission finds that the answer is less than clear. WGL has an expanding rate base, a phenomenon which should continue for some time. WGL's expanding plant will deprive not only present but also future ratepayers of rates reduced by these normalized construction overhead deductions. Under normalization with expanding plant, there will always be more deferred deductions which will offset the previously deferred deduction from which the ratepayers are now supposed to benefit. The net effect is that WGL's rates might never be reduced to account for construction overhead deductions. The result could be a permanent tax saving—at the ratepayer's expense. [*Id.* at 62.]

*Accord, e.g., Federal Power Commission v. Memphis Light, Gas & Water Division,* 411 U.S. 458, 460, 93 S.Ct. 1723, 1725, 36 L.Ed.2d 426 (1973); *Public Systems v. Federal Energy Regulatory Commission,* 196 U.S.App. D.C. 66, 69, 606 F.2d 973, 976 (1979); *Ala-*

---

**60.** Tax normalization can be viewed as an interest-free loan from the ratepayers because, under such a scheme, the tax benefits of the deductions claimed by the Company during the test year are not directly flowed through to the ratepayers in the same year. In the absence of normalization, tax deductions claimed during the test year serve to lower the utility's cost of service (since income taxes are part of the cost of service), thus reducing the overall rates to consumers (since cost of service is chargeable to ratepayers). When construction overheads are normalized, however, they effectively are treated as capital expenditures for ratemaking

purposes. The ratepayers receive tax benefits from these overheads only as they are depreciated over the useful life of the related plant, even though the utility has claimed the full benefit of the overheads on its test-year tax return. *See generally Federal Power Comm'n v. Memphis Light, Gas & Water Div.,* 411 U.S. 458, 459–60, 93 S.Ct. 1723, 1725, 36 L.Ed.2d 426 (1973); *Public Systems v. Federal Energy Reg. Comm'n,* 196 U.S.App.D.C. 66, 68–69, 606 F.2d 973, 975–76 (1979); *Alabama-Tenn. Nat. Gas Co. v. Federal Power Comm'n,* 359 F.2d 318, 326–28 (5th Cir.), *cert. denied,* 385 U.S. 847, 87 S.Ct. 69, 17 L.Ed.2d 78 (1966).

bama-Tennessee Natural Gas Co. v. Federal Power Commission, 359 F.2d 318, 328 (5th Cir.), cert. denied, 385 U.S. 847, 87 S.Ct. 69, 17 L.Ed.2d 78 (1966); City of Los Angeles v. Public Utilities Commission, 15 Cal.3d 680, 685–86, 125 Cal.Rptr. 779, 782, 542 P.2d 1371, 1374 (1975) (en banc). But see Regulations Implementing Tax Normalization for Certain Items Reflecting Timing Differences in the Recognition of Expenses or Revenues for Ratemaking and Income Tax Purposes, 46 Fed.Reg. 26,613 (1981) (to be codified in 18 C.F.R. Pt. 2) (requiring certain public utilities to use tax normalization to compute the income tax component of their cost of service and concluding that normalization, as set forth in the Federal Energy Regulatory Commission's final order, will not cause utilities or their investors to realize a permanent tax savings). Notwithstanding these concerns, the Commission stated that room for doubt still exists." It declined to permit WGL to normalize the construction overheads, but announced that, "In the future, if the Company can present a more persuasive case, this Commission will consider it with an open mind." Order No. 6051, at 62.

Until this proceeding, WGL routinely had flowed through any benefits from tax deductions directly to its customers; this case is the first in which WGL has sought to defer the tax effect of construction overheads for rate purposes. Although utility regulatory commissions are divided on the question of whether or not to permit companies to defer the flow-through of tax benefits to ratepayers, courts appear to be unanimous in concluding that the question is one which is entrusted to the sound discretion of regulatory commissions. See, e.g., Federal Power Commission v. Memphis Light, Gas & Water Division, supra 411 U.S. at 467, 93 S.Ct. at 1729; Midwestern Gas Transmission Co. v. Federal Power Commission, 388 F.2d 444, 448 (7th Cir.), cert. denied, 392 U.S. 928, 88 S.Ct. 2286, 20 L.Ed.2d 1387 (1968); Alabama-Tennessee Natural Gas Co. v. Federal Power Commission, 359 F.2d at 332–33, 339; Office of the Public Counsellor v. Indiana & Michigan Electric Co., Ind.App., 416 N.E.2d 161, 171 (1981);

Central Maine Power Co. v. Public Utilities Commission, 382 A.2d 302, 321–22 (Me. 1978). We cannot conclude that the Commission acted unreasonably or otherwise abused its discretion in denying the Company's normalization proposal. We therefore affirm the Commission's ruling on this issue.

## VII. TREATMENT OF THE TAX BENEFIT RESULTING FROM WGL'S FILING OF A CONSOLIDATED TAX RETURN

WGL and its subsidiaries take advantage of an Internal Revenue Code provision that permits affiliated companies to file a consolidated income tax return. I.R.C. § 1501. By so doing, losses sustained by unprofitable affiliates can be used to offset the taxable income of the profitable companies during a given year. The net result is that the group incurs a lower tax liability for the year than it would have if each affiliate had filed an individual tax return.

For the test year, WGL filed a consolidated return with three of its subsidiaries, none of which is directly regulated by the Commission. One of these companies is the Crab Run Gas Company (Crab Run), a gas exploration and production subsidiary, which is wholly owned by WGL. Crab Run is a recent addition to WGL's corporate family, and, like most gas exploration outfits, it has operated at a net loss during the first few years of its existence. In an earlier proceeding, the Commission decreed that the costs of keeping Crab Run afloat should be borne entirely by WGL's stockholders; thus, for ratemaking purposes the Company's investment in Crab Run was not to be reflected in WGL's rate base, nor were subsequent operating losses incurred by Crab Run to be included in WGL's cost of service. See Formal Case No. 610, Order No. 5685, Jan. 23, 1975, at 15. This would be fair to WGL's stockholders, the Commission said, because if Crab Run eventually were successful, its profits from the sale of gas would inure to the direct benefit of the parent company's stockholders, rather than its ratepayers. Id.

By including the operating losses of Crab Run in its consolidated tax return, WGL's District of Columbia operations realized a test-year income tax savings of $96,000 (compared with the amount of tax the Company would have paid had it filed an individual return). Order 6060, at 5. The Commission stated, "The new rates do include a component [$3.9 million] for Federal Income Taxes. This is the factual basis needed for implementing our approval of the principle that ratepayers should share in consolidated tax savings." *Id.* The Commission determined that the shareholders and ratepayers of WGL should share equally in this consolidated tax savings; accordingly, the Company's cost of service was reduced by one-half of the tax savings, or $48,000. WGL contends that because the stockholders have been required to bear all of the risk associated with Crab Run's operations, it was arbitrary and unreasonable for the Commission to allow the ratepayers to share in the consolidated tax savings. Not only was this unfair, WGL argues, but it also was contrary to the Commission's promise in Order No. 5685, *supra,* to assign all future profits from Crab Run to the benefit of the investors.

Initially, we note that there is a difference between profits from the sale of Crab Run gas (as discussed by the Commission in Order No. 5685), and profits realized from tax savings generated by consolidating Crab Run's and WGL's tax returns. There-

fore, WGL's allegation that the Commission has purloined the benefits that it promised to the stockholders in Order No. 5685 is not wholly valid.

Moreover, the Supreme Court has explicitly sanctioned the ratemaking principle at issue here. In *Federal Power Commission v. United Gas Pipe Line Co.,* 386 U.S. 237, 87 S.Ct. 1003, 18 L.Ed.2d 18 (1967), the Court held that it was neither unreasonable nor unlawful for the FPC to reduce a utility's revenue requirements by the full amount of a consolidated tax savings.[61] In *United,* as here, it was fairly clear that the ratepayers receiving the consolidated tax benefits had not funded the nonjurisdictional affiliate whose losses had made the savings possible. Nevertheless, the Court found that it was reasonable for the FPC to adjust the regulated utility's cost of service to reflect that company's pro rata share of taxes actually paid, rather than allow the company's shareholders to receive a permanent windfall tax savings based on a hypothetical tax expense. *See id.* 386 U.S. at 243–45, 87 S.Ct. at 1007–08. *Accord, e.g., Florida Gas Transmission Co. v. Federal Power Commission,* 391 F.2d 114 (5th Cir. 1968); *Mechanic Falls Water Co. v. Public Utilities Commission,* 381 A.2d 1080, 1091–95 (Me.1977); *Michaelson v. New England Telephone and Telegraph Co.,* 404 A.2d 799, 809–10 (R.I.1979); *In re The Chesapeake and Potomac Telephone Co.,* 4 P.U.R.4th 1, 36–39 (D.C.P.S.C.1974).[62]

---

**61.** Although the Court in *United* was interpreting the Federal Power Act, the principles that were involved there (*i.e.,* whether the FPC had impermissibly intermingled the profits and losses of nonjurisdictional utilities with those of the regulated utility, and whether the resultant rates were "just and reasonable") are relevant to our review under the District's statutes.

**62.** *But see Florida Gas Transmission Co.,* 47 F.P.C. 341, 93 P.U.R.3d 477 (1972), *modified,* 49 F.P.C. 261, 98 P.U.R.3d 221 (1973), *aff'd mem. sub nom. Sun Oil Co. v. Federal Power Comm'n,* 505 F.2d 476 (D.C.Cir.1974). In that case the Federal Power Commission reverted to determining regulated utilities' costs of service on the basis of individual tax liability, even where it is "hypothetical," rather than by accounting for consolidated tax savings. The Commission stated:

At the present time, we seek to avoid a determination that will tend to defeat efforts to acquire additional gas supplies or constitute a disincentive to exploration and development. Since 1968, all major industry data indicate that gas is being consumed at a greater rate than it is being discovered, and a number of pipelines have had to file plans for curtailment of service to their customers under our Order No. 431, 45 FPC 570. Therefore, if a case were before us where an affiliated, regulated or nonregulated, producer of oil or gas showed a tax loss, and this loss company were joined in a consolidated return with a pipeline, the *United* or *Cities Service* case, in our opinion, would no longer be persuasive authority, for to reduce the rates of a regulated pipeline because of such affiliated exploration and development activities would be discouraging to the very enter-

▮ The Commission acted within the scope of its authority and in accordance with accepted principles of utility ratemaking in allocating to the ratepayers a portion of the tax savings realized by the Company from the filing of consolidated tax returns. We affirm the Commission's ruling on this issue.

## VIII. TREATMENT OF MAP COMPUTERIZATION EXPENSES

During the test year, WGL entered into a contract for the computerization of its distribution maps and records system. Under this program, aerial photographs will be used to produce "digitized" maps of the Company's service area, showing the location of mains, services, and other aspects of its distribution plant. The contract is to be completed within four years at a total price of $2,075,000. WGL spent $132,000 for the first phases of this project during the final three months of the test year.

The Company, which books the conversion program as an expense item rather than a capital asset, proposed that the project's total cost be amortized evenly over the four-year contract term (at $519,000 annually), beginning with the test year. Instead, the Commission ruled that only the $132,000 actually incurred during the test year should be included in the Company's cost of service; remaining amounts expended on the contract after the test year were to be placed in a deferred expense account, and to be amortized (over an as-yet-undetermined period) once the project is completed. Order 6051, at 66–68. The Commission explained:

> In adopting this hybrid treatment, the Commission first rejects WGL's proposal for an immediate four-year amortization. WGL's computerized data base will benefit customers well beyond the term of the four-year contract. Accordingly, recovery of the full contract price in four years is unreasonable. Of course, present ratepayers have received some improvement in service from the partial performance to date. Nonetheless, WGL has made no prise we now want to encourage. [*Supra* at

attempt to match those benefits to its $519,000 expense proposal. Nor has WGL taken account of any offsets, such as improved labor efficiency and reduced costs attributable to the program. In sum, to adopt WGL's proposal would distort the test period match-up of costs and cost reductions.

> On the other hand, the Commission cannot totally ignore the program's costs, as People's Counsel's witness originally recommended. The computerization program is currently being used in the daily operations of the Company with resulting benefits. All of the District of Columbia has been photographed, and many of the aerial photographs have been digitized. Although additional benefits will result as the work progresses, parts of the program are in use now. No reason exists, therefore, for deferring the entire expense until the complete program is in operation. Indeed, even People's Counsel appears to accept that test-year expenses can properly include the $132,000 paid during that period.

> Under its decision, the Commission anticipates that a substantial portion of the total contract price will remain in the deferred expense account upon completion. It is clear to the Commission that the fully computerized data base will be useful to WGL in providing gas service after contract completion. The deferred expense accounting we have chosen recognizes that fact. Yet we are constrained by the state of the record not to establish how or over what period of time the deferred expenses will be recovered after contract completion. In a future rate filing, we anticipate that WGL will address how the computerized data base affects existing operations. It should also present evidence showing how the deferred expenditures should be treated for ratemaking purposes. [*Id.* at 67–68.]

The Company contends that the Commission's treatment of these expenses is unlawfully confiscatory. However, WGL's un-

362, 93 P.U.R.3d at 495.]

happiness seems to stem not so much from the allowance of only $132,000 during the test year, but rather from the Commission's suggestion that future expenditures on this project should be deferred for rate purposes until the conversion is completed. In its brief, WGL argues:

[O]ver the remaining life of the contract, WGL is precluded from recovering anything at all for the heavy investments made. The Company is not even permitted a return on the expended amounts · placed in the deferred expense account. For example, in WGL's current application for a permanent rate increase [Formal Case No. 722], pursuant to the Commission's mandate, map computerization expenses expended during the applicable test period are wholly excluded.

\* \* \* \* \* \*

The Commission's treatment of map computerization expense is novel. A superficial analogy might be drawn to the treatment of expenditures for construction work in progress. A minority of the regulatory commissions, including the Commission for the District of Columbia, do not permit construction expenditures to be included in the rate base until after the plant is completed and in service (see *Potomac Electric Power Co.,* Application for Rate Increase Formal Case No. 685, Order No. 7000, July 18, 1979). In that instance, however, the assumed return on the funds expended in construction is accumulated. Upon placing of the plant in service, the utility begins to recover the accumulated return during construction, *plus* the return on the plant added to the rate base; also, depreciation on the plant is *an allowable expense item in connec*tion with this capital asset. The Commission made no provision for accumulating returns on amounts placed in the deferred expense account for map computerization for eventual recovery after the project is completed. But this is only the start of the injustice.

In the instance of a *capital asset,* such as a constructed plant, to spread out recovery of investment in the form of de-

preciation allowances over the entire estimated period during which ratepayers will benefit from such asset is not unreasonable, inasmuch as throughout that period the Company is permitted to earn a reasonable return on that capital expenditure. On the other hand, to tie the recovery period of an *expense item,* such as for map computerization, to the period during which ratepayers may reap the full benefit of that expenditure is grossly unreasonable. [Brief for WGL at 26–27 (emphasis in original).]

The Commission and People's Counsel urge, on the other hand, that the PSC's action is consistent with the general ratemaking precept that the recovery of costs should be synchronized with the realization of affiliated benefits. Furthermore, they argue, the company's complaint about how post-test year expenses will be recovered is premature; this issue will be ripe for review only when, in a subsequent rate proceeding, the Commission issues a more definitive ruling on what treatment should be accorded these expenditures.

 We agree with the Commission and People's Counsel that only the $132,000 test year allowance is ripe for review. Because the opinion leaves open the question of precisely what rate treatment should be accorded post-test-year map computerization expenditures, we address only the reasonableness of the amount actually allowed in the case before us.

As the Company acknowledges, it is not uncommon for regulatory commissions to defer the inclusion of construction costs in a utility's rate base until after the plant is completed and in service. *See, e.g., Providence Gas Co. v. Burman, supra* at 692–93; *South Dakota Public Utilities Commission v. Otter Tail Power Co.,* 291 N.W.2d 291, 295 (S.D.1980); *Re Southwestern Electric Power Co.,* 26 P.U.R.4th 381, 382–83 (F.E.R. C.1978); *In re Southwestern Bell Telephone Co.,* 36 P.U.R.4th 283, 294 (Mo.P.S.C.1980); *Pennsylvania Public Utilities Commission v. Pennsylvania Electric Co.,* 1 P.U.R.4th 272, 278 (Pa.P.U.C.1973). Analogously, when particular test year operating expenditures

are deemed to be "extraordinary" (*i.e.*, infrequently recurring), commissions often amortize the recovery of these expenses over an appropriate number of years. *See, e.g., In re Central Illinois Public Service Co.,* 34 P.U.R.4th 267, 280 (Ill. Commerce Comm'n 1979) (cost of study to improve efficiency and performance amortized over five years); *In re Monmouth Consolidated Water Co.,* 24 P.U.R.4th 464, 470 (N.J.Bd. of Pub.Util.Comm'rs 1978) (expenses relating to extraordinarily cold winter amortized over ten years); *In re Columbus and Southern Ohio Electric Co.,* supra at 285–86 (expenses of installing sulfur dioxide scrubber amortized over twenty years). These types of rate treatment are corollaries of the "more basic principle of economics and regulation [that] costs which benefit future ratepayers should be capitalized and expensed in the future." *South Central Bell Telephone Co. · v. Louisiana Public Service Commission,* 352 So.2d 964, 980 (La.1977), *cert. denied,* 437 U.S. 911, 98 S.Ct. 3103, 57 L.Ed.2d 1142 (1978).

 Along these lines, we cannot conclude that the Commission erred in rejecting WGL's four-year amortization schedule for map computerization costs. So far as the record reveals, the map conversion project is essentially a non-recurring item which should benefit future ratepayers in terms of cost efficiencies "well beyond the term of the four-year contract." Order 6051, at 67. In response to testimony by WGL's witness, Smallwood, indicating that a number of interim benefits were being experienced as a result of work already completed, the Commission allowed WGL to recover the $132,000 already expended on the program. In the absence of a more detailed presentation by WGL matching future expenditures with resultant interim benefits, we do not think that the allowance of only $132,000 was unreasonable. Accordingly, we affirm on this issue.

IX. TREATMENT OF GAINS REALIZED ON
WGL'S SALE OF PROPANE RESERVES

WGL uses propane to provide gas when demand exceeds the available pipeline supply. Several years prior to the commencement of this rate proceeding, the Company purchased a sizeable quantity of propane, which is stored in Conway, Kansas. Subsequently, pipeline supplies became more plentiful and it was no longer necessary to maintain such large reserves of propane. Accordingly, during the period ending June 30, 1977, WGL sold the final eleven million gallons of propane that had been stockpiled in Kansas. The Company realized a net aftertax gain of $855,200 on these sales, $192,000 of which was allocable to the District of Columbia. Order 6051, Appendix A, Sch. 2.

WGL recorded the entire gain in a below-the-line account, and proposed that the Commission likewise allow the Company's shareholders to have the profits from the sales. The Staff and People's Counsel objected, urging that the ratepayers were entitled to the entire gain. The Commission ultimately adopted the Staff's proposal to amortize the gain over three years for the ratepayers' benefit; WGL's test-year operating revenues accordingly were increased by one-third of the total net after-tax gain ($64,000). *Id.* The Company contends that the Commission's action in this regard was unlawfully confiscatory.

The appropriate allocation of gains and losses realized upon the transfer of utility property is an issue that has received surprisingly little attention in reviewing courts. Those few courts that have addressed the subject have provided only general guiding principles by which to judge the propriety of a commission's action in such matters. It is evident, however, that each case must rest upon its own factual situation; the validity of each allocation of profits or losses depends upon the nature of the property transferred and a balancing of the equities involved. *See generally Democratic Central Committee v. Washington Metropolitan Area Transit Commission,* 158 U.S.App.D.C. 7, 26–32, 485 F.2d 786, 805–11 (1973), *cert. denied,* 415 U.S. 935, 94 S.Ct. 1451, 39 L.Ed.2d 493 (1974).

The propane that WGL sold during the test period had been recorded by the Com-

pany in Account 151.109 of the Uniform System of Accounts, see 18 C.F.R. Pt. 201 (1980). PC Exh. C, at 13. That account is labelled "Propane Stock" and is a subcategory of Account 151, "Fuel Stock." The Uniform System of Accounts prescribes methods for allocating gains and losses on the transfer of certain categories of utility property.[63] However, such guidelines do not materially aid our review function in this case for two reasons. First, the Uniform System's allocation scheme relies largely upon certain classifications of the property transferred, e.g., whether the property is "depreciable" or "non-depreciable," whether it is "operating" or "non-operating", and whether the property is in current use or "held for future use." See Washington Public Interest Organization v. Public Service Commission, supra at 82–84. The record in this case does not disclose the nature of the propane stock in question with precision from an accounting standpoint.[64] Moreover, even if the proper treatment under the Uniform System were plain, it would not be dispositive for rate-

making purposes. See note 41 supra. The more important inquiry in determining who should receive the gains from the propane sales is the question of who has borne the risks and burdens associated with its maintenance. See Democratic Central Committee v. Washington Metropolitan Area Transit Commission, supra 158 U.S.App.D.C. at 27–32, 40–43, 485 F.2d at 806–11, 819–22. See also Washington Public Interest Organization v. Public Service Commission, supra at 87–88; City of Lexington v. Lexington Water Co., 458 S.W.2d 778 (Ky.1970); New York Water Service Corp. v. Public Service Commission, 12 A.D.2d 122, 129, 208 N.Y. S.2d 857, 863–64 (1960), appeal denied, 10 N.Y.2d 705, 219 N.Y.S.2d 1025 (1961).

The Commission found that the equities favored a complete allocation of gains to the ratepayers.[65] It stated:

To begin, WGL procured this propane for the benefit of ratepayers and to provide more system reliability during peaking periods. As a result, this propane inventory was included in WGL's rate base. And ratepayers paid all WGL's

**63.** For a discussion of the Uniform System's allocation scheme, see Washington Pub. Interest Org. v. Public Serv. Comm'n, supra at 82–85; note 38 supra.

**64.** The Company recorded the gain realized upon the sale of the propane in Account 495.3, "Other Gas Revenues," a below-the-line account. See PC Exh. C, at 13.

**65.** Treatment of gains and losses on the sale of utility property has been inconsistent in the District as well as at the federal level. In 1973, the Federal Power Commission (now Federal Energy Regulatory Commission), relying upon Board of Pub. Util. Comm'rs v. New York Tel. Co., 271 U.S. 23, 46 S.Ct. 363, 70 L.Ed. 808 (1925), promulgated an amendment to the Uniform System of Accounts, which provided that such gains and losses should be allocated to shareholders. See Accounting Treatment to Account for Gains and Losses on the Disposition of Utility Property That Had Been Classified in Utility Service and Consolidation of Certain Depreciation Accounts, Order No. 473, 49 F.P.C. 390, 38 Fed.Reg. 4,947 (1973) [hereinafter cited as Order No. 473]. The same year, however, the District of Columbia Circuit decided Democratic Central Comm. v. Washington Metro. Area Transit Comm'n, supra, in which the court found "no impediment, constitutional or otherwise, to recognition of a rate-making principle enabling ratepayers to benefit

from appreciations in value of utility properties accruing while in service." Id., 158 U.S.App. D.C. at 21, 485 F.2d at 800. The Federal Energy Regulatory Commission, apparently satisfied that the circuit court's decision had adequately refuted any impediment posed by New York Telephone, then reversed directions and provided that ratepayers should be benefitted by a gain on the sale of an excess pipeline system. See Re El Paso Natural Gas Co., 23 P.U.R.4th 66, 92 (F.E.R.C.1977). In so ruling, the FERC relied upon Democratic Central Committee and ignored the FPC's 1973 accounting order. Meanwhile, however, the District of Columbia PSC, in WGL's most recent rate proceeding prior to this one, had characterized the holding in Democratic Central Committee as "peculiar to the utility there involved," and instead had relied upon the 1973 FPC order [Order No. 473, supra] in assigning to shareholders gains from the sale of certain WGL real estate in Georgetown. See In re Washington Gas Light Co., 16 P.U.R.4th at 286, remanded sub nom. Washington Pub. Interest Org. v. Public Serv. Comm'n, supra. Thus, in WGL's 1976 rate proceeding, the PSC relied upon an accounting rule that the FERC was soon to repudiate. In the case before us, the PSC now follows the same Democratic Central Committee ruling that it had apparently shunned in 1976.

costs for storing the propane in Kansas. In addition, if WGL lost the propane, as through some catastrophe, it would be likely to ask that ratepayers help bear the loss. Since the ratepayers face the risk of· loss, they should likewise realize the gain when this propane is sold off-system. [Order 6051, at 48.]

The Company does not dispute that the propane stock was included in WGL's rate base or that the ratepayers paid all costs associated with maintaining the reserves in Kansas. It argues, however, that because WGL's investors furnished the capital to purchase the propane, any profits realized on its disposal must go to the investors. This result is mandated, the Company argues, by the Supreme Court's opinion in *Board of Public Utility Commissioners v. New York Telephone Co., supra* 271 U.S. at 32, 46 S.Ct. at 366, wherein the Court stated:

> Customers pay for service, not for the property used to render it. Their payments are not contributions to depreciation or other operating expenses, or to capital of the company. By paying bills for service they do not acquire any interest, legal or equitable, in the property used for their convenience or in the funds of the company. Property paid for out of moneys received for service belongs to the company, just as does that purchased out of proceeds of its bonds and stock.

While the above language is appealing on its face, the Commission and People's Counsel correctly note that the case from which it was quoted is distinguishable from the one at hand. The issue in *New York Telephone* was whether past excess depreciation accruals could be used to reduce present depreciation accruals. The Court found that such a policy constituted unlawful retroactive ratemaking. Not only is that issue factually distinct from the one before us, but its applicability to the type of question presented here was implicitly rejected by the circuit court for the District of Columbia in *Democratic Central Committee v. Washington Metropolitan Area Transit Commission, supra. See* note 65 *supra.*

As we have noted with respect to this case, the ratepayers paid all costs associated with maintaining the propane in Kansas, including storage and transportation costs (and personal property taxes, if any). They also paid WGL a return on the original cost of the propane, since the fuel was included in the rate base. *See* PC Exh. C, at 14. We further note that the propane stock was maintained pursuant to WGL's obligation to hedge against fuel shortages during peak usage periods: propane is unique as the "property" of a gas distribution company, since in periods of need it becomes gas to be supplied to consumers. Therefore, the Company's assertion that it is "not in the business of selling" propane is essentially unrealistic.

We hold that the treatment of gains realized on the sale of propane reserves was not so unreasonable as to constitute an unlawful confiscation of the Company's property. We therefore affirm the Commission's ruling on this point.

## X. PROCEEDS FROM THE ARCO LITIGATION

In 1973, WGL and the Atlantic Richfield Company (ARCO) entered into a contract whereby ARCO would supply naphtha feedstock to WGL for use in the production of synthetic natural gas.[66] In 1975, WGL filed a lawsuit against ARCO alleging an anticipatory breach of that contract; ARCO then lodged a counterclaim. At about the same time, WGL abandoned the synthetic gas project for economic reasons. In November, 1976, the two companies reached a settlement under which ARCO paid WGL $2,750,000.

WGL recorded this amount in Account 434, "Extraordinary Income," on the ground that the settlement was a "nontypical, noncustomary, infrequently recurring gain[ ]." 18 C.F.R. Pt. 201, Account 434 (1980); *see* WGL Exh. H, at 1–2. The Commission, however, assigned all proceeds that were allocable to the District of Columbia to the ratepayers, amortizing that

---

**66.** Naphtha is a petroleum derivative.

amount over a three-year period.[67] Order 6051, at 49–52 & Appendix A, Sch. 2. WGL contends that the Commission's action was unreasonable and unlawfully confiscatory since, in the Company's view, the investors had borne the risks of the litigation. We disagree.

■ The precise issue presented here is apparently a novel one in this jurisdiction. Nevertheless, we are of the opinion that the governing law on review should be the same here as it was with respect to the gains realized on WGL's disposal of propane reserves, discussed in Part IX *supra:* the benefits of a particular utility endeavor should inure to those who have borne the risks and burdens associated with that undertaking. *See Democratic Central Committee v. Washington Metropolitan Area Transit Commission, supra* 158 U.S.App. D.C. at 27–32, 485 F.2d at 806–11. None of the parties disputes that this is the applicable legal principle; their disagreement stems from differing perceptions on the part of WGL, on the other hand, and People's Counsel and the Commission, on the other, as to who actually bore the risks and burdens in the ARCO litigation.

We again find no basis on which to reverse the Commission's decision. In analyzing the equities, it is instructive initially to note just what the settlement proceeds involved represent. Theoretically, the sum of $2.75 million represents the increased costs suffered by WGL as a result of ARCO's failure to perform the contract. These costs, had the synthetic gas project achieved fruition, eventually would have been passed on to the ratepayers. The project originally

was embarked upon for the benefit of the ratepayers. The ratepayers funded the design stages of the project and inevitably would have borne the burden of financing the least costly alternative to the ARCO contract in the event that WGL had not abandoned the project. It appears, then, that the ratepayers bore the primary burdens associated with the underlying synthetic gas project.

The Company makes much of the fact that it eliminated all expenses associated with the ARCO litigation from its cost of service in this proceeding. WGL's witness Heim testified that the Company made a conscious decision "long before settlement negotiations were undertaken with ARCO" that the stockholders would bear all costs and risks in the lawsuit. Therefore, WGL urges, it was the stockholders who carried the burdens and risks of the litigation. The Commission found this argument unpersuasive, as do we. On cross-examination, Heim acknowledged that WGL routinely records legal judgments against the Company above the line. As for the litigation expenses (attorneys' fees, etc.), the Commission expressed skepticism that the Company actually decided early in the litigation to exclude these fees from its costs of service.[68] Regardless of whether the Commission's skepticism was warranted, we do not think that the issue of who paid the legal fees is a particularly relevant one in allocating the settlement proceeds in this case. Under the Commission's decision, the settlement award is to be reduced by the amount of litigation expenses before it is allocated to the ratepayers; in other words, the

67. The Commission implemented its ruling by reducing WGL's operating expenses by $86,-299. This figure represented a reduction of the original $2.75 million settlement by taxes and expenses to $1,079,316, of which $258,898 was allocated to the District, with the three-year amortization yielding the final $86,299 expense adjustment. Order 6051, Appendix A, Sch. 2.

68. The Commission evidently theorized that it would be very easy and tempting for a utility to make a pro forma adjustment to eliminate legal fees from its test-year operating expenses once the utility had a sizeable settlement safely in hand. Its skepticism was supported by the fact

that WGL, in its 1976 rate proceeding (Formal Case No. 647), had not excluded litigation costs connected with the ARCO case from its cost of service. In justification of WGL's practice in Formal Case 647, the Company's witness Unkle testified that no adjustment had been made at that time because the expenses for that test year were so small that their elimination would have had no[J] effect on rates. WGL Exh. H, at 2–4. He also testified that the Company did exclude ARCO-related legal fees from its operating expenses in Maryland and Virginia rate proceedings in 1976.

shareholders will be reimbursed for these fees before the proceeds are moved above the line. Thus, there is no chance that the shareholders will have financed the ratepayers' gain.

■ Two additional factors favor affirmance of the Commission's decision on this point. First, the decision is consistent with the Commission's treatment of losses on another attempted but abandoned supplemental gas supply project. In Order No. 5522 in Formal Case No. 567, the Commission charged WGL's ratepayers with the unrecovered costs of the Company's abandoned Brandywine storage project. See Order 6051, at 51 n.1. The situation here is sufficiently analogous to support a similar above-the-line treatment of the settlement proceeds. Second, the Maryland Public Service Commission has found that ratepayers should receive the Maryland-allocable portion of the ARCO litigation proceeds. *Washington Gas Light Co.*, Order No. 62783 (Md.P.S.C., Dec. 15, 1977), at 10. The Maryland PSC reasoned that such treatment was consistent with the handling of the Company's loss on the Brandywine project. We think that the District of Columbia Commission was justified in following the same approach in this case.

Therefore, the Commission's ruling with respect to the ARCO litigation proceeds is affirmed.

## XI. APPLICATION OF THE PRESIDENT'S 1978 VOLUNTARY WAGE AND PRICE GUIDELINES

In December, 1978, the Council on Wage and Price Stability published voluntary wage and price guidelines implementing the President's anti-inflation program. See 43 Fed.Reg. 60,772 (Dec. 28, 1978) (codified in 6 C.F.R. Pt. 705). The Council specifically indicated that the guidelines should apply to rates charged by natural gas utilities, and it urged that federal and state regulatory commissions "assure compliance to the fullest extent possible." 43 Fed.Reg. at 60,777–78.[69]

In the proceedings below, the Commission reviewed its proposed rate schedule in light of the applicable guidelines, and determined that the new rates were in full compliance with the program's price deceleration standard. Order 6051, at 101–04. The Company contends that it was error for the Commission to rely on the guidelines in setting the Company's rates. The gravamen of its argument is that neither the guidelines nor even the Council's congressionally-enacted organic statute can limit the Commission's duty to set rates that will enable the Company to earn a fair rate of return. The Commission and People's Counsel treat this question as a non-issue, however, because the guidelines ultimately had no effect on the rates adopted by the Commission.

■ We agree with the Commission and People's Counsel that no case or controversy is presented by the Commission's merely having checked the new rates against the Administration's wage and price standards. The Commission's deference to the standards cannot be reviewed in a vacuum; we may consider only the overall reasonableness of the rates adopted by the Commission. *See Federal Power Commission v. Hope Natural Gas Co., supra* 320 U.S. at 602, 64 S.Ct. at 287. Thus, before we may assess the propriety of applying the guidelines in cases such as this one, we first must find, at a minimum, that the guidelines affected the level of rates established for the utility. Even then, it probably would be inappropriate for us to judge the validity of the guidelines as applied absent a further determination that the rates established by the Commission would deprive the utility's shareholders of a fair return on their investment. In this case, the Commission simply observed that its proposed rates passed muster under the guidelines. The guidelines played no affirmative role in the Commission's formulation of the rate schedule. WGL suffered no prejudice by virtue of the Commission's reference to the guidelines; therefore, there is no genuine issue presented for review on this point.

*Affirmed.*

---

**69.** The Council recently amended its guidelines to delineate specific standards for electric, gas, and water utilities. See 6 C.F.R. § 705.45 (1980).

PRYOR, Associate Judge, concurring:

I join in the majority opinion affirming the Commission's Order.

I note, however, that a divided Commission excluded certain expenses claimed by the Company in the areas of advertising, trade and civic association dues, and for community affairs programs. As I read the Order, it does not reject those items as categorically unrelated to the interests of the ratepayer; rather, the rulings rest on the narrower ground that the Company did not carry its burden of proof by merely asserting the claimed expenses. If it is true, as the dissenting Commissioner indicates, that this greater scrutiny is a departure from past practice, then the Commission should—as it indicates in its Order—take the necessary steps to clarify "... the treatment of advertising expenses in the near future."

Viewing the case as a whole, it is clear that the majority and dissenting opinions, in discussing the numerous issues at length, disagree, at bottom, on the lawful and appropriate role of the Commission in approving and structuring the rates of a public utility. Putting aside the dissenter's characterizations of the majority's views, the fundamental question which we have decided is whether the Commission's Order, innovative though it may be, is within the authority entrusted to it and is not arbitrary, capricious, or unreasonable. I think the Order passes the statutory test and I therefore vote to affirm.

HARRIS, Associate Judge,* concurring in part and dissenting in part:

While I concur in the result reached on many of the issues in this appeal—and in

---

* *Associate Judge* HARRIS *was a member of this court until February 5, 1982. His opinion in this case was filed prior to his retirement on that date. Minor modifications subsequently were made to the per curiam opinion and to his opinion.*

1. The projected rates of return by customer class under the new rate structure are as follows:

fact authored, but for a number of selective changes, most of those portions of the court's per curiam opinion with which I do not disagree—I believe the majority is patently *wrong* in sanctioning the enormously disparate rate design prescribed by the Commission in this proceeding. I also cannot concur in the majority's affirmance of the "below-the-line" treatment of advertising and certain other administrative expenses. Further, I am convinced that a number of the other issues on review present much closer questions than the majority's per curiam opinion would appear to acknowledge. I address each of my major areas of disagreement separately, devoting the bulk of this opinion to that area in which I find the error to be the most egregious: rate design.

## I. RATE DESIGN

### A. *Flaws in the Majority Opinion*

Although I believe that the Commission's decision with respect to rate design is seriously flawed, the majority's treatment of the issue on review is even more *disturbing* because of the method by which it accomplishes affirmance. The Commission's treatment of the subject is marred by the absence of either cost or non-cost related factors in the record which could justify the discriminatory rates which were prescribed.[1] Beyond that, however, the majority reaches far past the record and even beyond the Commission's orders in a strained and defective attempt to sustain that rate structure. In doing so, the majority not only has misinterpreted, but in addition apparently intentionally has circum-

| Class of Service | Rate of Return |
|---|---|
| Residential heating | 4.91% |
| Residential non-heating | (8.42)% |
| Commercial heating | 15.13% |
| Commercial non-heating | 26.11% |

*See* Order No. 6060, Charts C & D accompanying Commissioner Stratton's dissent. As will be discussed below, the substantial disparities result from the Commission's inclusion of an increased proportion of fixed, customer-related costs in the commodity or "therm" charge, and

vented, fundamental precepts both of our judicial review function and of public utility regulatory law.

To those unfamiliar with the development of this case at the agency level, the majority's discussion of rate design may appear to constitute a plausible treatise on the various factors which the Commission, in appropriate circumstances and upon an adequate factual record, may take into account in structuring gas rates. The majority writes for pages on a number of cost and non-cost criteria—value of service, energy conservation, historic rate patterns, etc.—which in past proceedings have been invoked legitimately to justify rate disparities among customer classes. In doing so, however, the majority ascribes dispositive significance to several factors with respect to which the Commission made no factual findings and upon which it placed little or no reliance in structuring the rates.

The majority's discussion of energy conservation and value of service is puzzling. Although the PSC mentioned that those items are among the non-cost factors which it may consider in designing rates, it did not apply those criteria to the facts of this proceeding to seek to justify the rate disparities. The Commission did invoke the concept of value of service to support the relatively high rate for interruptible customers, but the interruptible rate is not challenged by any party on review and the only "finding" made by the Commission which conceivably could be related to energy conservation as a basis for rate discrimination was the broad and unsubstantiated observation that "[t]he basic facts have not changed from Case No. 647 [in which the inherently promotional declining block structure was eliminated] to the present." Order No. 6051, at 90. The PSC did not even purport to rely to any meaningful extent on value of service and energy conservation in setting the rates at issue.

The majority's most conspicuous digression, however, is its heavy reliance on a "cost" factor which (1) was not even mentioned by the PSC in Orders No. 6051 and 6060, (2) is not relied upon by the PSC or by People's Counsel in their appellate briefs, (3) is not supported by the record of these proceedings, and (4) could not, in any event, justify the rate disparities. I refer to the majority's apparent tenet that the "rising cost of replacement gas" is a phenomenon that may be invoked to uphold any rate structure under which a utility is projected to recover disproportionately high rates of return from large-scale users of gas. It does not matter under the majority's theory whether there is any specific evidence of such "rising costs" in the record, nor does it matter how great the rate disparities are between customer classes. The extent to which such a result-justifying technique could be taken is as alarming as the concept is unsophisticated.

It is a basic principle of administrative law that a reviewing court may not sustain an agency ruling on grounds which were not relied upon by the agency. In *SEC v. Chenery Corp.*, 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1943), the Supreme Court laid down the broad propositions that "the grounds upon which the administrative agency acted [must] be clearly disclosed and adequately sustained" and that "[t]he grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based." *Id.*, at 87, 94, 63 S.Ct. at 459, 462. *See* 2 K. Davis, Admin. Law Treatise § 16.12 (1958) ("The first Chenery case rather clearly establishes the proposition that when an agency gives the wrong reasons for a decision of policy or law, the reviewing court will send the case back for a new determination, even though the court might have upheld the order if no reasons had been assigned.")[2] The standards for reviewing decisions of administrative agencies are, of course, more restricted than

a decreased proportion of such costs in the customer charge.

2. The majority's insinuation in n.18 of its opinion (pp. 1201–1202) that this standard of review is one which a court should not be expected even to try to live up to is disheartening.

those for reviewing actions of trial courts, as a trial court's decision may be affirmed if correct in result, even though for the wrong reason. Thus, just as a reviewing court may not substitute its judgment for that of an agency in overturning the agency's decision, neither may a court salvage an otherwise unsustainable administrative ruling by supplying supporting reasons of its own choosing.

That, however, is precisely what the majority has done. There is not a hint in either Order No. 6051 or Order No. 6060 that the PSC relied to any significant extent upon the rising cost of new gas in setting the customer charges. In fact, the Commission went to great lengths to explain why it was rejecting the uniform volumetric rate which had been proposed by People's Counsel. The proposed volumetric rate ostensibly was based on marginal cost pricing, a pricing scheme which would take into account the costs of incremental quantities of new gas. The Commission stated:

> Although exotic gas sources, such as SNG [synthetic natural gas], imported LNG [liquified natural gas], and Alaskan gas, will exceed WGL's current average costs, their impact will be relatively restricted for years. [Order No. 6051, at 88.]

There also is evidence in the record that gas supplies from existing sources are expected to continue to improve in the near future.

The majority nevertheless concludes that "the inclusion of substantial fixed costs in the commodity charge is cost justified. The high usage customers contribute disproportionately to the exhaustion of relatively inexpensive commodity sources, and thus accelerate future increases in commodity prices for all utility customers." *Ante* at 1201 (footnote omitted). The majority's analysis is squarely at odds with the PSC's reasoning, which simply and *obviously* was as follows:

> We take this action essentially for equitable reasons.... At least at this time, we feel compelled to provide some degree of relief for existing customers who are in no position to respond to more cost-based rates. Equally important is the Commission's desire to lessen the extent to which the low-volume gas user pays a higher per unit price for service. [*Id.*, at 97.]

It thus is clear that the Commission was determined to lower customer charges for relatively low-volume gas users simply because of a perceived need for economic relief for those customers. There is nothing in the Commission's orders indicating that it was concerned with penalizing higher-volume consumers for any increase in replacement gas costs to which they might contribute; in fact, parts of Order No. 6051 clearly refute that theory. For instance, the Commission rejected the Company's proposal to establish a higher customer charge for high-volume residential heating customers than for lower-volume customers in the same class. *Id.*, at 95–96. The Commission stated:

> WGL concedes that there is no real difference in the customer costs based on annual consumption (above or below 100 Ccf [hundred cubic feet] per year). Therefore, we see no reason to prescribe two different customer charges. [*Id.*, at 96.]

The majority's willingness to supply its own rationale for upholding the PSC's decision perhaps might be easier to understand if the new rate design actually were going to have the effect the Commission purportedly intended—*i.e.*, rate relief for lower-income gas customers. The fact is, however, that the customer classes with the highest projected rates of return are those with probably the greatest percentage of low-income customers, namely, the commercial heating and non-heating classes, which include all group-metered apartment buildings. These classes are projected to provide WGL with returns of 15.13% and 26.11%, respectively, as compared with returns of only 4.91% and *minus* 8.42% for the residential heating and non-heating classes, respectively. It is ironic that the residential non-heating customers toward whom the rate relief is targeted are quite likely well-to-do customers who heat their homes with currently more costly oil or electricity. There

certainly is no evidence in the record, as I discuss in detail below, that lower-income consumers tend to be concentrated in the residential non-heating class.

Moreover, I think it is unfair and illogical to presume—as the majority evidently does—that commercial customers are more "guilty" than residential customers, either as individuals or as a class, of increasing the price of replacement gas. It does not make sense to penalize a customer class based on its size alone. It is fair, for example, that residents of group-metered apartments (which are included in the commercial classes) should be forced to subsidize residents of individually-metered apartments (which are included in the residential categories) simply because the group-metered building is viewed as one "large" customer while the individually-metered building consists of many "small" ones? Is it reasonable to say that 50 newly-connected residential customers, each of which uses 100 Ccf of gas per year, are less responsible for rising marginal costs than is one hotel using 5,000 Ccf per year which has been a customer for many years? Unquestionably many of WGL's larger customers initially subscribed to gas service years ago when gas supplies were plentiful and a "declining block" rate structure was utilized; obviously it is not equitable to force those customers to shoulder the entire blame for today's higher replacement gas costs. In other words, it is necessary to look beyond a customer's mere label as a "large" customer to determine whether it is contributing disproportionately to rising replacement costs.

The flawed nature of the majority's reasoning further is evidenced by the projected rates of return within the commercial classes, which show that WGL will earn a significantly higher return on commercial non-heating customers than on commercial heating customers.[3] Unquestionably, the larger users of gas are in the latter catego-

ry; it takes considerably more gas to heat a building than to cook or provide hot water. Thus, even if the Commission had based the rate disparities on evidence of rising replacement costs—which unquestionably it did not—the resultant rates would not achieve what the majority seems to perceive as the desired goal of recovering the greatest proportion of those costs from the largest customers.

Energy conservation is, to be sure, a valid ratemaking objective, as is the recovery of increasing costs of new gas supplies from those who are shown to be most responsible for their incurrence. However, there is a limit to what the PSC permissibly may do under the general rubric of energy conservation. Here the Commission did not even attempt to use that goal as a predicate for the glaring rate disparities, although it did mention conservation as one factor that may be taken into account. As to the allocation of costs of replacement gas, the Commission made absolutely no findings, so it is totally unwarranted for this court, on judicial review, to affirm the rate design on that basis.

The majority's treatment of the rate design issue fails, then, in two fundamental respects, as a consequence of which the true merits of the question never are reached. First, the majority relieves the Commission of its "burden of showing fully and clearly why it has taken the particular ratemaking action." *Washington Public Interest Organization v. PSC,* D.C.App., 393 A.2d 71, 75 (1978), *cert. denied,* 444 U.S. 926, 100 S.Ct. 265, 62 L.Ed.2d 182 (1979). There we also stated:

> There are two aspects of this elaboration required of the Commission: (1) announcement of the criteria governing the rate determination, and (2) explanation of how the particular rate order reflects application of these criteria to the facts of the case. [*Ibid.*][4]

3. *See* note 1, *supra.*

4. I cite to the majority opinion in *Washington Public Interest Organization v. PSC* without enthusiasm, because I agree with the view of Judge NEBEKER that the majority in that case

misconstrued its review function in remanding the proceeding to the PSC. *See* 404 A.2d 541 (1979) (NEBEKER, J., dissenting). The above-quoted passage, however, correctly reflects the

Second, no doubt recognizing that the PSC's decision on rate design could not be sustained under the meager rationale offered by the Commission, the majority nevertheless proceeds to sanction discriminatory rates on a theory that is unsupported in the record and which apparently did not even occur to the two-member Commissioner majority. In so doing, the majority of this division of the court flagrantly violates the principle of judicial review established long ago in *SEC v. Chenery Corp., supra:* "The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based." 318 U.S. at 87, 63 S.Ct. at 459.

Such a misperception of our proper function in reviewing agency action permits the majority to sidestep the central issue in the rate design dispute, which is whether the obvious class-based rate discrimination is explained adequately by the PSC and is supported sufficiently by record evidence of legitimate cost and non-cost related considerations. Having outlined my disagreement with the majority's approach to this case, I now explain what I believe to be the flaws in the Commission's treatment of the subject.

### B. *Flaws in the Commission's Treatment*

As recognized in the per curiam opinion, the Commission departed from the tradi-tional, inherently promotional declining block rate structure in WGL's most recent prior rate proceeding in 1976. *See In re Washington Gas Light Co.,* 16 P.U.R. 4th 261, 278–84 (Formal Case No. 647, D.C. PSC 1976). In its place, the Commission instituted a two-part rate structure consisting of (1) a "system" charge, *i.e.,* a fixed charge (unrelated to volume of consumption) which was designed to recover a significant portion of customer-related costs,[5] and (2) a "commodity" charge, *i.e.,* a single per-therm rate for usage which was uniform for all customers regardless of customer class or volume of consumption. *See id.,* at 279. The Commission felt that a uniform commodity charge would encourage conservation of gas. At the same time, the system charge was presumed to allocate the recovery of customer costs equitably among customer classes.[6]

Although the Commission established separate system charges for each class of firm customers in the 1976 proceeding, it felt constrained to temper the effect of the sudden transition into a revolutionary new rate design. *Id.,* at 280. Thus, despite evidence showing that customer costs were approximately the same for all residential customers, the PSC prescribed substantially unequal annual system charges of $72 for residential heating customers and $45 for residential non-heating customers.[7] *Id.,* at

Commission's burden of elaboration in rate cases.

5. As the Commission has acknowledged in this case, the term "system" charge was a misnomer, because the charge was designed to recover only customer costs and not any part of the overall system's demand costs. The Commission has corrected the error in nomenclature by renaming this component the "customer" charge. Order No. 6051, at 4, 81.

6. Recovery of demand costs was allocated as part of the commodity charge, rather than the system charge. As Commissioner Stratton points out in his dissent in this proceeding, "it is reasonable to collect demand costs through the therm charge if one assumes that a portion of the revenue from each therm sold is applied toward recovery of demand costs." PSC Order No. 6060, at 25 (Stratton, C., dissenting). This is true because higher-volume customers gener-ally are responsible for higher demand costs than are low-volume customers. *See id.,* at 26. The Commission did, however, leave the door open to the possibility of including some demand costs in the system charge in future rate proceedings. *See In re Washington Gas Light Co., supra,* 16 P.U.R.4th at 280.

7. A heating customer is one who uses gas for heating and/or cooling purposes. Non-heating customers use gas solely for cooking and/or hot water. Individually-metered apartments are included in the residential class; group-metered apartment buildings are part of the commercial/industrial class.

Although the system charge (now the customer charge) was a fixed annual assessment, it was spread over the year and was payable monthly. For heating customers, however, the system charge was spread over only the nine coldest months of the year, in order to "remove

280 & n.13. The Commission justified this discrepancy "upon pragmatic as well as theoretical considerations. When a commission ushers in a drastically new rate structure," the PSC stated, "it has the responsibility— or at least the discretion—to temper radical changes in the historical rate patterns." *Id.*, at 280; *accord, Apartment House Council of Metropolitan Washington, Inc. v. PSC*, D.C.App., 332 A.2d 53, 57–58 (1975). Because the residential non-heating class had enjoyed low bills under the old declining block rates, the PSC saw a need to ameliorate the impact of the new rate structure on that class. It therefore felt justified in setting for residential non-heating customers an initial system charge which recovered only about two-thirds of the class' customer costs, even though that decision meant that other customer classes would have to make up for these unrecovered costs through higher commodity charges. The Commission was careful to note, however, that the transition period would not last forever and that in the future, such a cross-subsidization of one class by another would cease to be appropriate. It thus stated in the earlier case:

> Moreover, in a future general rate case, the commission will consider rate structure again. This case is only the first step in a periodic review of system charge levels. Once customers have had a fair opportunity to adjust to the new rate structure, the company can consider system charges which include more cost ingredients. [16 P.U.R. 4th at 280.]

The clear import of this passage was that in future ratemaking cases, the system charge for the residential nonheating class gradually would be raised to reflect customer costs more accurately. It is clear, however, that the new customer (formerly "system") charges which were established in the instant case achieve precisely the opposite result.

What the Commission has done is to raise the uniform commodity charge from 21.0¢ per therm to 32.59¢ per therm. [Order No.

the incentive for heating-only customers, or those on vacations during the summer, to discontinue service during June through August."

6051, at 106.] At the same time, the Commission lowered the customer charge component for residential heating customers from $72 per year to $45 per year. It lowered the customer charge for residential non-heating customers from $45 per year to $30 per year. It lowered the customer charge for small (less than 3,000 Ccf) commercial and industrial heating customers from $148.50 per year to $58.50 per year. For large commercial and industrial heating customers, the PSC left the customer charge at $148.50 per year. Finally, it left the customer charge for all non-heating commercial and industrial customers at $84 per year. The Commission thus declined to increase any class' customer charge, despite undisputed evidence that customer costs had increased for all classes. [Order No. 6051, at 106; Order No. 6060, at 28–29 (Stratton, C., dissenting).]

Commissioner Stratton lodged a vigorous and well-reasoned dissent from the Commission majority's rate design determination. His dissenting opinion, from which the petitioners on this issue understandably draw much of their support, took the position that the new customer charges—coupled with the higher commodity charge— would increase the disparities in rates of return among customer classes. Basing his calculations on test-year consumption patterns and on customer class cost-of-service studies conducted by WGL, he computed class rates of return—both existing (based on the old rates) and projected (based on the new rates)—for firm (*i.e.,* non-interruptible) service, as follows:

| Class of Service | Rate of Return | |
|---|---|---|
| | Old Rates | New Rates |
| Residential Heating * | 6.37% | 4.91% |
| Residential Non-heating * | (3.91%) | (8.42%) |
| Commercial Heating ** | 11.77% | 15.13% |
| Commercial Non-heating ** | 19.44% | 26.11% |

\* Includes individually metered apartments
\*\* Includes group-metered apartments

*Id.*, at 279–80. The same nine-month policy has been readopted in this proceeding with respect to heating customers.

**1248**

[*See* Order No. 6060, Charts C & D accompanying Commissioner Stratton's dissent.] Commissioner Stratton contended (as have petitioners here) that this move toward even more unequal rates of return components—precisely the opposite direction from that in which the PSC had promised in the 1976 rate proceeding to move—is devoid of justification in the record. That being true, he asserted, the new rate design results in an impermissible cross-subsidization of the residential non-heating class (whose rate of return is projected to be a stunning negative 8.42%) by the other classes, particularly the commercial/industrial heating and non-heating classes (the rates of return for which are projected to be 15.13% and 26.11%, respectively).

Those figures reveal that WGL's different customer classes will be making vastly unequal contributions toward the Company's overall authorized rate of return of 9.25%. Before addressing the legality of what I perceive to be manifest rate discrimination, however, I dispose of a concern relied upon by the majority and raised by the Commission and by People's Counsel in their appellate briefs. They challenge the validity of the projected rates of return by pointing to an admitted error in WGL's cost allocation studies. The Company apparently overstated the costs (both capital and operating costs) associated with gas delivery mains which were allocated to certain members of the residential heating and non-heating classes. WGL assigned those customers' costs evenly on a per-meter basis, not accounting for the fact that residential customers living in individually metered apartments are responsible for lesser main-related costs per customer than are other residential customers. The effect of a proper adjustment would have been to lower

somewhat the total customer costs and the rate base for the residential non-heating class, with a concomitant increase in that class' projected rate of return.[8] None of the witnesses, however, was able to pinpoint the degree of adjustment that would be appropriate, or to estimate even roughly the degree to which the rate of return would rise.

I carefully have reviewed the relevant cost allocation data and the related testimony of WGL's witnesses, bearing in mind that petitioners have the burden of establishing a convincing case of rate discrimination before this court may invalidate the rate design. I am well satisfied, however, that while Commissioner Stratton's rate of return figures may be distorted slightly due to the misallocation of main-related costs, those figures—viewed in conjunction with other record evidence—are reliable and indeed establish a prima facie case of rate discrimination. A number of factors makes this conclusion inevitable.

First, the allocation of costs pertaining to mains is an inherently imprecise endeavor. As compared with other costs incurred in delivering gas to customers (such as costs of regulators, meters, meterreading, billing, etc.), it is much more difficult to determine accurately for what percentage of the costs of the total system of mains each customer is responsible. This is true simply because many customers—and often customers in different classes—share the same mains. Hence, while WGL admittedly could have made further adjustments to its figures, it must be borne in mind that a good deal of educated guesswork naturally is involved in allocating costs associated with mains. Moreover, in computing the customer cost of mains for the residential classes, the Company took a very lenient approach.[9]

8. Such an adjustment would have a similar effect on the residential heating class, but only to a negligible extent. Out of approximately 87,500 billing units in that class, only about 4,000 are individually metered apartments. This constitutes less than 5% of the class. In the residential non-heating class, on the other hand, individually metered apartments comprise roughly 55% of the class (28,000 out of 51,000 billing units).

9. Rather than using the full costs of all serviceable mains, the Company allocated to each customer the cost of the theoretical minimum-sized main necessary to serve that customer. WGL's witness Smallwood explained:

We discerned the minimum size—theoretical minimum size main by doing a least squares regression analysis on the most prevalent types of mains in our system and by all of the classes. We have basically three types

For example, with respect to the residential heating and cooling class, less than one-third of the relevant mains were included. [Order No. 6060, at 11.]

Second, the cost data in the record make it clear that whatever the appropriate adjustment might have been, the projected rate of return for the residential non-heating class still would remain negative. As the Commission majority noted in its Final Opinion and Order, even if all costs associated with distribution mains were eliminated from the customer costs computation, the resultant customer costs still would exceed the new customer charges for the residential classes. See PSC Order No. 6060 at 11; see also Ex. WGL 7, Sch. 2, Item B, for cost figures associated with mains.[10] Given the fact that residential non-heating customers use fewer therms per customer than any other class, the excess of customer costs over customer charges for this class obviously cannot be recovered through the commodity charge. When a customer class does not cover its costs through the customer and therm charges combined, a negative class rate of return necessarily results. When this happens, the utility cannot have the opportunity to earn its authorized overall rate of return unless higher-volume customers in other classes cover these excess costs through the therm charge. This is precisely the stuff of which rate discrimination is made.

Finally, even if WGL's cost studies contain minor inaccuracies, they are the best—and indeed the only—evidence this court has to consider. They understandably were the only class-cost-of-service studies presented at the hearing. Even though one witness challenged their accuracy, neither he nor any other witness attempted to quantify the asserted misallocation. I therefore think it is not only reasonable but inescapable that the court should defer to the evidence of record, which petitioners have shown to be substantially correct. That evidence conclusively demonstrates that the PSC's new rate design is discriminatory.

Had the majority addressed this issue correctly, the next step on review—having established that the new rate design significantly discriminates in favor of the residential non-heating class at the expense of

---

of mains in our system: cast iron, steel and plastic, and we did a least squares regression analysis on those types of mains of the various sizes, and where the least squares trend line intercepted the Y axis at zero point, we determined that that was the minimum cost that could be associated with the theoretical minimum size main.

In other words, we don't have any mains of zero size, but it would be unfair to assign as a customer component a two-inch main if that is our smallest because to serve only one customer you wouldn't need a two-inch main.

So we simply said what is the theoretical minimum size we can get, and if you go down to theoretical minimum, that is a pin hole through a steel rod, and if that is what is needed to serve, then the minimum cost would be associated with that minimum size. And so that is how we arrived at this cost and then we spread that among the customers on the basis of each customer in every class would have to bear its average cost of that main. So we just took the total cost after we determined what the theoretical minimum size total cost was and divided by the number of customers in the jurisdiction and each customer then, bore a proportionate share of that.

**10.** It is noteworthy that when WGL's witness Smallwood was questioned about the asserted misallocation in the costs of mains, he stated that although he could not be certain, the rate of return for the residential non-heating class "probably" would still be negative even after the misallocation was corrected. It is important to recognize that Smallwood was referring to the expected return under the Company's proposed rate structure, not under the more discriminatory rates ultimately adopted by the PSC. Under the Company's proposed rates, the return on the residential non-heating class was projected to be a negative 0.49%. Under the rates eventually adopted, the projected return for that class (as calculated by Commissioner Stratton) was a more dramatically deficient negative 8.42%. It goes without saying that if the return still would have remained negative under the Company's proposed rates even after an appropriate cost adjustment, as Smallwood ventured, then the return based on the rates ultimately adopted necessarily would have remained well within the negative range after the adjustment as well. The majority seems to confuse the projected rates of return computed by Commissioner Stratton with those put forth by WGL.

larger-volume commercial and industrial customers—would have been to determine whether the PSC advanced valid reasons for the rate disparities, and, if so, whether those justifications have adequate support in the record.

It indeed may seem peculiar that the majority opinion largely avoids quoting the Commission's justifications for the new rate design. The reason the majority does not advert to the Commission's reasoning, however, is clear: The PSC's rationale simply does not square with that supplied by the majority in its desire to affirm the Commission's actions entirely. To read the majority opinion on rate design, and then to read the Commission's orders on the same subject, gives the impression that one is reading about two different rate proceedings. I think it is important to point out what the Commission's reasoning actually was, so that its decision may be judged on its own merits rather than on those supplied by the majority on this appeal. The Commission explained its decision to decrease so substantially the residential non-heating class' customer charge as follows:

> This sub-class of residential customers uses gas solely for cooking and/or heating water.
>
> Because of the very low volumes of gas which this sub-class takes relative to its customer costs, a two-part rate yields an anomoly; this sub-class pays the highest *unit* price for service at the same time as WGL earns the least return from this service.
>
> In designing rates for the residential non-heating/non-cooling sub-class, the Commission faces a direct conflict between the principle of cost causation, on the one hand, and historic rate patterns and social considerations on the other hand. Recognition of historic rate patterns for this group is required. We shall accordingly reduce the customer charge for this sub-class from $3.75 to $2.50 per month. This $1.25 reduction in the cus-

tomer charge maintains approximately the same relationship as before with the new lower customer charge for the residential heating and cooling sub-class.

> We take this action essentially for equitable reasons. Because WGL incurs a comparatively large amount of fixed costs in order to deliver the very small volumes used by this sub-class, the Company's service for cooking and hot water is unprofitable for WGL. Nevertheless, through past advertising and rate structure, WGL promoted the growth of this form of gas usage. As a result, today there are 51,000 cooking and hot water customers in D.C. At least at this time, we feel compelled to provide some degree of relief for existing customers who are in no position to respond to more cost-based rates. Equally important is the Commission's desire to lessen the extent to which the low-volume gas user pays a higher per unit price for service. [Order No. 6051, at 96–97.]

On this appeal, the PSC and People's Counsel contend that the Commission's order amply explains the rate disparities in terms of valid non-cost based factors, particularly "equitable" considerations and the desire to preserve historic rate patterns.[11] Petitioners, on the other hand, argue that the preference accorded to residential non-heating customers not only is explained inadequately by the PSC but also enjoys no independent support in the record. Petitioners draw upon Commissioner Stratton's dissenting opinion, in which the following manifestly valid observations were made:

> The purposes of rate design, once the revenue requirement is established, are, first, to establish rates that offer a reasonable prospect of generating revenues sufficient to cover the utility's cost of service as determined by the Commission, and, second, to distribute the burden of those rates fairly among the utility's customers. The rates established in this case most definitely fail the latter test. For what the Commission has not acknowl-

---

11. There is nothing, however, in the briefs of either the PSC or People's Counsel which suggests that the new rate structure can be upheld on the ground principally relied upon by the majority—*i.e.*, the notion of the rising costs of gas.

edged is that in arbitrarily "softening the impact" of rates on small users it is increasing the impact of rates on medium and large users who pay back through the therm charge every cent and more of their customer charge reductions.

\* \* \* \* \* \*

I believe the Company, its customers, and a reviewing court are entitled at a minimum to a finding that fixed monthly charges based on fixed costs do have an adverse impact on small users, and, if so, how and why. Then the Commission should explain in the requisite detail why the "adverse impact" consideration should overcome all the other reasons advanced for not moving toward a one-part rate. Next the Commission should state how and why the adverse impact on only small users was taken into consideration when every other class of ratepayers is also impacted by fixed monthly charges. Finally, the Commission should justify its decision to visit additional impact on most ratepayers in order to alleviate the impact on the small user.

There is a reason that this order lacks those fundamental requisites. It is that the record in this case not only does not support this decision, but requires that the customer charges of those classes who are not now covering their customer costs through those charges be raised. [Order No. 6060, at 35–37 (Stratton, C., dissenting) (footnote omitted).]

Commissioner Stratton thus concluded that the new rates were not only discriminatory but unsupported as well. I think it is obvious, as Commissioner Stratton pointed out, that the increasedly unequal rates of return result from the PSC's decision to lower the customer charge for most of its firm customers while raising the commodity charge. As more and more of the utility's fixed costs (including customer costs) are recovered through the commodity charge, rather than through the customer charge, the burden of cost recovery falls dispropor-

tionately upon large-volume customers. *See* Order No. 6060, at 26 (Stratton, C., dissenting). All that remains to be determined is whether, contrary to Commissioner Stratton's assertions, the rate disparities enjoy adequate record support in terms of valid cost or non-cost considerations.

As the Commission's final order reveals, the customer charge reductions were effected "essentially for equitable reasons." Order No. 6051, at 97. The Commission asserted that it faced "a direct conflict between the principle of cost causation, on the one hand, and historic rate patterns and social considerations on the other hand." *Ibid.* It also alleged that "through past advertising and rate structure, WGL promoted the growth of this form of gas usage," even though those customers are responsible for a comparatively large amount of fixed costs and have been unprofitable. *Ibid.* The Commission concluded that it was "compelled to provide some degree of relief for existing customers who are in no position to respond to more cost-based rates." *Ibid.*

I turn to the "social" and "equitable" considerations cited by the PSC. Assuming, arguendo, that these factors could provide an appropriate justification for such a discriminatory rate structure, there is no evidentiary support for them in the record. While the Commission's order suggests that the unprofitable residential non-heating customers were seduced into subscribing to gas service at low prices by WGL's past promotional campaigns, the only record evidence of the Company's promotional efforts is the following statement by WGL witness Smallwood:

> Yes, we did have a large tonnage air conditioning promotional campaign in the mid and late '60's, as I guess everybody did until the crunch came in '72.

That advertising campaign, of course, was directed to large scale users of gas in the heating and cooling sub-classes.[12] As to the

---

12. On this point, Commissioner Stratton accurately stated:

> The conclusion that the Company "promoted" this business is unsupported on this record. Rather, these uneconomical customers

assertion that low-volume users are, as a class, less able to respond to more cost-based rates than are other classes, there is a similar dearth of support for such a concept in the record. To the contrary, the Company's witness Smallwood testified that although nearly 30,000 of WGL's customers used less than 1,000 therms in the test year, no study had been made of the income distribution of that group:

> We have not attempted to study whether customers using a thousand or less [therms] are low-income or fixed-income customers or whether they are well-to-do customers.

No other witness offered any testimony on the subject of income distribution by customer classes. In assuming that small users of gas tend to have lower incomes, then, the Commission acted not on the basis of reliable evidence in the record, but rather on the basis of pure, rank speculation. It just as easily might be fathomed that the typical residential non-heating customer is a relatively well-off family which uses gas for cooking and hot water, but which heats its house or apartment with now more costly oil or electricity.[13]

The Commission also mentioned its desire to preserve "historic rate patterns." While preservation of historic rate patterns is a valid ratemaking objective when needed to temper a radical change in rate structure, the only relevant "historic rate pattern" in this case is a $3.75 customer charge for the residential non-heating class which was established in the 1976 rate proceeding. At that time, the customer charge recovered only about two-thirds of the class' costs of service, but it was accompanied by the PSC's promise to include more cost ingredients in future cases. *See In re Washington Gas Light Co., supra,* 16 P.U.R.4th at 280. What was then the future is now, but instead the residential non-heating class has been extended a $2.50 customer charge—a one-third reduction despite overwhelming evidence of rising customer costs. Certainly, then, the recent history of WGL's rate structure does not support—and indeed contradicts—this action by the Commission.[14]

have been attached pursuant to WGL's utility obligation. Acknowledging that they are unprofitable, the Commission has adjusted rates downward, thereby increasing their unprofitability and the burden they impose upon other ratepayers. The Commission thereby commits the classic regulatory folly upon the gas business, namely to decree uneconomically low prices for a utility service thereby insuring that it will be oversold and bring calamitous results in the future. If anyone stands fairly accused of "promoting" this business surely it is the Commission who has lowered rates to a noncompensatory level in the face of rising costs. [Order No. 6060, at 38–39 (Stratton, C., dissenting).]

13. In his dissent, Commissioner Stratton commented:

> What of the conclusion that low usage ratepayers "are in no position to respond to more cost-based rates." One searches the record in vain for evidence to support this statement. We know that some utility customers have seen their utility bills rise faster than their incomes over the past five years, and they desire a subsidy of their utility usage, which a compassionate body politic and its elected representatives may provide them some day. Meanwhile, because the regulatory process affords a forum to air their plight we are invited to provide the subsidy at the expense of utility investors and other ratepayers. And PSC has done so, by this decision and by its actions in electric rate decisions in recent years. But there is no evidence that these victims of a rising cost of living are low usage consumers of gas, or that all low usage consumers of gas are similarly situated. Targeting compassionate relief in a way that reduces every bill for low gas usage benefits every customer, needy or not, on every bill for low usage at the expense of every customer, needy or not, on every bill for high usage.

> The Commission has succumbed to what Alfred Kahn has called, "the almost irresistible opportunity it [economic regulation] offers to use price—typically very imprecisely and inefficiently—as an instrument for the redistribution of income." [PSC Order No. 6060 at 39–40 (Stratton, C., dissenting) (footnotes omitted), *quoting* A. Kahn, *Applying Economics to an Imperfect World,* an article drawn from the 1978 Ely lecture before the American Economic Association, reprinted in 2 REGULATION 17, 18 (November/December 1978).]

14. As Commissioner Stratton noted in his dissent, the PSC apparently used the term "historic rate pattern" in a relative sense, by maintaining the existing ratio between the residential heating customer charge and the residential non-heating customer charge. *See* Order No.

The Commission and People's Counsel nevertheless argue that the new rate design can be supported under this Court's decision in *Apartment House Council of Metropolitan Washington, Inc. v. PSC, supra.* In that case, the PSC had established electric rates which resulted in somewhat unequal projected rates of return by customer class. We noted that in judging the reasonableness of the return differentials, "we first examine the cost-related factors and then the non-cost-related factors." 332 A.2d at 56. We made it clear that "[i]t is not necessary that differences in rate of return be specifically and quantitatively supported by customer class-cost considerations." *Id.,* at 57. Valid non-cost-related factors—such as energy conservation and preservation of historic rate and usage patterns—may be used to help justify class return differentials. *Id.,* at 57–58. We also subscribed to the general rule of thumb "that a rate structure must achieve the lowest price for the largest number of users." *Id.,* at 57, *citing Philadelphia Suburban Transportation Co. v. Pennsylvania Public Utility Commission,* 3 Pa.Commw.Ct. 184, 195–98, 281 A.2d 179, 186–87 (1971). Finding evidence of both cost and non-cost-related justifications in the record, we upheld the electric rate structure in *Apartment House Council.*

While *Apartment House Council* is precedent, the facts of that case are fundamentally different from the facts before us in at least two major respects. First, the disputed electric rates in *Apartment House Council* involved relatively minor discrepancies in rates of return. The following class returns were projected:

| | |
|---|---|
| Residential | 5.63% |
| General Service | 7.78% |
| High Tension | 8.27% |

[332 A.2d at 55.]

In stark contrast, the projected class rates of returns in issue here (for firm service) range from 26.11% to a shockingly negative

6060, at 38 (Stratton, C., dissenting). The Commission apparently felt it would be treating all classes fairly if the customer charge for each were reduced proportionally. I already have noted why this reasoning is fallacious: it

8.42%—while WGL's overall authorized rate of return is 9.25%.

Second, and more importantly, the court in *Apartment House Council* found substantial evidence in the record to support both the cost-related and the non-cost-related justifications put forth by the Commission. Here, the PSC essentially concedes that its rate design is not cost-justified, and there is no support in the record for the non-cost factors the Commission has advanced.

From a more fundamental standpoint, however, the non-cost factors relied upon by the Commission legally could not support the enormously disparate rates at issue here, even if there were evidence in the record to support them. The PSC's enabling act provides in relevant part that:

> The charge made by any such public utility for any facility or services furnished or rendered, or to be furnished or rendered, shall be reasonable, just, and non-discriminatory. Every unjust or unreasonable or discriminatory charge for such facility or service is prohibited and is hereby declared unlawful. [D.C.Code 1981, § 43–501.]

The Commission has a statutory mandate to set rates which are reasonable and non-discriminatory; nowhere in the Act is the Commission authorized to function in a contrary fashion.

The Colorado Supreme Court (sitting en banc) recently construed a virtually identical statutory provision as prohibiting that state's public utilities commission from setting preferential rates based on social considerations. *See Mountain States Legal Foundation v. Public Utilities Commission,* 197 Colo. 56, 590 P.2d 495 (1979). In that case the PUC had established reduced gas rates (often called "lifeline" rates) for low-income elderly and disabled persons. The court determined that the preferential rates were invalid under the Commission's enabling act, which forbids "unjust discriminatory rates." The court stated:

> ignores the fact that high-usage customers pay back through the increased commodity charge much more than the amount of savings they realize from a decreased customer charge. *See id.,* at 35–36.

[T]he PUC has limited authority to implement a rate structure which is designed to provide financial assistance as a social policy to a narrow group of utility customers, especially where that low rate is financed by its remaining customers.

\* \* \* \* \* \*

Establishing a discount gas rate plan which differentiates between economically needy individuals who receive the same service is unjustly discriminatory.

To conclude, although the PUC has been granted broad rate making powers by Article XXV of the Colorado Constitution, the PUC's power to effect social policy through preferential rate making is restricted by statute no matter how deserving the group benefiting from the preferential rate may be. [*Id.*, at 60, 590 P.2d at 497–98.]

Of course, the Colorado Supreme Court's reasoning is equally applicable here, particularly given the pertinent similarity in the two jurisdictions' utility codes. *See also Public Service Co. of New Hampshire v. State,* 113 N.H. 497, 509, 311 A.2d 513, 521 (1973); Note, *Conservation, Lifeline Rates and Public Utility Regulatory Commissions,* 19 Nat.Res.J. 411 (1979) ("Public Utilities— Public Service Commissions' Jurisdiction and Powers Applied to Rate Structures: Public Service Commissions are limited to cost of service analysis in prescribing appropriate rate structures for public utilities. Environmental considerations and income redistribution may only be considered within the confines of this analysis".)

The Commission in past years has recognized its proper mission, and it has acknowledged the primary role of cost-related factors in structuring rates. For example, in *In re Potomac Electric Power Co.,* 84 P.U. R.3d 250 (D.C. PSC 1970), the PSC rejected a proposal that low-income customers be exempted from a general increase in electric rates. It then stated:

From the legal point of view, we are required by the statute to establish rates which are not unjustly discriminatory. The net result of the Consumer Council proposal is that persons with incomes higher than $5,500 per year would be paying higher rates for the same service in order to avoid an increase for those in the lower income category. The premise on which the discrimination would be based is that persons with incomes lower than $5,500 per year cannot afford any further increase. However, it could well be that persons with incomes in excess of $5,500 per year would also feel, in some cases with great justification, that they cannot afford to pay more for electricity either. We think that the standards suggested, i.e., the ability of a customer to pay the increase, is too subjective and too indefinite to provide a sound basis on which to base an obvious rate discrimination. [*Id.,* at 255–56.]

More recently, the Commission recognized that

[b]ecause cost recovery is the ultimate test of equity among ratepayers, "the development of rate structures which conform as closely as possible to the cost standard provides the ideal goal toward which rate-making processes should tend." [*In re Chesapeake & Potomac Telephone Co.,* 9 P.U.R.4th 550, 571 (D.C. PSC 1975), *quoting* SHARFMAN, THE INTERSTATE COMMERCE COMMISSION, Vol. III, at 325.][15]

*See also Payne v. Washington Metropolitan Area Transit Commission,* 134 U.S.App.D.C. 321, 335, 415 F.2d 901, 915 (1968). The preferability of cost-based rate structuring has been accepted widely by courts and regulatory agencies in other jurisdictions. *See, e.g., Jager v. State,* 537 P.2d 1100, 1109–10 (Alaska 1975); *In re Utah Power Co. & Light Co.,* 22 P.U.R.4th 351, 373 (Ida-

---

**15.** In his dissent in this case, Commissioner Stratton made the following observation:

True, there are considerations other than cost —equity, history, rate stability—that go into rate design, but these considerations have not been accorded primacy; they have been used to justify departures from cost-based rate-making. Economic regulation must commence from a basis of costs, otherwise the regulation is not "economic" but something else. [Order No. 6060, at 23 (Stratton, C., dissenting).]

ho PUC 1977); *Public Service Co. of Oklahoma,* Opin. No. 788 (Feb. 17, 1977); *In re Central Vermont Public Service Corp.,* 28 P.U.R.4th 469, 486 (Vt. PSB 1978); *In re Virginia Electric and Power Co.,* 29 P.U. R.4th 65, 89 (Va. SCC 1979).

We recently upheld an electric rate structure prescribed by the Commission which was alleged to discriminate unreasonably against large scale commercial customers. In *Metropolitan Washington Board of Trade v. PSC,* D.C.App., 432 A.2d 343 (1981), we found no reversible error in the Commission's decision to institute a "time-of-day" (TOD) peak load pricing scheme for commercial electric customers who consume an average of at least 1,000 kilowatt-hours monthly. *Id.,* at 360–61. The petitioners in that case argued that it was unreasonable for the Commission to limit the new TOD pricing to large commercial customers, and that if it were to be instituted at all, it should be applied across the board. They contend that the net impact of the TOD rates would favor residential customers at the expense of the commercial class. We found the apparent rate discrimination to be justified by several legitimate mitigating factors, the likes of which are nowhere to be seen in the gas rate proceeding now before us.

First, the TOD rates are in an experimental stage, at least in this jurisdiction. As mentioned earlier, the Commission has the discretion when ushering in a radically different rate structure to temper its impact on those customers which it would affect most adversely. In addition, the Commission in *Metropolitan Washington Board of Trade* had noted that the costs of installing the new meters needed for TOD pricing could be borne much more feasibly by large customers than by smaller customers during the initial stages of the new pricing system. The Commission also indicated that other customer classes would be included in the future if the TOD experiment proves successful with the large electricity users.

The PSC's electric rate decision in *Metropolitan Washington Board of Trade,* much like its gas rate decision in 1976, represent-ed a commendable first step toward a new, more cost- and resource-efficient rate structure. In each case the disruption in the historic rate patterns was tempered appropriately during the transition period, but with strong indications that future rates would be structured on a more cost-realistic basis. The trouble is, now that what was then the future has arrived for WGL's customers, the Commission has regressed toward an even less cost-based rate design.

Therefore, with due recognition of the Commission's wide discretion in setting and structuring rates and of our limited review role, I nevertheless conclude that the PSC stepped well past the bounds of reasonableness in this proceeding. Petitioners have met their burden of showing that the new rate design is not "reasonable, just, and non-discriminatory." D.C.Code 1981, § 43–301. The Commission failed to provide adequate explanation or evidentiary support for the obvious class cross-subsidization. The case should be remanded to the Commission with directions to restructure the rates so as to make them non-discriminatory in nature. The majority's unpersuasive affirmance of the new rate structure is, in my view, an ominous disservice to the citizens, businesses, and governmental entities that use natural gas in the District of Columbia.

II. TREATMENT OF EXPENSES INCURRED FOR ADVERTISING, TRADE ASSOCIATION MEMBERSHIP, AND COMMUNITY AFFAIRS PROGRAMS

At the suggestion of People's Counsel, the Commission—over Commissioner Stratton's dissent—disallowed as above-the-line operating costs $95,000 in general advertising expenses, $56,000 in trade association dues, $130,000 expended in providing information to schools and community groups, and $35,000 in civic and business support payments. The Commission's rationale in so doing, which is echoed by the majority here on appeal, is that "the Company failed to prove that these expenditures directly benefited the ratepayers," and thus they should be borne by the Company's shareholders. *Ante,* at 78, 87. While I recognize

that a number of factors recently has led a number of state commissions to adopt restrictive policies on the allowance of advertising and public affairs expenses, I do not believe that a "failure to prove" that each item of expense "directly benefits" the customers properly may be invoked as the sole basis for shifting the entire onus of those expenses to the utility's stockholders. It is particularly unreasonable to adopt such a policy in this proceeding, in light of the Commission's heretofore unvarying practice of recognizing all such expenses for rate-making purposes.

Commissioner Stratton aptly summed up the arbitrariness of the Commission majority's action in this respect:

> The total elimination from the cost of service of expenses for advertising, trade association dues, dues to civic and business associations, and community affairs programs is misguided overkill. Every organization, business or governmental, must communicate with its clients and customers, and the cost of doing so is a legitimate expense. The irony that those who object most strongly to the recognition of communication and outreach expenses in rates are often those whose activities make increased communication necessary only emphasizes the point. Like every expense, these must be reasonable in amount. If this Commission's past practice of allowing all such expenses which are recorded in above the line accounts be thought too uncritical, the remedy is to correct it either through rule-making (as has been done in New York) or through a more careful analysis of these expenses in the context of the rate proceeding, but not an abrupt rever-

sal of long-standing Commission policy. [Order No. 6060, at 54–55 (Stratton, C., dissenting).]

### A. Advertising Expenses

The Commission's decision to change its prior policy so as to disallow WGL's advertising expenses for rate-making purposes was precipitated by the testimony of People's Counsel's witness Sack. He stated:

> In light of the Company's restrictions concerning connecting of new customers, I did not consider it appropriate to have the ratepayer provide funds for advertising when such advertising may be in vain.[16]

In its brief before the Commission, People's Counsel further alleged that WGL's advertising was "image building" in nature, intended solely to improve the utility's stature in the community. As such, People's Counsel argued, the Company's advertising expenses should be borne entirely by the stockholders.

On cross-examination by WGL's counsel, Sack admitted that he had made no effort to ascertain the actual nature of the advertising in question. He acknowledged that his characterization of the advertising as "image building" was based merely upon "speculation ... of what the descriptive titles would imply."

In his prepared rebuttal testimony, WGL's witness Unkle responded to Sack's assertions as follows:

> Q. Will you please discuss the nature of the advertising expenses which Mr. Sack eliminated from the cost of service.

---

**16.** Sack did not explain, and it is not clear from the record, exactly to what restrictions he was referring. I note, however, that in May 1978 the PSC authorized WGL to expand its annual firm service obligation by 5,000,000 therms to a maximum of 3,000 new customers. *Washington Gas Light Co.,* Formal Case 687, Order No. 5998 (May 16, 1978). The Commission determined in that case that the Company's projected gas supplies would be adequate to satisfy the needs of both old and new customers through the year 2000. *Id.,* at 6. It concluded:

> The prognostication for future supplies is such that, maintaining a margin for error, it is fair to conclude that the Company will not only hold its own but increase the energy available for delivery to its customers by some five percent in the fairly near term, and that this higher level of supply can reasonably be expected to continue and even rise moderately through the end of this century. [*Ibid.*]

A. The $95,000 of general advertising costs included in the Administrative and General Expense relates to advertising which, in common terminology, would be described as "informational" in character. The advertising addresses two specific issues of great concern to our customers— the gas supply situation and the rising cost of gas. It is entirely proper and right that our company address these issues in communicating with customers.[17]

Despite the paucity of support in the record for People's Counsel's allegations, the Commission for the first time imposed upon the Company the burden to "come forward with a detailed presentation" of how its advertising directly benefited its customers. Order No. 6051, at 69. I believe it was arbitrary for the Commission *ex post facto* to impose such a burden upon WGL, and I do not believe it was reasonable to conclude that absent such a detailed showing the advertising in question must be presumed to benefit only the Company's stockholders.

In 1935, the Supreme Court held that a state utilities commission's disallowance of a gas distributor's promotional advertising expenses was an unconstitutional usurpation of management prerogative. *West Ohio Gas Co. v. PUC*, 294 U.S. 63, 55 S.Ct. 316, 79 L.Ed. 761 (1935). Justice Cardozo, writing for the Court, stated:

> Good faith is to be presumed on the part of the managers of a business. In the absence of a showing of inefficiency or improvidence, a court will not substitute its judgment for theirs as to the measure of a prudent outlay. The suggestion is made that there is no evidence of competition. We take judicial notice of the fact that gas is in competition with other forms of fuel, such as oil and electricity. A business never stands still. It either

grows or decays. Within the limits of reason, advertising or development expenses to foster normal growth are legitimate charges upon income for rate purposes as for others. When a business disintegrates, there is damage to the stockholders, but damage also to the customers in the cost or quality of service. [*Id.*, 294 U.S. at 72, 55 S.Ct. at 321 (citations omitted).]

*West Ohio Gas* has been interpreted as establishing that, once the company has made out a prima facie case that an advertising expense was incurred, the burden rests with the Commission's staff (or any other interested party) to prove that the expense was unreasonable because of wastefulness, inefficiency, or bad faith. *Boise Water Corp. v. PUC*, 97 Idaho 832, ——, 555 P.2d 163, 169 (1976), citing *West Ohio Gas, supra*, 294 U.S. at 72, 55 S.Ct. at 321; see Note, *Advertising by Public Utilities as an Allowable Expense for Ratemaking: Assault on Management Prerogative*, 13 Val.U.L.Rev. 87, 119–20 (1978). In this case WGL, relying upon the Commission's long-established practice of approving all advertising expenses listed in the firm's General and Administrative Expenses account, produced evidence that it had spent $95,000 on "informational" advertising which dealt with "the gas supply situation and the rising cost of gas." This should have been sufficient to establish a prima facie showing of reasonable informational advertising expenditures, subject to proof by the Staff or People's Counsel to the contrary. People's Counsel's witness made an allegation that the advertising was strictly for "image" building and that it was inappropriate as an operating expense in light of WGL's restrictions concerning

---

17. On cross-examination, Unkle acknowledged that the Company recorded the $95,000 in disputed advertising expenses in Account 930.1 of the FERC Uniform System of Accounts. According to an explanatory note accompanying Account 930.1, properly includable in that account is "the cost of advertising activities on a local or national basis of a goodwill or institutional nature, which is primarily designed to improve the image of the utility or the industry .... " However, Unkle disavowed any reliance by the Company on the "technical wording" of the Uniform System of Accounts, maintaining that the advertising was "informational" in nature. All parties seem to agree that "informational" advertising properly would be includable in the Company's cost of service.

the connecting of new customers.[18] He admitted, however, that he had no idea what the subject matter of the ads had been. The PSC nevertheless concluded that "[f]aced with this challenge, WGL should have come forward with a detailed presentation." Order No. 6051, at 69. In so ruling, the Commission erroneously shifted the burden of proof back to the Company upon nothing more than a bald allegation by People's Counsel's witness.

I also do not think that the allowance of advertising costs as an operating expense should hinge on whether the advertising is classified as "informational," "promotional," or "institutional." The utility's management must have the discretion to make decisions on advertising, and the costs of advertising should be treated as valid operating expenses so long as they are reasonable in amount and the advertising is designed to serve some legitimate utility purpose. While *West Ohio Gas* involved "promotional" advertising, its holding logically has been extended to cover "institutional" (*i.e.,* goodwill or image-building) advertising as well. In *New England Telephone and Telegraph Co. v. Department of Public Utilities,* 360 Mass. 443, 275 N.E.2d 493 (1971), the Supreme Judicial Court of Massachusetts quoted approvingly from a New York PSC decision:

> What is of concern here are advertisements which are obviously designed to project a favorable image of the company to its customers, its existing stockholders or potential investors. To the extent that such advertising fosters sound consumer relations or encourages people to invest in the company, it seems clear that the consumers, as well as the stockholders, are ultimately benefitted through the lessening of the expense of doing business. * * In conclusion, it is determined that in view of the fact management should control advertising expenditures as long as they are within the limits of reason, and so long as these expenses do not exceed what is reasonably necessary and proper

in the particular case ... there is no ground to distinguish such costs from other necessary and proper expenses. [*Id.,* 360 Mass. at 485, 275 N.E.2d at 518, *quoting In re Consolidated Edison Co. of N. Y.,* 41 P.U.R.3d 305 (N.Y. PSC 1962).]

More recently, the Supreme Court of Alabama wrote pointedly in addressing the same issue:

> Although subject to regulation by the government, a utility, like any corporation, should be allowed to operate consistent with the free enterprise system to the extent possible.
>
> Advertising is of vital importance to corporations in establishing and maintaining their public image, as well as in educating the consuming public. As such, it is a responsibility of the duly authorized manager of a utility to decide the type, quantity, or form of advertising which would most benefit the corporation in its continued growth. The utility has the initial right to decide the amount and type of advertisement which comports with good management practices. The function of the Alabama Public Service Commission is that of regulation, and not of management. Petition of *New England Tel. & Tel. Co.,* 115 Vt. 494, 66 A.2d 135 (1949). The Commission should not be allowed to interfere with the proper operation of the utility as a business concern by usurping managerial prerogatives. [*Alabama Power Co. v. PUC,* 359 So.2d 776, 780 (Ala.1978).]

After quoting with approval from *West Ohio Gas,* the court concluded:

> Advertising, under *honest, efficient,* and *economical management,* can be an operating expense and reasonable advertising costs expended by a public utility should be allowed. [*Ibid.*]

*See Central Maine Power Co. v. PUC,* 153 Me. 228, 243–46, 136 A.2d 726, 736–37 (1957); *In re New England Telephone & Telegraph Co.,* 115 Vt. 494, 509–12, 66 A.2d

---

**18.** The "restrictions" to which he evidently was referring were not very restrictive at all. *See* n.16, *supra.*

135, 145–46 (1949); *see also El Dorado v. PSC,* 235 Ark. 812, 825, 362 S.W.2d 680, 688 (1962); *Southern Bell Telephone & Telegraph Co. v. PSC,* 203 Ga. 832, 49 S.E.2d 38, 65 (1948); *State ex rel. North Carolina Utilities Commission v. Piedmont Natural Gas Co.,* 254 N.C. 536, 550–52, 119 S.E.2d 469, 479–80 (1961); *Commonwealth v. Virginia Electric and Power Co.,* 211 Va. 758, 772, 180 S.E.2d 675, 685 (1971), *aff'd In re Virginia Electric Power Co.,* 84 P.U.R.3d 1 (Va. SCC 1970); *General Telephone Co. of Wisconsin v. PSC,* 46 P.U.R.3d 1, 5 (Wis.Cir.Ct. 1962).

As the majority notes, a number of state commissions recently have begun to disallow promotional and/or institutional advertising expenses as operating costs. Some of the decisions were the result of concerns that promotional advertising was unwise in the face of then-critical energy shortages. Others simply concluded that institutional or goodwill advertising categorically is of no benefit to the consumer. I am unaware of any such opinion which even attempts to explain its departure from the principles laid out in *West Ohio Gas* and its progeny.[19] Nevertheless, however excusable the silent abandonment of *West Ohio Gas* might be in other individual cases, this case presents no special circumstances which would justify such a departure.[20] At the very least, the Company deserves some advance notice that the Commission is changing its long-standing policy so that it may be prepared to defend its advertising decisions in more detail.

In summary, I believe the Commission and the majority of this court have erred

**19.** *See* Note, *Advertising by Public Utilities as an Allowable Expense for Ratemaking: Assault on Management Prerogative, supra,* in which the author criticizes the trend among state commissions toward disallowance of advertising expenses as an improper usurpation of management discretion in violation of the Supreme Court's opinion in *West Ohio Gas.*

**20.** The Supreme Court recently ruled that the New York PSC constitutionally could not ban an electric utility from advertising to promote the use of electricity. *Central Hudson Gas & Electric Corp. v. PSC of New York,* 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980). The Court found that the State's interest in energy conservation was substantial, but held that the commission had not shown that such an interest could not be protected adequately by more limited regulation of the utility's commercial expression. *Id.,* 447 U.S. at 569–70, 100 S.Ct. at 2353. Although the decision in *Central Hudson* was based on free speech considerations and thus did not deal precisely with the question presented here, the Court confirmed the continuing validity of *West Ohio Gas:*

> Monopoly over the supply of a product provides no protection from competition with substitutes for that product. Electric utilities compete with suppliers of fuel oil and natural gas in several markets, such as those for home heating and industrial power. This Court noted the existence of interfuel competition 45 years ago, *see West Ohio Gas Co. v. Public Utilities Comm'n,* 294 U.S. 63, 72, 55 S.Ct. 316, 321, 79 L.Ed. 761 (1935). Each energy source continues to offer peculiar advantages and disadvantages that may influence consumer choice. For consumers in those competitive markets, advertising by utilities is just as valuable as advertising by unregulated firms.

> Even in monopoly markets, the suppression of advertising reduces the information available for consumer decisions and thereby defeats the purpose of the First Amendment. The New York court's argument appears to assume that the providers of a monopoly service or product are willing to pay for wholly ineffective advertising. Most businesses—even regulated monopolies—are unlikely to underwrite promotional advertising that is of no interest or use to consumers. Indeed, a monopoly enterprise legitimately may wish to inform the public that it has developed new services or terms of doing business. A consumer may need information to aid his decision whether or not to use the monopoly service at all, or how much of the service he should purchase. In the absence of factors that would distort the decision to advertise, we may assume that the willingness of a business to promote its products reflects a belief that consumers are interested in the advertising. [*Id.,* 447 U.S. at 567–68, 100 S.Ct. at 2352 (footnotes omitted).]

In a footnote to the above-quoted passage, the Supreme Court added:

> There may be a greater incentive for a utility to advertise if it can use promotional expenses in determining its rate of return, rather than pass those costs on solely to shareholders. That practice, however, hardly distorts the economic decision whether to advertise. Unregulated businesses pass on promotional costs to consumers, and this Court expressly approved the practice for utilities in *West Ohio Gas . . . .* [*Id.,* 447 U.S. at 568 n.11, 100 S.Ct. at 2352 n.11.]

both with respect to the allocation of the burden of proof and by drawing unsupported conclusions as to the value of the advertising involved to WGL's consumers. I would remand this issue to the Commission with instructions to make an appropriate adjustment.

### B. *Trade Association Dues*

For essentially the same reasons that pertain to the issue of advertising expenses, it was arbitrary and unreasonable for the Commission to have excluded from operating costs the entire $56,000 expended by WGL for trade association dues. In affirming the disallowance, the majority states that the PSC's action was reasonable "in the absence of evidence that AGA activities benefited customers." *Ante,* at 1229. I am at a loss to see how the Company can be expected to demonstrate a corresponding consumer benefit for each dollar spent on AGA dues. Such a requirement places an almost unsurmountable burden of proof upon the Company.

The Company's management deserves considerable discretion in determining whether such membership is in the best interest of the utility. Where it appears that association membership may improve the overall efficiency of the utility's operation, its cost should be allowed, at least in substantial part, as a legitimate cost of doing business. The uncontradicted evidence of record reflects that the AGA serves as a valuable pool of resources for its member distributors. It provides informational as well as research and development services to its members at a much lower per-member cost than would be possible if each member company were to conduct those activities itself. To the extent that the AGA engages in political or other activities which reasonably could not be expected to benefit consumers even indirectly, perhaps the Commission could apportion an appropriate part of the membership dues to the stockholders. A total exclusion of the entire membership fee from the Company's operating expenses, however, assuredly is not justified.

The purpose of the Commission's oversight of a utility's operating costs is to prevent monopolistic exploitation in the form of exorbitant returns or wasteful expenditures. Insofar as a utility's operating expenses are consistent in nature and amount with those incurred by competitive businesses, they should be allowed. It goes without saying that the concept of trade association membership is hardly unique to monopolistic enterprises. Competitive industries, businesses, and professions almost invariably are served by trade associations, and the individual members may be expected to pass the costs (and the benefits) of association membership on to their customers.

In the past, the PSC has allowed such dues as an operating expense. A number of other state commissions similarly include these costs above-the-line. *See, e.g., In re Peoples Gas System, Inc.,* 11 P.U.R.4th 505 (Fla. PSC 1975) (abstract); *In re Southwestern Bell Telephone Co.,* 28 P.U.R.4th 519, 537 (Kan. SCC 1979); *In re Rules and Regulations Covering Rate Case Treatment of Certain Expenses,* 30 P.U.R.4th 338, 343 (N.M. PSC 1979); *In re Columbus and Southern Ohio Electric Co.,* 24 P.U.R.4th 261, 287 (Ohio PUC 1978). In my view, the Commission's action on this expense item was arbitrary, unreasonable, and unsupported by evidence in the record. I therefore disagree with the majority on this point, too, and would remand for an appropriate adjustment.

### C. *Community Affairs Expenses*

Again, I cannot concur in the Commission's and the majority's treatment of community affairs expenses for essentially the same reasons that apply to the two expense items just discussed.

Despite the vague allegation by People's Counsel's witness Sack that WGL's community affairs activities are "clearly to enhance the public image of the Company," the record unquestionably reflects that the program is primarily informational in nature. WGL sends out speakers, at the invitation of schools and community groups, to

talk about matters relating to gas service such as fuel conservation, safety considerations, the two-part billing system, estimated billing, the gas supply situation, and the rising cost of gas. On cross-examination by WGL's counsel, Sack admitted that his characterization of the Company's speakers program as "one of enhancing the public image of the Company" was based solely on speculation. In prepared rebuttal testimony, WGL's witness Unkle told the Commission:

> Talking about such subjects to community groups is one important way our Company can provide information about subjects of vital concern both to us and our customers.
>
> Mr. Sack is wrong when he says these activities are undertaken to enhance our image. That is not the purpose of our community activities. The purpose is to communicate with customers on those subjects about which they want more information. In fact, the Company is under a certain amount of community pressure to engage in such activities. Such expenses are not only proper, but they are vital.

The PSC's action here again constitutes an unreasonable usurpation of management prerogative. Managers of a utility have the discretion, and indeed the duty, to inform their customers about such service-related concerns as safety, conservation, billing, cost-of-service, and so forth. Expenses incurred by virtue of conducting such informational activities, to the extent that they are not excessive or the result of an abuse of managerial discretion, are valid costs of doing business and should be treated as such in the ratemaking process.

The Company's community affairs program is closely akin to the concept of informational advertising, which all parties before us and an overwhelming majority of state commissions agree is a proper above-the-line expense. *See, e.g., In re Consumers Power Co.,* 14 P.U.R.4th 1, 29–30 (Mich. PSC 1976); *In re Northern States Power Co.,* 6 P.U.R.4th 38, 42 (N.D. PSC 1974); *In re Gas Co. of New Mexico,* 21 P.U.R.4th 159, 175 (N.M. PSC 1977); *In re Columbia Gas of Ohio, Inc.,* 25 P.U.R.4th 399 (Ohio PUC 1978); *Re Utility Advertising Expenditures,* 14 P.U.R.4th 578 (Ore. PUC 1976) (abstract); *Pennsylvania PUC v. Peoples Natural Gas Co.,* 28 P.U.R.4th 180 (Pa. PUC 1978); *In re Northwestern Bell Telephone Co.,* 15 P.U.R.4th 289 (S.D. PUC 1976); *In re Wisconsin Power & Light Co.,* 4 P.U.R.4th 305 (Wis. PSC 1974). The Florida PSC has promulgated rules specifically providing that community activities of the type in question here are legitimate costs of service. *See In re Promotional Practices of Electric Utilities,* 8 P.U.R.4th 268, 276 (Fla. PSC 1975). Even the majority acknowledges informational advertising as a legitimate above-the-line expense item. *See ante,* at 1230. However, the majority then retreats to its familiar and transparent posture with respect to the Company's burden of proof:

> As the Company has primary control of its own records, there is no injustice in allotting to the Company the initial responsibility for demonstrating the reasonableness of above-the-line charges to its ratepayers.
>
> The sparse record with respect to the challenged community affairs expenses consists merely of cross-allegations as to the nature and purpose of the speakers programs, unsubstantiated by documentary evidence on either side. * * * [*Ante,* at 1230.]

It is difficult to conceive of what further proof could reasonably be expected of the Company on an item such as this. The Company's witness explained the nature of its speakers program, the subjects covered, and the community demand for the program. Perhaps the Commission would wish to see a verbatim transcript of each public appearance by a WGL speaker, but such a monitoring requirement hardly could improve the cost efficiency of the program for either the ratepayers or the stockholders.

The Commission also is misguided in its attempt to equate the speakers program with "forced contributions" to charity. As the record reveals, the Company's communi-

ty activities are not limited to certain charitable organizations, but rather are available to any group, regardless of its nature, that expresses an interest therein. The ratepayers are not being forced to contribute to selected organizations which they otherwise might not choose to support. The only selectivity involved lies in the fact that groups, rather than individuals, are the immediate beneficiaries. However, other more conventional forms of informational communication (which indisputably are proper operating expenses) probably are not equally available to all ratepayers, either. Therefore, the PSC's finding that "only a limited number of community organizations are receiving speakers from WGL" begs the issue.

On the other hand, I do concur with the majority in affirming the disallowance of WGL's contributions to various business and civic organizations. The Company's direct monetary contributions to those organizations—unlike its informational speakers program—are tantamount to contributions to charitable concerns. Although even regulated companies are under a great deal of community pressure to make such donations, the question of whether ratepayers should finance this largesse is a sensitive one. While state commissions and reviewing courts are divided on the appropriateness of including civic support payments in the cost of service, see Annot., *Charitable Contributions by Public Utility as Part of Operating Expenses,* 59 A.L.R.3d 941 (1974), I agree that it was within the PSC's discretion to find that WGL's customers should not be compelled through rate payments to make contributions to organizations which they independently might not wish to support.

### III. OTHER ISSUES AND OBSERVATIONS

Apart from the issues which I have discussed, I join the majority in finding no reversible error in the other challenged aspects of the Commission's orders. Nevertheless, in this, my last opinion as an active member of this court, I feel compelled to comment upon the Commission's apparent perception of its role in setting utility rates. *See also Potomac Electric Power Co. v. PSC,* D.C.App., 402 A.2d 14, 27 (en banc) (HARRIS, J., dissenting), *cert. denied,* 444 U.S. 926, 100 S.Ct. 265, 62 L.Ed.2d 182 (1979).

It cannot be a coincidence that virtually every contested issue throughout the course of this proceeding was decided adversely to the Company. The Commission in recent years has shown an unmistakable predisposition to treat WGL and the city's electric energy supplier, Potomac Electric Power Company, as some sort of miscreants who unilaterally are to blame for higher energy costs. In this case, as in others, the Commission simply has not lived up to its duty to balance the ratepayers' interest in preventing unduly high rates with the utility shareholders' legitimate interest in having the Company have the opportunity to earn a fair rate of return.

One must wonder why WGL's authorized return on equity is at the bottom end of the "zone of reasonableness" in comparison with comparable gas distributors; why the Company is granted no attrition allowance despite clear evidence of consistent regulatory lag and the fact that the Company has been unable to earn anywhere near its authorized rate of return in recent years; and why the PSC denied each of the Company's far from outlandish requests for rate relief on such items as tax normalization, consolidated tax savings, and the treatment of gains on sales of propane reserves. Moreover, one must wonder how the Commission rationally could conclude, following more than a decade of rampant inflation, cost increases, and high interest rates, that the Company's authorized rate of return on equity should be *reduced* from 13.25 percent to 13 percent.

I sincerely hope the Commission is not so single-purposed as to ignore the fact that financial health is essential to the provision of reliable utility service. The regulation of natural monopolies requires give-and-take on both sides. If the utility consistently is required to do all the giving, no one can benefit in the long run and one day there may be nothing left to take.

Finally, I direct attention to the fallacy in what apparently is the underlying basis for the majority's acquiescence in all aspects of the orders under review. On p. 1194, *ante,* the majority takes the position that

if the Commission has fully and clearly explained what it does and why it does it, and the agency decision is supported by substantial evidence, the court, upon a finding that the Commission order is reasonable in its overall effect, should sustain the order.

It is not for me to speculate as to whether the majority genuinely believes that that unsupported assertion truly describes our standard of review. I readily state, however, that only by applying such a distorted concept of the proper review standard may the orders under review be sustained in all respects. No one should be misled into believing that the quoted statement may alter existing law. Utilities and their investors, no less than others, still have constitutional rights. Utilities still have common law rights which have been set forth in many decisions which need not be cited again here. Utilities also still have statutory rights. Among them is this court's obligation to reject findings by the Commission which "are unreasonable, arbitrary, or capricious." D.C.Code 1973, § 43–706. Also existing, as noted above, is the following statutory proscription:

The charge made by any . . . public utility for any . . . services furnished, or rendered, . . . shall be reasonable, just, and nondiscriminatory. Every unjust or unreasonable or discriminatory charge for such . . . service is prohibited and is hereby declared unlawful. [*Id.,* § 43–301.]

The majority's "see-no-error, hear-no-error" approach to this case, coupled with its purported belief that nothing matters except "the overall effect" as long as any deviant component of a rate order somehow is explained, may persuade it that total affirmance is appropriate in this case. It does not persuade me, however, nor can I conceive that it persuades even the minimally knowledgeable objective reader.

For the reasons set forth above, while I concur in the affirmance of some of the Commission's challenged rulings, I conclude that reversible error was committed in the portions of the orders under review which I have discussed in detail. Accordingly, I respectfully dissent in part.